1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

The Honorable Barbara J. Rothstein

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TELEBUYER, LLC,

                Plaintiff and
                Counterdefendant,

     v.

AMAZON.COM.INC., *et al.*,

                Defendants and
                Counterclaimants.

Case No. 2:13-cv-01677-BJR

**PLAINTIFF TELEBUYER, LLC'S
OPENING CLAIM CONSTRUCTION
BRIEF**

**<u>DUE DATE (RESPONSIVE BRIEF)</u>:
OCTOBER 7, 2014**

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF
NO. 2:13-cv-01677-BJR



YARMUTH WILSDON PLLC

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1

## TABLE OF CONTENTS

2
**Page(s)**

3  I.   INTRODUCTION ................................................................................................. 1

4  II.  LEGAL STANDARDS ....................................................................................... 4

5  III. DISPUTED TERMS FOR CONSTRUCTION ................................................... 6

6       A.   The "Control" Terms ............................................................................... 6

            1.   Telebuyer's Constructions Are The Plain Meanings Of The Terms ........ 8

7           2.   The "Control" Terms Connote Sufficient Definite Structure And
                 Are Not Functional Limitations Governed By §112(f)............................ 14

8
            3.   Amazon's Claim Construction And Indefiniteness Analysis
9                Contradicts Established Law.............................................................. 17

10      B.   "Site" ...................................................................................................... 22

11      C.   The "Video Memory" And "Storage Memory" Terms........................... 24

            1.   The "Memory" Terms Have A Well-Understood Plain Meaning
12               And Connote Sufficiently Definite Structure ........................................... 25

13          2.   The "Memory" Terms Do Not Recite Functional Limitations And
                 Are Not Indefinite ................................................................................ 27

14      D.   The "Processor Capability" Terms ........................................................ 29

15          1.   The "Processor Capability" Terms Connote Structure And Are Not
                 Functional Limitations Governed By §112(f)........................................ 30

16          2.   The "Processor Capability" Terms Are Not Indefinite........................... 31

17      E.   The "Still Video" and "Dynamic Video" Terms .................................... 32

18          1.   Telebuyer's Constructions Are Consistent With the Claims,
                 Specification, and File Histories ............................................................. 32

19
            2.   "Dynamic" Video Is Not Indefinite And Does Not Mean Live or
20               Unrecorded............................................................................................ 33

21      F.   The "Proposed Data" And "Request Data" Terms ............................... 34

     IV.  CONCLUSION................................................................................................. 35
22
23

24

25

26

27

YARMUTH  WILSDON PLLC
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

1

# TABLE OF AUTHORITIES

2

Page(s)

3

*Cases*

4

*Agere Systems, Inc. v. Broadcom Corp.*,
 2004 U.S. Dist. LEXIS 14187 (E.D. Pa., Jul. 20, 2004) ...................................................... 30

5

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,
6    616 F.3d 1249 (Fed. Cir. 2010) ........................................................................................ 17, 34

7 *Biax Corp. v. Intel Corp.*,
 2007 U.S. Dist. LEXIS 14250 (E.D. Tex., March 1, 2007) .................................................. 30

8

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
9    296 F.3d 1106 (Fed. Cir. 2002) ............................................................................................ 19

10 *Data General Corp. v. International Business Machines Corp.*,
 93 F. Supp. 2d 89 (D. Mass. 2000) ....................................................................................... 30

11

*F5 Networks, Inc. v. A10 Networks, Inc.*,
12    2011 U.S. Dist. LEXIS 73689 (W.D. Wash. July 8, 2011) .................................................. 10

13 *Flo Healthcare Solutions, LLC v. Kappos*,
 697 F.3d 1367 (Fed. Cir. 2012) ........................................................... 5, 14, 15, 25, 28, 30

14

*General Electric Co. v. Sonosite, Inc.*,
15    580 F. Supp. 2d 743 (W.D. Wis. 2008) ............................................................................... 25

16 *Hill-Rom Servs. v. Stryker Corp.*,
 755 F.3d 1367 (Fed. Cir. 2014) ..................................................................... 4, 5, 8, 21, 35

17

*In re Katz Interactive Call Processing Patent Litigation*,
18    639 F.3d 1303 (Fed. Cir. 2011) ........................................................................................... 31

19 *InterDigital Communs., LLC v. ITC*,
 690 F.3d 1318 (Fed. Cir. 2012) ........................................................................................... 18

20

*IP Innovation, LLC v. Red Hat, Inc.*,
21    2009 U.S. Dist. LEXIS 69682 (E.D. Tex., Aug. 10, 2009) .................................................. 25

22 *LG Electronics, Inc. v. Bizcom Electronics, Inc.*,
 453 F.3d 1364 (Fed. Cir. 2006) ........................................................................................... 16

23

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
24    382 F.3d 1354 (Fed. Cir. 2004) ....................................................................... 3, 5, 14, 16, 19

25 *Lucent Technologies, Inc. v. Newbridge Networks Corp.*,
 168 F. Supp. 2d 181 (D. Del. 2001) ..................................................................................... 16

26

*Luma Corp. v. Stryker Corp., et al.*,
27    2005 U.S. Dist. LEXIS 40884 (S.D. W. Va., July 27, 2005) ............................................... 26



**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Mallinckrodt, Inc., v. Masimo Corp.*,
    254 F. Supp. 2d 1140 (C.D. Cal. 2003) ............................................... 30

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996)............................................................................. 4

*Motorola, Inc. v. VTech Communications, Inc.*,
    2009 U.S. Dist. LEXIS 59226 (E.D. Tex., Jul. 6, 2009)...................... 30

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) ........................................................................ 34

*Negotiated Data Solutions, LLC v. Dell, Inc.*,
    596 F. Supp. 2d 949 (E.D. Tex. 2009) (same) .................................... 16

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)........................................................... 20

*Optimal Rec. Solutions v. Leading Edge Techs.*,
    6 Fed. Appx. 873 (Fed. Cir. 2001) ...................................................... 27

*Personalized Media Communs., LLC v. ITC*,
    161 F.3d 696 (Fed. Cir. 1998)....................................................... 19, 26

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)........................................... 4, 8, 13, 33

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
    438 F.3d 1136 (Fed. Cir. 2006)........................................................... 22

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001)..................................................... 14, 23

*Rowe v. Dror*,
    112 F.3d 473 (Fed. Cir. 1997)............................................................. 20

*Salazar v. Procter & Gamble Co.*,
    414 F.3d 1342 (Fed. Cir. 2005)........................................................... 22

*Sprint Communications Co. L.P. v. Big River Telephone Co., LLC*,
    2009 U.S. Dist. LEXIS 58161 (D. Kan., Jul. 8, 2009)........................ 16

*St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc.*,
    412 Fed. Appx. 270 (Fed. Cir. 2011) .................................................. 10

*TecSec, Inc. v. IBM Corp.*,
    731 F.3d 1336 (Fed. Cir. 2013).................................................... 4, 27

*Visto Corp. v. Seven Networks, Inc.*,
    2005 U.S. Dist. LEXIS 46113 (E.D. Tex., Apr. 20, 2005) .................. 26

YARMUTH WILSDON PLLC
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*WeddingChannel.com, Inc. v. Knot, Inc.*,
   2005 U.S. Dist. LEXIS 991 (S.D.N.Y., Jan. 26, 2005)........................................................ 27

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
   239 F.3d 1225 (Fed. Cir. 2001)........................................................ 20

*WesternGeco LLC v. ION Geophysical Corp.*,
   735 F. Supp. 2d 623 (S.D. Tex. 2010) ........................................................ 16, 23

*Wi-LAN USA, Inc. v. Alcatel-Lucent USA, Inc.*,
   2013 U.S. Dist. LEXIS 128181 (S.D. Fla. Sept. 9, 2013) ................................................ 28, 31

*Statutes*

35 U.S.C. §112(f)........................................................ 3, 4, 5, 11, 14, 19, 25, 26, 27, 28, 29, 30, 31

*Other Authorities*

Local Patent Rule 131(a) ........................................................ 3

Local Patent Rule 132(b) ........................................................ 3

Local Patent Rule 132(c) ........................................................ 2, 19



YARMUTH  WILSDON PLLC
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

## I.   __INTRODUCTION__

In this suit, Telebuyer seeks redress for Amazon's ongoing and widespread infringement of seven groundbreaking patents: U.S. Patent Nos. 6,323,894 ("'894 Patent"); 7,835,508 ("'508 Patent"); 7,835,509 ("'509 Patent"); 7,839,984 ("'984 Patent"); 8,059,796 ("'796 Patent"); 8,098,272 ("'272 Patent"); and 8,315,364 ("'364 Patent") (collectively, the "Patents-in-Suit").[1] The asserted independent claims of the Patents-in-Suit are listed in Appendix 2.

In 1994, Mr. Ronald Katz invented an innovative traffic control system that facilitates electronic commerce (e-commerce) between multiple buyers and vendors. *See, e.g.*, '894 Patent at 3:40-65.[2] Each traffic control system is implemented with a network of interconnected computers, including, for example, a control computer, a file server, an operator station, an interface system, and other components. *Id.* at Fig. 5. This novel traffic control system is designed to efficiently facilitate communications between multiple vendors and buyers using a computer network. *See id.* at 4:67-5:6. The invention discloses a highly scalable architecture—the overall system can be implemented with a single, central control system (providing a central site) or a distributed network of interconnected and coordinated control systems. *See id.* at 5:16-22. The disclosed system enables a number of then revolutionary features, including, for example, motion video presentations, product recommendations based on a buyer's area of interest, post-transaction email confirmations, storing of metrics, rating of vendors, and vendor prioritization.

Although the Patents-in-Suit disclose using a dial-up telephone system as part of an exemplary embodiment, they do not—as Amazon argues—restrict the invention to a dial-up system. Rather, the Patents-in-Suit explain that the disclosed invention facilitates communications through an electronic network, and is not limited to a particular way of accessing that network:

> Communication between the routing system and the different buyers and
> vendors may be accomplished in a variety of ways, as for example, by

---

[1] The Patents-in-Suit are attached to the Joint Claim Construction Statement as Dkt. No. 132, Ex.B ('894 Patent), Ex. D ('508 Patent), Ex. F ('509 Patent), Ex. H ('984 Patent), Ex. J. ('796 Patent), Ex. L ('272 Patent), and Ex. N ('364 Patent).

[2] Because the Patents-in-Suit share substantially the same specification, the parties have agreed to cite to U.S. Patent No. 6,323,894 (Dkt. No. 132, Ex. B) for all specification cites. *See* Dkt. No. 132 at 3 n.1.

> electronic-mail (transmission of messages across a network between two desktop PCs), electronic bulletin boards, on-line computer services (such as Prodigy[TM] or CompuServe[TM]), facsimile, voice-mail or the like.

*Id.* at 4:67-5:6.  Indeed, during prosecution of the Patents-in-Suit, Telebuyer apprised the examiner of the known use of the World Wide Web by "online access via a computer to a vendor site" as one exemplary method of communication.  *See* Dkt. No. 132-20 at 67.

Consistent with well-settled law, Telebuyer proposes to construe the disputed claim terms to accurately reflect the full scope of the invention disclosed in the Patents-in-Suit, and the plain meaning of the claim terms as they would be understood by a person of ordinary skill in the art at the time of the invention.[3]  Telebuyer's proposed constructions are well supported by the intrinsic record (*i.e.*, the patents' specification, the claims, and the prosecution history)[4] and dozens of contemporaneous patents and technical references that use the same terms in a manner consistent with Telebuyer's constructions.

In stark contrast, Amazon takes positions that are unsupported by, and in many instances directly contrary to, the law and the evidence.  Indeed, it is clear that Amazon seeks to use this claim construction process as an early summary judgment motion.  In a blatant attempt to circumvent Local Patent Rule 132(c)—which requires identification of the ten most important disputed claim terms for construction—Amazon grouped together **23 different claim limitations** (what it calls the "control" terms) as a single term and argues they should all have the same construction.[5]  But Amazon does not even propose definitions for these terms.  Instead, it argues that they should all be viewed as "means-plus-function" limitations and found indefinite under 35

---

[3] Appendix 1 identifies the parties' respective positions for all claim terms addressed in this brief.

[4] The specification is the body of the patent, which provides a written description of the invention.  The claims, located at the end of the specification, define the metes and bounds of the right conferred by the patent.  The prosecution history is a record of the proceedings before the USPTO during the application process of a patent.

[5] Because of Amazon's improper "grouping" of claim terms, the parties were unable to agree on how the terms should be counted for purposes of identifying the ten most important terms.  *See* Dkt. No. 132 at 3-15.  Absent resolution by the Court, Telebuyer agreed as a compromise to brief more than ten terms, as Telebuyer counts them.  *See* Dkt. No. 149 at 1 n.1.  Telebuyer defers to the Court as to whether this is an appropriate resolution or whether only the first ten terms, as properly counted, should be addressed at the claim construction hearing.

YARMUTH WILSON PLLC
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1    U.S.C. §112(f) (hereafter, "§112(f)").[6] Amazon presents similar arguments for nine other claim

2    limitations, grouped into three "terms" by Amazon. But Amazon's arguments in favor of mean-

3    plus-function construction defy established law. Courts have "seldom held that a limitation not

4    using the term 'means' must be considered to be in means-plus-function form," and there is a

5    strong presumption against such a claim construction. *Lighting World, Inc. v. Birchwood Light-*

6    *ing, Inc.*, 382 F.3d 1354, 1358, 1362 (Fed. Cir. 2004). Disregarding this strong presumption,

7    Amazon asks the Court to find that 32 claim limitations—not a single one of which uses the

8    word "means"—are all means-plus-function limitations and that they are all indefinite.

9        Amazon's strategy of using claim construction to present its invalidity defense is con-

10   firmed by the testimony of its technical expert, Dr. Leonard Forys. In its Disclosure of Prelimi-

11   nary Constructions pursuant to Local Patent Rule 131(a), Amazon did not identify any of the 23

12   "control" terms as means-plus-function terms, did not argue that they were indefinite, and pro-

13   posed a structural construction for them. Berliner Decl., Ex. G at 3.[7] Dr. Forys testified that he

14   spent little time, if any, reviewing Amazon's original constructions. Ex. E ("Forys Dep.") at

15   150:3-21. Indeed, he understood that his role was ***not*** to opine on claim construction, but that he

16   was retained specifically to develop Section 112 defenses. *Id.* at 145:20-146:22. Thus, it is no

17   surprise that Amazon executed a complete about-face by the time the parties exchanged their fi-

18   nal constructions—Amazon withdrew its structural construction for the "control" terms and pre-

19   sented newly concocted §112(f) invalidity arguments in its portion of the Joint Claim Construc-

20   tion and Prehearing Statement submitted under Local Patent Rule 132(b). Dkt. No. 132-1 at 1-2.

21       Dr. Forys' eleventh-hour invalidity opinions are baseless, contrary to the plain facts, and

22   hinge on a misunderstanding and fundamental misapplication of the law. Instead of starting with

23   the presumption that §112(f) is inapplicable to the disputed claim terms—as the law requires—

24   Dr. Forys assumes that these terms should be interpreted as means-plus-function limitations.

25       [6] Prior to 2011, 35 U.S.C. §112(f) was referred to as 35 U.S.C. §112, ¶ 6.

26       [7] Unless specified otherwise, all citations to exhibits refer to the exhibits attached to the Declaration of Brian
     M. Berliner, filed concurrently herewith.

27

YARMUTH WILSDON PLLC

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1   Then, Dr. Forys pieces together "functions" that are either wrenched out of context from other

2   claim limitations or imported from the specification.   Armed with these bogus "functions,"

3   Dr. Forys opines they demonstrate that the terms are governed by §112(f), and uses them to iden-

4   tify narrow corresponding structure from the specification.   Lastly, Dr. Forys summarily con-

5   cludes that the narrow structure he identified is insufficient to perform the functions he fabricat-

6   ed, which (conveniently) renders all 32 claim limitations indefinite and all asserted claims in this

7   case invalid.   Dr. Forys' reasoning is circular and unsupported, and Amazon's invalidity argu-

8   ments have no foundation.   Amazon has not identified any evidence that comes close to rebutting

9   the strong legal presumption that the disputed claim terms are outside of §112(f).

10       Most claim construction disputes in this case—addressed in Sections III.A, III.C, and

11   III.D—hinge on the very same question: whether the relevant claim terms should be given their

12   plain meaning (as Telebuyer proposes) or construed as means-plus-function limitations (as Ama-

13   zon proposes).   For the remaining terms—addressed in Sections III.B, III.E, and III.F—the dis-

14   pute is whether the terms should be given their plain meaning (once again, as Telebuyer propos-

15   es) or should be limited so narrowly as to be inconsistent with the intrinsic record and extrinsic

16   evidence.   For each disputed claim term, it is clear that only Telebuyer's construction is con-

17   sistent with the law and comports fully with the evidence, and should therefore be adopted.

18  **II.**   **LEGAL STANDARDS**

19       The construction of terms used in a patent claim is a question of law.   *Markman v.*

20   *Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).   To ascertain the scope of claim terms, the

21   Court should look "to the words of the claims themselves, the specification, the prosecution his-

22   tory, and, lastly, any relevant extrinsic evidence."   *TecSec, Inc. v. IBM Corp.*, 731 F.3d 1336,

23   1340 (Fed. Cir. 2013) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315-17 (Fed. Cir. 2005)).

24       "Claim terms are generally given their plain and ordinary meanings to one of skill in the

25   art when read in the context of the specification and prosecution history."   *Hill-Rom Servs. v.*

26   *Stryker Corp.*, 755 F.3d 1367, 1371-72 (Fed. Cir. 2014) (citations omitted).   There are two ex-

27   ceptions to this rule: "1) when a patentee sets out a definition and acts as his own lexicographer,

1    or 2) when the patentee disavows the full scope of the claim term either in the specification or

2    during prosecution." *Id*.  In the absence of a definition or clear disavowal, it is improper to "read

3    limitations from the embodiments in the specification into the claims." *Id*.  The scope of patent

4    claims cannot be limited to the embodiments disclosed by the specification, "even when the

5    specification describes only a single embodiment." *Id*.

6         The construction of claim terms drafted in means-plus-function form—*i.e.,* claim limita-

7    tions "expressed as a means or step for performing a specified function without the recital of

8    structure, material, or acts in support thereof"—is governed by 35 U.S.C. §112(f).  Such claim

9    terms "shall be construed to cover the corresponding structure, material, or acts described in the

10   specification and equivalents thereof." *Id*.

11        If a claim does not use the word "means," however, the Court must presume that it does

12   not contain means-plus-function limitations.  *See Flo Healthcare Solutions, LLC v. Kappos*, 697

13   F.3d 1367, 1373-74 (Fed. Cir. 2012) ("[T]he presumption flowing from the absence of the term

14   'means' is a strong one" that cannot be overcome unless "the claim term fails to recite sufficient-

15   ly definite structure or else recites function without reciting sufficient structure for performing

16   that function.").  Courts should not apply §112(f) "without a showing that the limitation essen-

17   tially is devoid of anything that can be construed as structure." *Id*.  In evaluating whether suffi-

18   ciently definite structure is recited, courts "have not required the claim term to denote a specific

19   structure" but have found it "sufficient if the claim term is used in common parlance or by per-

20   sons of skill in the pertinent art to designate structure, even if the term covers a broad class of

21   structures and even if the term identifies the structures by their function." *Lighting World,* 382

22   F.3d at 1358-60.  A term "understood to describe structure" is not governed by §112(f), whereas

23   a term that is "simply a nonce word or a verbal construct that is not recognized as the name of

24   structure" should be construed using §112(f). *Id*.

25

26

27

## III.   DISPUTED TERMS FOR CONSTRUCTION

### A.   The "Control" Terms

| Claim Term Groups | Telebuyer's Construction | Amazon's Construction |
|---|---|---|
| Group 1: the "system" terms[8] | "a computer system that receives, processes, stores, and sends information [related to commercial transactions]" (bracketed phrase applies only to claim terms reciting "commercial") | Indefinite for functional claiming. To the extent the court disagrees, 35 U.S.C. §112(f) applies as follows:<br><br>Function: Interfacing buyers and/or sellers to control electronic communications for transactions<br><br>Structure: A telephonic interface apparatus for interfacing remote telephonic terminals of the dial-up telephone system as set forth, for example, in the '894 patent at abstract, Fig. 1, Fig. 2, Fig. 5 (TIS) 1:24-30, 3:40-44, 6:66-7:3, 11:8-15, and 19:15-20:30, which is insufficient to perform the function and is therefore indefinite. |
| Group 2: the multiple coordinated systems terms[9] | "one or more groups of networked computer systems that receive, process, store, and send information [related to commercial transactions]" (bracketed phrase applies only to claim terms reciting "commercial") | |
| Group 3: the multiple coordinated "control units" terms[10] | "one or more groups of networked control computers" | |
| Group 4: "central site" and "central control site" | "location of one or more control computers" | |

As both parties' experts agree, the inventions of the Patents-in-Suit can be implemented with a single system (sometimes referred to as a "station"), or by multiple groups of systems working in coordination.  *See* Berliner Decl., Ex. A ("Shamos Opening Report") at ¶140; Ex. C

---

[8] The "system" terms include: "central data system," "commercial transaction communication system," "control system," "central communication control system," "commercial transaction control system," "communication control system," "traffic control system," and "commercial transaction communication control system."

[9] The "coordinated systems" terms include: "one or more multiple coordinated control systems," "one or more of multiple coordinated control systems," "one or more of multiple coordinated communication control systems," "one or more multiple coordinated communication control systems," "one or more multiple coordinated commercial transaction control systems," "one or more multiple commercial transaction control systems," "one or more multiple coordinated control stations," "one or more multiple coordinated central control stations," "one or more central control stations," "one or more multiple coordinated central stations," and "one or more of multiple coordinated one or more central control stations."

[10] The "control unit" terms include: "one or more multiple coordinated control units," and "one or more multiple coordinated central control units."



("Forys Opening Declaration") at ¶36; '894 Patent at 5:15-21.   An exemplary system—controlled by a "control unit" (*i.e.*, "Control Computer (Memory) T16")—is shown in Figure 5 of the Patents-in-Suit, reproduced and annotated below.



**FIGURE 1, Annotated Figure 5 of the Patents-in-Suit**

Within each system, a control unit (a control computer) directs the operation of the other components of the system to facilitate the various communications and operations.  *See* '894 Patent at 19:54-20:11.  Each system may have a single control unit or multiple groups of such control units that operate in coordination with each other.  *See, e.g.,* '984 Patent at claim 1.  Regardless of the specific configuration, the system (or systems) may provide a "central site" by which buyers and vendors access the system and communicate.  *See, e.g.,* '796 Patent at claim 1.  The claims of the Patents-in-Suit use a number of terms to describe variations of the above components.  These terms, identified in the above table, are separated into four groups by Telebuyer. The general hierarchy among the four groups of "control" terms is illustrated, below:

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF - 7
NO. 2:13-cv-01677-BJR

YARMUTH WILSDON PLLC
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1

2



3

4

5

6

7

8

9

10

11

**FIGURE 2, Illustration of the Hierarchy Among the Four Groups of "Control" Terms**

12   Telebuyer proposes to construe these four term groups in accord with their plain and or-

13  dinary meaning when read in the context of the Patents-in-Suit and their prosecution histories.

14  *See Hill-Rom Servs.*, 755 F.3d at 1371.  Amazon takes the untenable position that all 23 terms

15  (which it calls the "control" terms) have the same meaning, that all 23 terms are means-plus-

16  function limitations (even though none of them includes the word "means"), and that all 23 terms

17  are indefinite.  Amazon's position should be rejected because it flagrantly violates established

18  rules of claim construction and contradicts the testimony of its own technical expert.

19  **1.   Telebuyer's Constructions Are The Plain Meanings Of The Terms**

20  **The "system" terms (Group 1):** When viewed in context of the Patents-in-Suit, the

21  "system" terms should be construed, consistent with their plain and ordinary meaning, as "a

22  computer system that receives, processes, stores, and sends information [related to commercial

23  transactions]," wherein the bracketed portion of the definition applies only to claim terms that

24  include the word "commercial."

25   Claim construction begins with a review of "the context in which a term is used in the as-

26  serted claim."  *Phillips*, 415 F.3d at 1314.  The asserted claims define the "system" terms as de-

27  vices that include computers, memories, and other components.  For example, claim 85 of the

1   '508 Patent recites a "commercial transaction control system" as comprising "a control computer
2   unit" and "a storage memory."  Claim 1 of the '796 Patent recites a "control system" as compris-
3   ing a "processor" and "memory storage."  Claim 79 of the '984 Patent recites a "commercial
4   transaction communication system" that is controlled by "many processors."  Claim 1 of the '894
5   Patent recites steps of "receiving request data … at the traffic control system," "storing at least a
6   part of the request data … at the traffic control system," processing the received data "to selec-
7   tively obtain proposed data," and "transmitting an indication of confirmation."  Thus, read in
8   context of the claims, the "system" terms mean a computer system that receives, processes,
9   stores, and sends information.  *See* Shamos Opening Report at ¶132-33.

10       Telebuyer's construction is directly supported by the specification, which discloses a
11   computer-based "traffic control system": "The central traffic control system TIS includes a com-
12   puter control and interface system 28 coupled to several operating devices …."  '894 Patent at
13   12:5-9.  The specification further explains that "[t]he present system is configured to direct and
14   exchange communication traffic … between selective members of plural groups … [and] for an-
15   alyzing and compiling data."  *Id.* at 3:57-65.  Figure 5 of the Patents-in-Suit illustrates an exem-
16   plary system that includes multiple interconnected computers, storage devices, and other operat-
17   ing devices, all controlled by a "control computer" T16.  *See id.* at Fig. 5.  Thus, consistent with
18   Telebuyer's proposed construction, the specification describes the claimed "system" as a com-
19   puter system that receives, processes, stores, and sends information.  The specification also states
20   that the disclosed invention can be broadly used for "merchandising applications, including pur-
21   chasing, selling, marketing" or for "educational conventions for medical doctors and other pro-
22   fessionals, game shows, dating services and so on."  *Id.* at 1:36-40.  Accordingly, for "system"
23   terms that include the word "commercial," a person of ordinary skill in the art would have under-
24   stood that the "system" is limited to commercial transactions.  Shamos Opening Report at ¶136.

25       Telebuyer's construction is also consistent with the prosecution history of the Patents-in-
26   Suit.  For example, during prosecution of the '508 Patent, the examiner compared the claimed
27   "control system" to a "central processor 80" disclosed by U.S. Patent No. 4,799,156 ("Shavit")

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF - 9
NO. 2:13-cv-01677-BJR

YARMUTH WILSON PLLC
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

when examining the novelty of claims pending before the U.S. Patent and Trademark Office ("USPTO"). *See* Shamos Opening Report at ¶¶90-91; Ex. A11[11]. Shavit's "central processor 80" is a computer system that includes "a central processing unit (CPU) 81, communications interface 79, and a mass storage system 72." Ex. A11 at 5:39-42. By making this comparison, the examiner showed an understanding that the term "control system" meant a known type of computer system. As courts often recognize, the patent examiner is "considered one of ordinary skill in the art" and her knowledge of the art and interpretation of the claim term in light of that knowledge "carries significant weight." *F5 Networks, Inc. v. A10 Networks, Inc.*, 2011 U.S. Dist. LEXIS 73689, *10 (W.D. Wash. July 8, 2011) (citing *St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc.*, 412 Fed. Appx. 270, 276 (Fed. Cir. 2011)).

Telebuyer's construction is further supported by abundant extrinsic evidence. At the time of the invention, those of ordinary skill in the art frequently used these "system" terms to describe computer systems for receiving, processing, storing, and sending information. Telebuyer's expert, Dr. Michael Shamos, identified over a dozen contemporaneous technical articles and patents that used the "system" terms in a manner according to Telebuyer's construction. *See* Shamos Opening Report at ¶¶75-128; Exs. A11-A25. For example, a 1989 patent describes a "central data system" as "a control computer which gathers data from a wide variety of sources and formats the data for transmission." Ex. A13 at 4:28-32. A 1993 patent describes a "transaction control system" as controlled by a "central computer." Ex. A17 at 3:45-49.

Even Amazon's expert, Dr. Forys, agrees that Telebuyer's proposed construction accurately reflects the relevant disclosure of the Patents-in-Suit and is consistent with the extrinsic evidence. For example, Dr. Forys conceded that the structure from the specification he identified as corresponding to the "system" terms is a "computer system" that "receives, processes, stores and sends information." Forys Dep. at 305:11-306:2; 306:5-10; 306:14-16; 307:6-12. When

---

[11] Exs. A3-A35, A37, and A38 of the concurrently filed Declaration of Brian M. Berliner correspond to Exhibits 3-35, 37, and 38 of the Opening Expert Report of Dr. Michael Shamos, which is attached to the Berliner Declaration as Exhibit A.



1   asked about the Campbell reference cited by Telebuyer's expert (Shamos Opening Report at
2   ¶¶79-81; Ex. A13), Dr. Forys readily admitted that the relevant structure of a "central data sys-
3   tem" is a "computer system … [with components that] receive, process, store and send infor-
4   mation."  Forys Dep. at 239:1-5; 239:24-240:12.  Thus, if the Court finds that the "system" terms
5   are not governed by §112(f), Amazon does not appear either to dispute the accuracy of
6   Telebuyer's construction of the "system" terms or to offer any alternative construction.  Accord-
7   ingly, the fundamental question to be resolved by the Court is whether Amazon has overcome
8   the strong presumption against construing the "system" terms as means-plus-function limitations.
9   Section III.A.2, below, shows conclusively that Amazon cannot overcome this presumption.

10      **The "coordinated systems" terms (Group 2):**  The terms in Group 2 differ from those
11   in Group 1 by the addition of the phrase "one or more multiple coordinated," or some variant of
12   that language.  *See* Shamos Opening Report at ¶139; Forys Opening Declaration at ¶44.  Thus,
13   the Group 2 terms should be construed consistent with their ordinary meaning to require "one or
14   more groups of networked computer systems that receive, process, store, and send information
15   [related to commercial transactions]."

16      Both sides' experts agree that the Patents-in-Suit disclose two embodiments: (1) a single
17   system embodiment, and (2) a multiple coordinated systems embodiment.  *See* Shamos Opening
18   Report at ¶140; Forys Opening Declaration at ¶36; '894 Patent at 5:15-21.  The "multiple coor-
19   dinated" embodiment includes networked systems connected together with each having the abil-
20   ity to route information to other systems in the network—*i.e.,* an ability to coordinate with one
21   another—in order to balance the workload.  *See, e.g.,* '894 Patent at 5:56-60 ("Multiple coordi-
22   nated central traffic control stations may be employed to communicate with widely distributed
23   vendor or buyer locations with capabilities to route calls to each other …."). [12]  Thus, in the con-
24   text of the Patents-in-Suit, a person of ordinary skill in the art would have understood that the

25

26      [12] The patents use "control systems" and "control stations" interchangeably and they are understood to have the
27   same meaning.  *See* Shamos Opening Report at ¶151.  This is not disputed by Amazon.  *See* Forys Opening Declara-
     tion at ¶34.



1   coordinated systems terms refer to one or more groups of networked computer systems.[13]  *See*

2   Shamos Opening Report at ¶140.

3      **The multiple coordinated "control units" terms (Group 3):**  Unlike the terms of the

4   first two groups, which all recite "systems,"[14] the terms in Group 3 recite "units," *i.e.*, a sub-

5   component of the "system."  Hence, "control units" are part of "systems" that in turn coordinate

6   with other "systems" to provide "multiple coordinated systems."  Consistent with this hierarchy,

7   the Group 3 terms should be construed as "one or more groups of networked control computers."

8      This structural relationship is exemplified in the asserted claims that recite "control units"

9   as components of an overall system.  *See, e.g.,* '984 Patent at claim 1 ("A **commercial transac-**

10  **tion communication system** including **one or more multiple coordinated control units** ….")

11  (emphasize added).  The specification similarly explains that the exemplary system is controlled

12  by a "control computer T16" for "purposes of control, storage management, delivery, scheduling

13  and interconnecting remote stations."  '894 Patent at 19:54-20:1.  Figure 5 of the Patents-in-Suit

14  (reproduced at page 7, above) illustrates an exemplary "system" that includes a "control comput-

15  er" (T16) controlling the operations of other computers—including a "video file server" and an

16  "operator station"—and various storage devices.  *See id.* at Fig. 5.  Lastly, Telebuyer's expert,

17  Dr. Shamos, has identified numerous contemporaneous references that used "control unit" in a

18  manner consistent with Telebuyer's construction.  *See* Shamos Opening Report at ¶156-166

19  (Exs. A3, A14, and A29).  Thus, a person of ordinary skill in the art reading the claims in con-

20  junction with the specification would have understood that a single "control unit" refers to a con-

21  trol computer component of a claimed system.  *See* Shamos Opening Report at 154.  Because the

22  claims recite multiple coordinated control units, the Group 3 terms mean "one or more groups of

23  networked control computers."

24

25   [13] As Dr. Shamos testified, "multiple coordinated" refers to a group of networked devices, whereas "one or
26   more multiple coordinated" refers to one or more groups of networked devices.  *See* Ex. F ("Shamos Dep.") at
     191:12-192:11.

27   [14] *See* footnote 12.

**YARMUTH  WILSDON** PLLC
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**"Central site" and "central control site" (Group 4 terms):**  The parties agree that the word "site" refers to a location.  *See* Ex. D ("Forys Rebuttal Declaration") at ¶143 ("There is no dispute that 'site' is a reference to a location.").[15]  The only dispute with regard to the two "central site" terms is whether they should be construed consistent with this ordinary meaning, as Telebuyer proposes, or be given two drastically different meanings, as Amazon and its expert argue.  *See, e.g.,* Forys Dep. at 320:24-321:3; 325:8-327:15 (testifying that "central site" has two different meanings when used in claim 1 of the '796 Patent).  Consistent with the construction of the word "site," as discussed below in Section III.B, the "central site" terms should be construed as the "location of one or more control computers."

In the field of computer technology, those of ordinary skill in the art commonly use the word "site" to identify a computer's location, which can either be physical or virtual.[16]  *See* Shamos Opening Report at ¶171-188.  For example, when used in the context of "visiting a website," a person of ordinary skill in the art would have understood that to mean communicating with another computer by accessing its virtual location (*i.e.*, a network address) on the Internet.  *See, e.g.,* Dkt. No. 132-20 at 58 (the USPTO examiner observed during prosecution that "the term 'data site' is generally known in the art as a location on the World Wide Web").  The "central site" terms of the Patents-in-Suit do not limit "site" to a particular type of location, but use it consistently with its common usage in the relevant field—*i.e.*, as encompassing a virtual computer location.  *See, e.g.,* '796 Patent at claim 24 ("wherein the buyer terminals communicate with a central site offering the one or more different merchandise or services"); claim 47 ("wherein the buyer identification data identifies the prospective buyer terminal to the central site").  Thus, Telebuyer's proposed construction of the "central site" terms—as the location of the control computers—should be adopted because they "stay[] true to the claim language and most naturally align[] with the patent's description of the invention."  *Phillips*, 415 F.3d at 1316.

---

[15] Amazon proposes to construe the word "site" as "physical location (not a website)."  *See* Section III.B.

[16] An Internet "location" is a "virtual" place as it is not a physical place, but conceptually may be thought of as one.  *See* Shamos Opening Report at ¶172.

1    Amazon's position—that the "central site" terms have the same construction as the other

2    "control" terms—is so contrary to the record that, in an effort to reconcile Amazon's position

3    with the record, its expert is forced to opine that the same claim term—"control site"—has two

4    completely different meanings when used within the same claim.  *See* Forys Dep. at 320:24-

5    321:3; 325:8-327:15.  Sometimes, Dr. Forys says that the term has the same functional meaning

6    he ascribes to the other so-called "control" terms; other times, he says that it means a physical

7    location.  *Id.*  This purported expert evidence violates the basic principle that "a claim term

8    should be construed consistently with its appearance in other places in the same claim or in other

9    claims of the same patent," and therefore should be afforded no weight.  *Rexnord Corp. v.*

10   *Laitram Corp.,* 274 F.3d 1336, 1342 (Fed. Cir. 2001).

      **2.   The "Control" Terms Connote Sufficiently Definite Structure And Are Not Functional Limitations Governed By §112(f)**

13   Amazon's constructions are fundamentally flawed because they incorrectly analyze all 23

"control" terms as means-plus-function limitations.  There is a strong presumption against appli-

15   cation of §112(f) to these terms because none includes the word "means."  *See Flo Healthcare*

*Solutions*, 697 F.3d at 1374.  Moreover, because the "control" terms all describe sufficiently def-

17   inite structure, they should not be construed as means-plus-function limitations.  *Id.*

18   A claim term recites sufficiently definite structure when it "is used in common parlance

19   or by persons of skill in the pertinent art to designate structure."  *Lighting World*, 382 F.3d at

20   1359-60.  The term does not need to "denote a specific structure;" it is sufficiently structural so

21   long as it "covers a broad class of structures."  *Id.*  In determining whether a term denotes suffi-

22   cient structure, courts often "look[] to the dictionary to determine if a disputed term has achieved

23   recognition as a noun denoting structure, even if the noun is derived from the function per-

24   formed."  *Id.* at 1360.  For example, in *Lighting World*, the Federal Circuit cited a dictionary def-

25   inition for the word "connector"—defined as "something that connects"—to find the term "con-

26   nector assembly" to be structural.  *See id*. at 1361.  And in *Flo Healthcare Solutions*, the Federal

27   Circuit cited a dictionary definition for the word "adjustment"—defined as "a device, as a knob

1    or lever, for adjusting"—to find the term "height adjustment mechanism" to be structural.  *See*

2    697 F.3d at 1374.  These examples demonstrate the principle that a term denotes "sufficiently

3    definite structure" even if it covers a very broad class of structures.

4           The four groups of "control" terms have well-known structural meanings and therefore

5    recite sufficiently definite structure.  For example, the Microsoft Computer Dictionary defines a

6    "communications system" (*see* Group 1 "system" terms, above) as "the combination of hard-

7    ware, software, and data transfer links that make up a communications facility," and defines a

8    "control unit" (*see* Group 3 "control unit" terms, above) as "a device or circuit that performs an

9    arbitrating or regulating function."  Ex. A14 at 84, 96.  Likewise, technical dictionaries published

10   by the Institute of Electrical and Electronics Engineers (IEEE) define "control system" (Group 1)

11   as "an assemblage of control apparatus coordinated to execute a planned set of controls," and

12   "control unit" (Group 3) as "a functional unit of a computer that interprets and executes the in-

13   structions of a program in a prescribed sequence."  Ex. A3 at 21; Ex. H at 263.  The Random

14   House Dictionary defines "site" (*see* Group 4 "central site" terms) as a "position, location,

15   place."  Ex. A30 at 1788.  These structural definitions in contemporaneous dictionaries are fur-

16   ther evidence that the four groups of "control" terms are not devoid of structural meaning.[17]

17          Each of the four groups of "control" terms is also used prevalently by contemporaneous

18   patents and technical publications to describe structure.  *See* Shamos Opening Report at ¶¶75-

19   128 (patents and articles that use Group 1 terms to describe structure (Exs. A12-A25)); ¶¶144-46

20   (patents that use Group 2 terms to describe structure (Exs. A26-A28); ¶¶161-65 (patent that use

21   Group 3 terms to describe structures (Ex. A29)); ¶¶180-86 (patents and articles that use Group 4

22   terms to describe structure (Exs. A32-A35)).  For example, U.S. Patent No. 5,311,172 describes

23   the structure of a "communication control system."  Ex. A18 at 1:14-27.  A 1998 article pub-

24   lished by the IEEE describes the design and operation of a "central control station."  Ex. A28 at

25   822-23.  A UK patent cited in the prosecution history uses "control unit" to describe hardware

26   _____

27          [17] As noted above, the Group 2 terms are multiples of the Group 1 terms.



1    structure.  Ex. A29 at 3:15-35.  A 1993 patent relating to video lottery machines uses "central

2    site" to refer to the location of a central computer that communicates with video lottery termi-

3    nals.  Ex. A33 at 4:28-36.  The ubiquitous usage of "control" terms in such technical literature

4    further demonstrates that they are "used in common parlance or by persons of skill in the perti-

5    nent art to designate structure."  *Lighting World*, 382 F.3d at 1359.

6          That the four groups of "control" terms denote structure is further supported by the pros-

7    ecution history of the Patents-in-Suit.  Throughout the prosecution, the examiner consistently

8    treated the "control" terms as structural limitations by comparing them to like structural elements

9    disclosed by other patents.  For example, the examiner compared the "commercial transaction

10   communication system" term (Group 1) recited by the '894 Patent to the "telecommunication

11   network 10" disclosed by the Ahuja patent.  Shamos Opening Report at ¶128-29 (citing '894 file

12   history (Dkt. No. 132-5 at 2) and Ex. A25).  The Examiner also compared the "control system"

13   term (Group 1) recited by the '508 Patent to the "central processor 80" disclosed by the Shavit

14   patent.  *Id.* at ¶90-91 (citing '508 file history (Dkt. No. 132-9 at 7) and Ex. A11).  At no time did

15   the examiner analyze any "control" term as a means-plus-function limitation.  *Id.* at ¶28.

16         Telebuyer's position that the four groups of "control" terms connote structure also com-

17   ports with decisions from many other courts—including the Federal Circuit—that have construed

18   similar claim terms as structural limitations.  *See, e.g.*, *LG Electronics, Inc. v. Bizcom Electron-

19   ics, Inc.*, 453 F.3d 1364, 1372 (Fed. Cir. 2006) (rejecting means-plus-function construction for

20   "control unit" (Group 3)); *Sprint Communications Co. L.P. v. Big River Telephone Co., LLC*,

21   2009 U.S. Dist. LEXIS 58161, *18 (D. Kan., Jul. 8, 2009) (construing "communication system"

22   (Group 1) as a structural limitation); *Negotiated Data Solutions, LLC v. Dell, Inc.*, 596 F. Supp.

23   2d 949, 968 (E.D. Tex. 2009) (same); *Lucent Technologies, Inc. v. Newbridge Networks Corp.*,

24   168 F. Supp. 2d 181, 201 (D. Del. 2001) (same); *WesternGeco LLC v. ION Geophysical Corp.*,

25   735 F. Supp. 2d 623, 635-36 (S.D. Tex. 2010) (construing "global control system" and "local

26   control system" (Group 1) as structural limitations).

27         Even Amazon's expert confirms that the "control" terms recite sufficiently definite struc-

1    ture.  In describing his experience, Dr. Forys repeatedly used the phrase "control systems," one

2    of the 23 "control" terms he now opines as having no known structural meaning.  Forys Dep. at

3    27:18-28:17; 185:17-21.   Dr. Forys similarly conceded that he knows the meaning of another

4    "control" term—"commercial transaction communication system"—noting he has "heard it a lot

5    of times."  *Id.* 184:13-17.  Acknowledging the lack of evidence in his report, Dr. Forys concedes

6    that he "can't prove there is no structure" to the "control" terms.  *Id.* at 188:7-10.

7          Because there is no reasonable dispute that each of the four groups of "control" terms is

8    used in the Patents-in-Suit and recognized in the art to describe sufficiently definite structure,

9    Amazon's result-oriented contention that the "control" terms should be construed as means-plus-

10   function limitations is baseless.

11         ### 3.   Amazon's Claim Construction And Indefiniteness Analysis Contradicts Established Law

12

13         Amazon misapplies the law to support its erroneous claim construction.  The premise of

14   Amazon's analysis—that the "control" terms should be construed as means-plus-function limita-

15   tions—is incorrect.  But Amazon then compounds this error by continuing to misapply the law

16   even in conducting its means-plus-function analysis.

17         ***First***, Amazon's argument that all 23 terms have the same construction runs afoul of the

18   basic principle that "[a] claim construction that renders asserted claims facially nonsensical 'can-

19   not be correct.'"  *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1255

20   (Fed. Cir. 2010) (citations omitted).   The plain text of the asserted claims clearly differentiates

21   the four groups of "control" terms, as explained above in Section III.A.1.  One need to look no

22   further than claim 1 of the '984 Patent, which recites "A ***commercial transaction communica-***

23   ***tion system*** including ***one or more multiple coordinated control units*** …."  '984 Patent at claim

24   1 (disputed terms emphasized).  Claim 1 recites a hierarchical relationship in which "control

25   units" are defined as components within a "communication system."  This relationship shows

26   that the two terms—"communication system" and "control units"—cannot mean the same thing,

27   as Amazon suggests.  If it did, the claim would require "a commercial transaction communica-

tion system including a commercial transaction communication system"—which is obviously circular and nonsensical. Notably, the limitation of "including one or more multiple coordinated control units" was not drafted by the patentee, but was added by the USPTO examiner during prosecution as a condition of allowance. *See* Ex. B ("Shamos Rebuttal Report") at ¶32-33 (citing Dkt. No. 132-18 at 28-29). The examiner's addition of "one or more multiple coordinated control units"—intended to clarify and distinguish between "commercial transaction communication system" and "control units"—would be undone by Amazon's proposed construction. *See id.* Indeed, Amazon's expert admitted during his deposition that the two terms must have different meanings in light of the unambiguous claim language. *See* Forys Dep. at 176:21-177:5. The Court should reject Amazon's position for this reason alone.

Similarly, claim 1 of the '796 Patent recites "a ***central site*** associated with the ***control system***." '796 Patent at claim 1 (disputed terms emphasized). Construing "central site" to have the same meaning as "control system" would again render the claim nonsensical. Yet another example is claim 71 of the '796 Patent, a dependent claim reciting "wherein the ***central control site*** comprises ***one or more multiple coordinated central control stations***." *Id.* at claim 71 (disputed terms emphasized). Construing "central control site" to have the same meaning as "one or more multiple coordinated central control stations" renders the dependent claim superfluous and thus violates the doctrine of claim differentiation. *See InterDigital Communs., LLC v. ITC*, 690 F.3d 1318, 1324-25 (Fed. Cir. 2012) (finding that the doctrine of claim differentiation strongly counsels against a construction rendering a dependent claim superfluous).

Faced with the foregoing evidence, Amazon's expert conceded that the 23 "control" terms do not have the same meaning. Forys Dep. at 176:21-177:19 (admitting that "commercial transaction communication system" and "one or more multiple coordinated control units" have different meanings); 190:10-16 (testifying that "central site" and "control system" are not identical); 160:12-162:13 (conceding that he does not view all 23 terms as having the same meaning). Rather, Dr. Forys' testimony reveals that his grouping of the 23 "control" terms was arbitrary, and driven only by Amazon's desire to characterize them all as performing the same generalized

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF - 18
NO. 2:13-cv-01677-BJR

YARMUTH WILSDON PLLC
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1  function in order to rationalize Amazon's indefiniteness argument.  *See id.*  Not only has Ama-

2  zon failed to offer a defensible construction for the 23 disputed "control" terms, the clear lack of

3  a common meaning for the 23 terms shows that Amazon has flouted this Court's local rule limit-

4  ing the number of terms to be construed in this proceeding.  *See* Local Patent Rule 132(c).

5  **Second**, Amazon and Dr. Forys misapply the law in arguing that the "control" claim

6  terms are "means-plus-function" under §112(f), despite the strong presumption against this con-

7  clusion.  In analyzing whether the terms lack sufficiently definite structure, Dr. Forys assumes,

8  without any legal basis, that there must be "some commonality" of specific structure for a term

9  to define a class of structure, and that a broad class of structures cannot be sufficiently definite.

10  *See* Forys Dep. at 214:19-215:5.  This is contrary to the law—a term connotes sufficiently defi-

11  nite structure so long as it "is used in common parlance or by persons of skill in the pertinent art

12  to designate structure, even if the term covers a broad class of structures and even if the term

13  identifies the structures by their function."  *Lighting World*, 382 F.3d at 1359-60; *see also, Per-*

14  *sonalized Media Communs., LLC v. ITC*, 161 F.3d 696, 705 (Fed. Cir. 1998) ("Even though the

15  term 'detector' does not specifically evoke a particular structure, it does convey to one knowl-

16  edgeable in the art a variety of structures known as 'detectors.'").  In other words, a term is not

17  *per se* indefinite just because it is broad.  Thus, Dr. Forys' requirement for "commonality" ap-

18  plies the wrong legal standard and has no justification in the law.

19  **Third**, even if the Court were to accept Amazon's erroneous assumption that the 23 "con-

20  trol" terms are means-plus-function limitations (which they plainly are not), Amazon misapplies

21  the law governing their construction.  The first step in a means-plus-function analysis is to identi-

22  fy the **claimed** function—*i.e.*, the function recited by the claim language.  *See Cardiac Pacemak-*

23  *ers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002) ("First, the court must iden-

24  tify the claimed function.  …  The court must construe the function of a means-plus-function

25  limitation to include the limitations contained in the claim language, and only those limita-

26  tions.").  For each disputed term, Amazon improperly identifies a "function" that lacks support in

27  the actual language of the individual claims.  This is error.  The Federal Circuit has explained

that when construing means-plus-function terms, "we must take great care not to impermissibly limit the function by adopting a function different from that ***explicitly recited in the claim***." *Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1322 (Fed. Cir. 2003) (emphasis added).

None of the "control" terms recites a function, which is a necessary predicate to construing the terms as means-plus-function limitations. To get around this glaring defect in its analysis, Amazon simply conjures a function—"interfacing buyers and/or sellers to control electronic communications for transactions"—that is not associated with the "control" terms but is instead impermissibly imported from unrelated claim limitations or the specification. Many asserted claims—such as claim 111 of the '894 Patent, claim 78 of the '984 Patent, and claims 24 and 70 of the '796 Patent—do not even mention "interfacing" anywhere in their text. *See* '894 Patent, '984 Patent, '796 Patent. Amazon's expert, Dr. Forys, admitted that claim 78 of the '984 Patent does not explicitly recite the function identified by Amazon.[18] *See* Forys Dep. at 253:14-254:3. In this regard, Amazon's means-plus-function construction explicitly violates the Federal Circuit's proscriptions against identifying a function not recited by the relevant claim and importing a limitation into a claim. *See Omega Eng'g,* 334 F.3d at 1322 (improper to "adopt[] a function different from that explicitly recited in the claim"); *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (improper to "import functional limitations that are not recited in the claim").

While some claims do recite limitations related to "interfacing," such "interfacing" limitations do not define the function of the relevant "control" terms, but pertain to other structures or steps recited by the claims. For example, claim 85 of the '508 Patent recites:

> 85. A ***commercial transaction control system*** for accomplishing electronic communications via an electronic device between members of buyer

---

[18] To the extent Amazon argues that the alleged "function" of the term "commercial transaction communication system" is derived from the recitation of "for communications including video between multiple buyers and one or more vendors" in the preamble of claim 78 of the '984 Patent, Amazon's argument violates yet another basic rule of claim construction. This preamble clause merely states an intended purpose of the claimed invention, which does not transform the preamble into a means-plus-function limitation. *See Rowe v. Dror,* 112 F.3d 473, 478, (Fed. Cir. 1997) (preamble statement of intended use is not limiting "where a patentee defines a structurally complete invention in the claim body").



and vendor groups, including at least one buyer and at least one vendor, at remote locations, the ***commercial transaction communication control system***, comprising:

an interface system configured to accomplish buyer and vendor interaction with said ***commercial transaction control system*** …;

a storage memory …;

a control computer unit ….

'508 Patent at claim 85 ("control" terms bold and italicized; "interface" term underlined). Claim 85 recites an "interfacing system" as a structural component of the "commercial transaction control system." Nowhere in this claim is "interfacing buyers and/or sellers" recited as the ***function*** of the claimed "commercial transaction control system," which includes at least two other components—"a storage memory" and "a control computer unit"—that perform different functions. *See id.* Again, Amazon has improperly imported a function not recited by the claim language. Likewise, for method claims, Amazon takes the indefensible position that any interface-related step involving a "control" term defines the function of that term. *See, e.g.,* '796 Patent at claim 47 ("providing a computer interface by which the prospective buyers can communicate with the central site"). Amazon's flawed logic would improperly transform all structures used in the performance of method steps into means-plus-function limitations.

Relying on a function not recited by any claim, Amazon then identifies structure allegedly corresponding to that function and summarily concludes that its hand-picked structure is insufficient to perform the alleged function, which renders all 23 "control" terms indefinite. Amazon's argument is an invalidity defense masquerading as claim construction, and, as shown above, its analysis fails at every step. Under Federal Circuit precedent, the 23 "control" terms are properly construed as structural limitations based on their plain and ordinary meaning read in context of the specification and prosecution history—as Telebuyer has done with its proposed constructions. *See Hill-Rom Servs.*, 755 F.3d at 1371. Accordingly, the Court should adopt Telebuyer's constructions and reject Amazon's misguided attempt to invalidate all asserted claims through a factually unsupported and legally erroneous means-plus-function analysis.

YARMUTH WILSDON PLLC

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

B.       **"Site"**

| Telebuyer's Construction | Amazon's Construction |
|---|---|
| "a location or place" | physical location (not a website) |

Telebuyer's construction of "site" reflects the plain meaning of the term and comports with both the intrinsic and extrinsic record.  *See* Section III.A.1.  As explained above, Amazon's expert conceded that "[t]here is no dispute that 'site' is a reference to a location."  Forys Rebuttal Declaration at ¶143.  Amazon, however, insists that the construction of this word must be limited to a physical location that excludes websites (by imposing the negative limitation "not a website").  Thus, the only dispute is whether "site" should be given it full plain meaning, or should be narrowly construed to exclude virtual locations (*e.g.,* websites).  The answer is clearly that "site" should be accorded its full plain meaning.

The testimony of Dr. Shamos and the contemporaneous evidence he cites plainly shows that a person of ordinary skill in the art in 1994 would have understood "site" to refer to either a physical location or a location within a network of computers, such as "websites" or "FTP sites."  *See* Shamos Opening Report at ¶¶171-88.  For example, a 1994 patent entitled "Data Communication System Using Encrypted Data Packets" repeatedly uses the term "site address" to describe the network location of a computer.  *See id.* at ¶174 (citing Ex. A31).

Amazon does not dispute that Telebuyer's construction reflects the plain meaning of "site."  Rather, Amazon argues that Telebuyer has disclaimed that plain meaning during prosecution so as to exclude websites.  *See* Forys Rebuttal Declaration at ¶146.  Not true.  A disclaimer requires "a clear and unmistakable disavowal of scope during prosecution."  *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).  A disclaimer must be express—"an applicant's silence regarding statements made by the examiner during prosecution, without more, cannot amount to a 'clear and unmistakable disavowal' of claim scope."  *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1345 (Fed. Cir. 2005).  Far from making a clear and unmistakable disavowal, Telebuyer expressly maintained the same view during prosecution that it presents now—the term "site" can refer to non-physical locations on the Internet.

YARMUTH  WILSDON PLLC
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1   Amazon cites an exchange between Telebuyer and the USPTO during the prosecution of

2   the '796 Patent in which the examiner objected to the recitation in the claims of a "vendor data

3   site" because that phrase was not found in the patent specification.  *See* Forys Rebuttal Declara-

4   tion at ¶146.  In response, Telebuyer simply removed the word "data" so the claims recited the

5   same term ("vendor site") found in the specification.  *See id.;* Dkt. No. 132-20 ('796 Patent pros-

6   ecution history) at 67.  But to make the record clear that the amendment was not intended to alter

7   the scope of the term, Telebuyer explained that, consistent with the Examiner's understanding of

8   "site," Telebuyer was using this term in the same way to encompass a non-physical location:

> With respect to the Examiner's observation that the term "data site" is generally known in the art as a location on the World Wide Web and describes a web site accessible via the Internet, Applicant respectfully submits that ***his specification describes online access via a computer to a vendor site***.

*Id.* (emphasis added).  As such, Telebuyer made no disavowal of patent scope and the Court

should  reject  Amazon's  attempt  to  import  a  negative  limitation  into  the  claims.  *See*

*WesternGeco*, 735 F. Supp. 2d at 637 (finding negative claim constructions disfavored).

Amazon's proposed construction must be rejected for the additional reason that it is in-

consistent with the asserted claims and Amazon's own proposed construction for other terms

(*i.e.*, the "central site" terms discussed in Section III.A).  Amazon proposes that "site" be limited

to a physical location.  Yet, when used in the term "central site," Amazon argues that this same

word takes on a completely different meaning of specifying certain computer components.  As a

result of this inconsistent interpretation, Amazon's expert is forced to offer the untenable opin-

ions that the same claim term "central site" has two completely different meanings, even when

recited within the same claim.  *See* Forys Dep. at 320:24-321:3; 325:8-327:15.  As explained

above, this violates a fundamental tenet of patent law that a claim term must be given the same

meaning within the same claim and within claims of the same patent.  *See Rexnord Corp.,* 274

F.3d at 1342.  As such, Amazon's construction cannot be correct.

1

## C.    The "Video Memory" And "Storage Memory" Terms

| Claim Term | Telebuyer's Construction | Amazon's Construction |
|---|---|---|
| "video memory" terms[19] | No construction necessary, plain and ordinary meaning applies.  Plaintiff's constructions of terms construed elsewhere and the parties' agreed constructions are incorporated herein. | Claim element is governed by 35 U.S.C. § 112(f) and should be limited to the following function and structure:<br><br>Function: conveying one or more video images [including at least high resolution still images] as part of the proposed data relating to the area of interest indicated by the buyers.<br><br>Structure: A video file server coupled directly to a telephone interface structure and a control computer, an auto dialer, an audio response unit, and a buyer-vendor merchandise code storage unit addressed by the control computer as described in '894 patent Fig. 5, T12, T14, T16, T18, T26, T34, col. 20 ll. 5-19, col. 20 ll. 26-28, col. 23 ll. 13-15, col. 23 ll. 29-52, col. 24 ll. 11-14, and col. 24 ll. 20-22, which is insufficient to perform the function and is therefore indefinite. |
| "storage memory configured for receiving and storing data on said members of said buyer and vendor groups, including identi- | No construction necessary, plain and ordinary meaning applies.  Plaintiff's constructions of terms construed elsewhere and the parties' agreed constructions are incorporated herein. | Claim element is governed by 35 U.S.C. § 112(f) and should be limited to the following function and structure:<br><br>Function: receiving and storing data on said members of said buyer and vendor groups, including identification data and commercial transaction data including video data relating to at least certain group |

___

[19] The "video memory" terms include: "video memory device for conveying one or more video images including at least high resolution still images as part of the proposed data relating to the area of interest indicated by the buyers;" "video memory for conveying one or more video images as part of the proposed data relating to the area of interest indicated by the buyers;" "video memory for conveying one or more high resolution video images as part of the proposed data relating to the area of interest indicated by the buyers;" "video memory for providing one or more high resolution video images as part of the proposed data relating to the area of interest indicated by the buyers;" "video memory wherein the video memory is configured to provide video data including dynamic video images or high resolution still images or both as part of the proposed data relating to the area of interest indicated by the buyers;" "video memory for providing stored video including one or more dynamic or high resolution still video images as part of the proposed data relating to the area of interest indicated by the buyers;" and, "video memory for providing one or more video images including dynamic video or high resolution still images as part of the proposed data relating to the area of interest indicated by the buyers."



YARMUTH WILSDON PLLC
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

| fication data and commercial transaction data including video data relating to at least certain group members that also relates to the area of interest" | | members that also relates to the area of interest.<br><br>Structure: A video file server coupled directly to a telephone interface structure and a control computer, a buyer-vendor storage unit storing ANI or DNIS information or a database of PIN numbers, an audio response unit, and a buyer-vendor merchandise code storage unit as described in the '894 patent Fig. 2 (28, 30, 36, 37), Fig. 5 (T12, T16, T18, T24, T26, T34), Figs. 7, 8, col. 9 ll. 50-54, col. 10 ll. 1-15, col. 20 ll. 26- 28, col. 21 ll. 62-64, col. 22 ll. 50-52, col. 23 ll. 13-15, and col. 23 ll. 29-33, which is insufficient to perform the function and is therefore indefinite. |
|---|---|---|

The parties disagree regarding the construction of six "video memory" terms and one "storage memory" term (collectively, the "memory" terms). Telebuyer submits that these terms are well-understood and are used in the patents consistent with their plain and ordinary meaning, thus requiring no construction. *See, e.g.*, *IP Innovation, LLC v. Red Hat, Inc*., 2009 U.S. Dist. LEXIS 69682, *35 (E.D. Tex., Aug. 10, 2009) (finding "memory" is "entitled to its ordinary meaning, and no further definition is necessary"); *General Electric Co. v. Sonosite, Inc*., 580 F. Supp. 2d 743, 769 (W.D. Wis. 2008) (declining to adopt a construction for "memory").

Despite the fact that none of the terms use the word "means," Amazon again takes the flawed position that all "memory" terms are means-plus-functions limitations governed by §112(f) and that they are all indefinite. Amazon's position is factually unsupported and legally erroneous. Thus, the "memory" terms should be given their plain and ordinary meaning.

**1. The "Memory" Terms Have A Well-Understood Plain Meaning And Connote Sufficiently Definite Structure**

All of the "memory" terms are presumptively outside the ambit of §112(f) because they do not use the statutory "means for" language. *Flo Healthcare Solutions*, 697 F.3d at 1374. Because Amazon cannot make a "showing that the limitation essentially is devoid of anything that can be construed as structure," the "memory" terms are not governed by §112(f). *Id.*

1    Amazon cannot and does not deny that the word "memory" has an accepted, clear struc-

2    tural meaning to persons of ordinary skill in the art.  Amazon's own expert admitted that "[a]

3    'memory' or 'memory device' is understood by those of skill in the art to be a generic term for a

4    computer component that stores information."  *See* Forys Opening Declaration at ¶¶69, 92.  Con-

5    sistent with Dr. Forys' admission, an IEEE dictionary defines memory as "all of the addressable

6    storage in a processing unit and other internal storage that is used to execute instructions."  *See*

7    Shamos Opening Report at ¶35; Ex. A3.  The Patents-in-Suit use "memory" consistent with its

8    plain, structural meaning—*i.e.*, as a computer storage device.  *See, e.g.,* '894 Patent at 7:34-35

9    ("buyer's schedule may be transmitted to and loaded into a memory").

10    The addition of the word "video" or "storage" does not alter this conclusion.  In each us-

11    age, "video" simply denotes the type of data stored in the memory, and "storage" simply "de-

12    notes a type of memory used for persistent storage of data."  Shamos Opening Report ¶¶36, 47.

13    Indeed, adding "an adjectival qualification" to a structural term "does not make the sufficiency

14    of that structure any less sufficient for purposes of [§112(f)]," but instead "makes the term more

15    definite."  *Personalized Media Communs.,* 161 F.3d at 705.  Moreover, countless contemporane-

16    ous patents and technical publications use the same phrases "video memory" and "storage

17    memory" to describe computer storage devices.  *See, e.g*., Shamos Opening Report ¶¶39-43 (pa-

18    tents and articles that use "video memory" to describe structure (Exs. A4-A6)) and ¶¶48-58 (pa-

19    tents and articles that use "storage memory" to describe structure (Exs. A7-A11)).  This plainly

20    demonstrates that these terms are understood and commonly used by persons of ordinary skill to

21    designate structure.  Indeed, the phrase "video memory" appears in other claims (*e.g.*, '364 Pa-

22    tent, claims 1, 47, and 76), and Amazon does not dispute that those usages denote sufficiently

23    definite structure so as to fall outside §112(f).  The accepted structural definition of "memory"

24    and the common use of "video memory" and "storage memory" remove any doubt that the

25    "memory" terms recite sufficiently definite structure.

26    Furthermore, many courts have found that "memory" connotes sufficiently definite struc-

27    ture.  *See, e.g., Luma Corp. v. Stryker Corp., et al*., 2005 U.S. Dist. LEXIS 40884, *47 (S.D. W.

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF - 26
NO. 2:13-cv-01677-BJR

YARMUTH WILSDON PLLC
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

Va., July 27, 2005) (construing "memory" as "a device for storing information or data"); *Visto Corp. v. Seven Networks, Inc.*, 2005 U.S. Dist. LEXIS 46113, *31 (E.D. Tex., Apr. 20, 2005) (construing "memory" as "a medium where information can be stored and retrieved"); *WeddingChannel.com, Inc. v. Knot, Inc.*, 2005 U.S. Dist. LEXIS 991, *23, 30 (S.D.N.Y., Jan. 26, 2005) (construing "memory" as "any device where information can be stored and retrieved"). Indeed, even when used with the word "means," the Federal Circuit nevertheless found the structural meaning of "memory" sufficiently clear to rebut the presumption of means-plus-function construction.  *See TecSec,* 731 F.3d at 1347 ("system memory means" is not a means-plus-function term); *Optimal Rec. Solutions v. Leading Edge Techs.*, 6 Fed. Appx. 873, 878 (Fed. Cir. 2001) ("memory means for storing the position of the golf cup" is not a means-plus-function term).   By comparison, none of the "memory" terms in this case use "means" and there is a strong presumption ***against*** means-plus-function construction.   Thus, there can be no question that the "memory" terms connote sufficiently definite structure and are not governed by §112(f).

### 2. The "Memory" Terms Do Not Recite Functional Limitations And Are Not Indefinite

Notwithstanding the clear and definitive structural meaning associated with "video memory" and "storage memory," Amazon argues that some uses of these terms in certain claims require construction under §112(f).  To support its flawed argument, Amazon mischaracterizes the claim language and misleadingly excerpts only a portion of the relevant claim limitations when identifying the "memory" terms for construction, leaving out important claim language that is needed to put the disputed terms in proper context.  *See* Dkt. No. 132 at 13.  Using claim 17 of the '509 Patent as an example, the full limitation relating to "video memory" reads:

> providing access by the buyers under control of the one or more multiple coordinated control systems to a video memory device for conveying one or more video images including at least high resolution still images as part of the proposed data relating to the area of interest indicated by the buyers

'509 Patent at claim 17.  Amazon argues that the phrase "for conveying one or more video images" describes the function of "video memory."  But closer examination reveals that claim 17 is a method claim reciting a step of "providing access by the buyers … to a video memory device."

1    This step is performed under the control of "one or more multiple coordinated control systems"

2    for the purpose of conveying video images to buyers. *See id.* Thus, the phrase "for conveying

3    one or more video images" describes the intended result of the "providing access" step. It does

4    not, as Amazon disingenuously argues, describe a function that the "video memory" structure

5    must perform on its own. *See* Shamos Rebuttal Report ¶91.

6          Similarly, with respect to the "storage memory" term, the pertinent limitation in claim 85

7    of the '508 Patent reads:

8            a storage memory configured for receiving and storing data on said mem-
             bers of said buyer and vendor groups, including identification data and
9            commercial transaction data including video data relating to at least cer-
             tain group members that also relates to the area of interest

10   '508 Patent at claim 85. The language following "storage memory," *i.e.,* "configured for receiv-

11   ing and storing data …," describes the required configuration of the "storage memory." It re-

12   quires the "storage memory" to be interconnected with the other claimed components to allow

13   for the described result, and does not define its function. *See* Shamos Rebuttal Report at ¶106.

14   Reciting the configuration of the "storage memory" does not transform it into a means-plus-

15   function limitation. *See Wi-LAN USA, Inc. v. Alcatel-Lucent USA, Inc.,* 2013 U.S. Dist. LEXIS

16   128181, *127-28 (S.D. Fla. Sept. 9, 2013) ("processor configured to …" is not governed by

17   §112(f)); *Sipco, LLC v. Abb, Inc.,* 2012 U.S. Dist. LEXIS 106659, *11, *32-33 (E.D. Tex. July

18   30, 2012) (construing "computer configured to …" as a "Non-Means-Plus-Function Term").

19         Even if one were to treat the "memory" terms as reciting functional requirements of con-

20   veying, storing, and receiving data, this would still be insufficient to show that the "memory"

21   terms are means-plus-function limitations. A structural limitation should be treated as a means-

22   plus-function term only if it "recites function without reciting sufficient structure for performing

23   that function." *Flo Healthcare Solutions*, 697 F.3d at 1373. A "memory" inherently has suffi-

24   cient structure to receive, store, and convey data; those are the essential features of a computer

25   memory. *See* Shamos Rebuttal Report at ¶¶85-86. Thus, Amazon cannot establish that any of

26   the "memory" terms recites function, and cannot show that the recited "memory" structure is in-

27   sufficient to perform any of the alleged functions it identified. Accordingly, the Court should

YARMUTH WILSON PLLC

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1   reject Amazon's construction of the "memory" terms as means-plus-function limitations, and

2   should instead afford them their plain and ordinary meaning.  Because Amazon's indefiniteness

3   argument is premised on its improper application of §112(f), it must fail for the same reasons.

4       **D.**    **The "Processor Capability" Terms**

| Claim Term | Telebuyer's Construction | Amazon's Construction |
|---|---|---|
| "processor capability" terms[20] | No construction necessary, plain and ordinary meaning applies.  Plaintiff's constructions of terms construed elsewhere and the parties' agreed constructions are incorporated herein. | Claim element is governed by 35 U.S.C. § 112(f) and should be limited to the following function and structure:<br><br>Function: [selective processing of/selectively controlling] communications [between certain multiple buyers and the at least one vendor] based on an area of interest indicated by certain multiple buyers either (a) via remote terminals with a video display, (b) via remote telephonic terminals responding to automated voice prompts from the audio response unit [, or (c) via the operator interface] and utilizing the area of interest to [provide/determine] responsive data relating to the area of interest from the [site including select video data/vendor] and providing the responsive data to the certain multiple buyers at the remote terminals with a video display [or the remote telephonic terminals].<br><br>Structure: none/indefinite |

19       The parties disagree regarding the construction of two "processor capability" terms.

20   Telebuyer maintains that the terms should be construed according to their plain and ordinary

---

21       [20] The "processor capability" terms include: "the processor capability configured for selective processing of communications based on an area of interest indicated by certain multiple buyers either (a) via remote terminals with a video display, (b) via remote telephonic terminals responding to automated voice prompts from the audio response unit, or (c) via the operator interface, the processor capability configured to utilize the area of interest to provide responsive data relating to the area of interest from the site including select video data and providing the responsive data to the certain multiple buyers at the remote terminals with a video display;" and "processor capability . . . for selectively controlling communications between certain multiple buyers and the at least one vendor, the processor capability selectively processing communications based on an area of interest indicated by certain multiple buyers (a) via remote terminals with a video display, or (b) via remote telephonic terminals responding to automated voice prompts from the audio response unit, the processor capability utilizing the area of interest to determine responsive data relating to the area of interest from the vendor and providing the responsive data to the certain multiple buyers via the remote terminals with a video display or the remote telephonic terminals."

1  meaning.  Because the meaning of "processor" is already clear and well understood, no further

2  construction is necessary.  *See, e.g., Mallinckrodt, Inc., v. Masimo Corp.*, 254 F. Supp. 2d 1140,

3  1151 (C.D. Cal. 2003) ("processor" and "signal processor" require no construction); *Agere Sys.,*

4  *Inc. v. Broadcom Corp.*, 2004 U.S. Dist. LEXIS 14187, *52 (E.D. Pa., Jul. 20, 2004) ("module

5  processor" requires no construction).  As with most other disputed terms, Amazon again takes

6  the untenable position that the terms are means-plus-function limitations and indefinite.

### 1.  The "Processor Capability" Terms Connote Sufficiently Definite Structure And Are Not Functional Limitations Governed By §112(f)

7

8  The legal analysis for the "processor capability" terms is the same as for the "memory"

9  terms and the result should be the same—the "processor capability" terms connote sufficiently

10 definite structure and therefore should not be construed under §112(f).  The construction of the

11 "processor capability" terms must begin with the strong presumption that the terms fall outside

12 §112(f) because they lack the words "means for."  *See Flo Healthcare Solutions*, 697 F.3d at

13 1374.  There can be no serious question that "processor" connotes sufficiently definite structure

14 and has a well understood plain and ordinary meaning.  As Amazon's own expert admits, a per-

15 son of ordinary skill in the art would understand that the word "processor" has a structural mean-

16 ing.  *See, e.g.,* Forys Opening Declaration at ¶127 ("I understand a 'processor' to be an integrat-

17 ed circuit device that interprets and executes program instructions.").  Consistent with this defini-

18 tion, contemporary technical publications use "processor" to refer to a class of hardware de-

19 vices that process data.  *See* Shamos Opening Report ¶¶63-65.  And, the structural meaning of

20 "processor" has been confirmed by numerous courts addressing similar claim language.  *See,*

21 *e.g., Motorola, Inc. v. VTech Communications, Inc.*, 2009 U.S. Dist. LEXIS 59226, *43 (E.D.

22 Tex., Jul. 6, 2009) ("processor element" is "sufficiently definite such that [§112(f)] does not ap-

23 ply"); *Biax Corp. v. Intel Corp.*, 2007 U.S. Dist. LEXIS 14250, *16 (E.D. Tex., March 1, 2007)

24 (a "processor element" is "a device that is capable of interpreting and executing instructions").

25 Indeed, even when paired with the word "means"—which gives rise to a means-plus-function

26 presumption—courts have found "processor" to be sufficiently structural to overcome that pre-

27

1    sumption.  *See Data General Corp. v. International Business Machines Corp.*, 93 F. Supp. 2d 89,

2    97 (D. Mass. 2000) ("processor means" is not a means-plus-function term).

3         The addition of the word "capability" to "processor" does not transform the structural

4    term into a means-plus-function limitation.  The relevant claims describe either a "single proces-

5    sor or a collection of multiple processors" contained within one or more coordinated control sys-

6    tems.  *See* Shamos Opening Report ¶68.  The claims simply use "processor capability" as short-

7    hand to encompass both possible scenarios.  *Id.*  For example, claim 78 of the '984 patent recites

8    a "processor capability within the one or more coordinated control systems" and its dependent

9    claim 79 further specifies that "the processor capability is comprised of many processors."  *Id.*

10        Likewise, language following the "processor capability" term, *i.e.,* "configured for selec-

11   tive processing of communications," does not transform the term into a means-plus-function lim-

12   itation, either.  As with the "memory" terms, this "configured for" language describes the con-

13   figuration of physical structures, and is not a functional limitation on the claim term.  *See*

14   Shamos Opening Report ¶69.  In *Wi-LAN USA, Inc.,* the court rejected an argument nearly iden-

15   tical to Amazon's position in this case—that the term "processor configured to …" must be con-

16   strued under §112(f).  2013 U.S. Dist. LEXIS 128181 at *128.  The *Wi-LAN* court found that

17   "processor" combined with the claim's recital of its operation conveyed sufficient structural

18   meaning.  *See id.*  The same analysis applies here and the Court should reject Amazon's attempt

19   to construe the "processor capability" terms as means-plus-function limitations.

20        **2.   The "Processor Capability" Terms Are Not Indefinite**

21        Even if, notwithstanding the lack of evidence, the Court were to apply §112(f), the "pro-

22   cessor capability" terms are not indefinite.  The specification, which discloses computer-based

23   systems (*see* Section III.A above), provides sufficient structure for the "selective processing …"

24   function identified by Amazon.  The Federal Circuit has held that a computer is sufficient struc-

25   ture for performing general computing functions such as "processing" data.  *See, e.g., In re Katz*

26   *Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) (finding a

27   computer provides sufficient structure for "functions of 'processing,' 'receiving,' and 'storing'").

YARMUTH  WILSON PLLC

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1  Thus, Amazon's indefiniteness argument lacks merit.

2  ### E.  The "Still Video" and "Dynamic Video" Terms

| Claim Term Groups | Telebuyer's Construction | Amazon's Construction |
|---|---|---|
| "still video," "still images," "still image data," "still video images," and "still video data" | "still image and/or graphic, e.g. a photograph, which may include text but not the display of only text" | "Still" should be given its plain and ordinary meaning. The parties have agreed on a construction for "video." |
| "dynamic video," "dynamic … video," "dynamic video images," "dynamic … video images," "dynamic images," "dynamic motion video," "dynamic data," "dynamic video data," and "video data being … dynamic" | "[data associated with] moving images and/or graphics, e.g., movies, which may include text but not the display of only text" | These phrases are indefinite, and if the court finds these phrases are not indefinite, "dynamic" should be construed to mean "live" or "unrecorded" and the parties have agreed on a construction for "video." |

12  The parties agree that the term "video," as used in the Patents-in-Suit, means "infor-

13  mation visually displayed including images and/or graphics, which may include text but not the

14  display of only text." Dkt. No. 132 at 2.  Given this agreed construction, there should be no dis-

15  pute regarding the meanings of the "still video" and "dynamic video" terms.  "Still" and "dynam-

16  ic" are contrasting terms used throughout the specification and file histories to describe respec-

17  tively non-moving and moving images and graphics.  Amazon refuses to accept Telebuyer's pro-

18  posed plain meaning of the "still video" terms, but does not explain why it disagrees with

19  Telebuyer.  For the "dynamic video" terms, Amazon proposes an overly narrow and illogical

20  definition and then, based on this erroneous meaning, purports to find inconsistencies rendering

21  the term indefinite.  Because Telebuyer's proposed constructions are most true to the use of the

22  terms in the patents and their prosecution histories, and because those constructions avoid any

23  alleged inconsistencies within the claims, Telebuyer's constructions should be adopted.

24  ### 1.  Telebuyer's Constructions Are Consistent With the Claims, Specification, and File Histories

25  The asserted claims use "dynamic" and "still" to contrast between two different types of

26  video data.  For example, claim 68 of the '509 Patent recites "video data including dynamic vid-

PLAINTIFF'S OPENING CLAIM
CONSTRUCTION BRIEF - 32
NO. 2:13-cv-01677-BJR

YARMUTH WILSDON PLLC
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1   eo images or high resolution still images or both," and claim 1 of the '984 Patent recites "video

2   data including dynamic video data or high resolution still video images or both."  In each usage,

3   "dynamic" video means moving images, while "still" video means non-moving images.  *See*

4   Shamos Opening Report at ¶196.

5        The specification and prosecution history likewise use "dynamic" to contrast "still" when

6   discussing moving and non-moving video data.  *See, e.g.*, '894 Patent at 15:47-48 ("Separate

7   displays for dynamic and still videos may be used"); Dkt. No. 132-6 at 51 (discussing "the provi-

8   sion of 'high resolution still image data or dynamic video data or combination of both'").  As

9   Amazon's expert concedes, because "the specification contrasts 'dynamic and still video,'" it

10   implies "that dynamic may simply mean not still or moving."  Forys Opening Declaration at

11   ¶161.  Given that the claims and specification consistently contrast "dynamic" against "still," the

12   "dynamic video" terms plainly mean moving images while the "still video" terms mean non-

13   moving images.  *See Phillips*, 415 F.3d at 1313 (terms should be construed "in the context of the

14   particular claim in which the disputed term appears" and "in the context of the entire patent").

15        **2.   "Dynamic" Video Is Not Indefinite And Does Not Mean Live or Unrecorded**

16        Amazon argues that the "dynamic video" terms are indefinite because they can have mul-

17   tiple meanings: (1) live video, (2) moving video, or (3) "something more than simply moving

18   video or images."  *See* Forys Opening Declaration at ¶161.  In the alternative, Amazon argues

19   that "dynamic" must be limited to "live or unrecorded." *Id.* at ¶167.  Amazon's arguments fail

20   for multiple reasons.

21        ***First***, a person of ordinary skill in the art would not have understood "dynamic" to mean

22   "live or unrecorded" in the context of the Patents-in-Suit.  The Patents-in-Suit use a different

23   term—"real-time"—to describe and claim live video.  *See, e.g.,* '894 Patent at 3:34-35 ("imple-

24   menting face-to-face conferences (in real-time)"); '364 Patent at claims 16 and 79 (reciting "real-

25   time video communication" to claim a live video conference).

26        ***Second***, Telebuyer's proposed construction defining "dynamic" to mean moving is whol-

27   ly consistent with, and encompasses, the examples Amazon identified for all three of its purport-

**YARMUTH  WILSON** PLLC

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1   ed alternate definitions.[21]  Thus, there is no confusion.

2   *Third*, Amazon's construction of "dynamic" as "live or unrecorded" would render the as-

3   serted claims nonsensical.  Many claims recite a step of storing "dynamic video" in memory or

4   retrieving stored "dynamic video" from memory.  *See, e.g.,* '509 Patent at claim 74 (reciting a

5   step of "providing access by the buyers … to a video memory for providing stored video includ-

6   ing one or more dynamic or high resolution still video images …"); '894 Patent at claims 1 and 7

7   (reciting a step of "selectively obtain proposed data … from the video storage device having

8   stored video data," wherein "the stored video data includes dynamic motion video").  These limi-

9   tations indicate that the "dynamic video" is moving video prerecorded and stored in the "video

10   memory."  Applying Amazon's erroneous construction would cause the claims to require a step

11   of providing buyers access to unrecorded (*i.e.,* not stored) data that is stored in the memory,

12   which would make the claim nonsensical.  Indeed, Amazon's expert admitted that if "dynamic"

13   is construed as "live," any claim requiring "storing dynamic video" would not make sense.

14   Forys Dep. at 390:2-18.  Thus, Amazon's construction "renders [the] asserted claims facially

15   nonsensical" and "cannot be correct."  *Becton*, 616 F.3d at 1255.

16   Therefore, there is no ambiguity as to the meaning of the "dynamic video" terms and the

17   terms are not indefinite.  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129-30

18   (2014) ("a patent shall be presumed valid," and terms are not indefinite when they "inform those

19   skilled in the art about the scope of the invention with reasonable certainty").

20   **F.    The "Proposed Data" And "Request Data" Terms**

21

| Claim Term | Telebuyer's Construction | Amazon's Construction |
|---|---|---|
| "proposed data" | data suggested, put forth, or recommended for consideration | proposal |

---

[21] For example, Amazon cites to the use of "dynamic" in describing images transmitted through certain types of live video-telephone calls.  *See* Forys Opening Declaration at ¶161 (citing '894 Patent at 3:40-48, 8:64-65, 15:22-25, 15:47-51).  As Amazon's expert admits, such a video must be moving.  *See* Forys Dep. at 383:6-384:3.  Amazon also cites to the phrase "dynamic motion" in the specification.  *See id.* (citing '894 Patent at 8:63-65, 12:43-45).  A "dynamic motion" video is also moving.



| "request data" / "data from the requesting party to indicate an area of interest" / "buyer request" | No construction necessary, plain and ordinary meaning. | request for proposal |
|---|---|---|

Telebuyer's construction of "proposed data" is consistent with the intrinsic and extrinsic record.  The claims use "proposed data" to refer to data suggested, put forth, or recommended to the buyers for the buyers' consideration.  *See, e.g.,* Shamos Opening Report ¶206; '509 Patent at claim 17 (reciting a step of using a part of buyers' "request data to selectively obtain proposed data from" vendors that is responsive to the buyers' request data).  And contemporaneous dictionaries show that Telebuyer's construction is consistent with the common usage of "propose" at the time of the invention.  *See* Shamos Opening Report ¶207 (citing three dictionaries: Exs. A30, A37, and A38).  The "request data" terms do not require construction as the terms are used according to their well-understood plain meaning, and there is no indication Telebuyer intended to limit the "request" terms to a narrower meaning.  *See, e.g.,* '509 Patent at claim 17 (reciting "receiving request data from the certain buyers").

Amazon's constructions are contrary to the applicable law.  In the absence of a definition in the specification or a clear disclaimer, courts should not narrow the scope of claim terms beyond their plain meaning.  *See Hill-Rom Servs.*, 755 F.3d at 1371.  It is improper to "read limitations from the embodiments in the specification into the claims" even when "a patent describes only a single embodiment."  *Id.*  The patentee neither defined the disputed terms nor disavowed any claim scope.   Amazon offers no justification for limiting the scope of the claims to an embodiment where "proposed data" covers only a "proposal," and "request data" covers only a "request for a proposal."  Amazon's construction violates established rules of claim construction by importing limitations from the specification into the claim.  Therefore, the Court should reject Amazon's unduly narrow constructions of "proposed data" and "request data."

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should adopt Telebuyer's claim construction positions and reject Amazon's constructions.

YARMUTH WILSDON PLLC
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1  DATED:  September 23, 2014.

By: _/s/ Brian M. Berliner____
2  Mark A. Samuels (*pro hac vice*)
Brian M. Berliner (*pro hac vice*)
3  Xin-Yi Zhou (*pro hac vice*)
O'MELVENY & MYERS LLP
4  400 South Hope Street
Los Angeles, CA  90071
5  Telephone:    213.430.6000
Facsimile:    213.430.6407
6  Email:  msamuels@omm.com;
bberliner@omm.com; vzhou@omm.com

7  Marc J. Pensabene (*pro hac vice*)
O'MELVENY & MYERS LLP
8  7 Times Square
New York, NY 10036
9  Telephone:    212.326.2070
Facsimile:    212.326.2061
10  Email: mpensabene@omm.com

11  Jonathan Crawford (*pro hac vice*)
O'MELVENY & MYERS LLP
12  2765 Sand Hill Road
Menlo Park, CA 94025
13  Telephone:    650.473.2615
Facsimile:    650.473.2601
14  Email: jcrawford@omm.com

15  Jeremy E. Roller, WSBA No. 32021
Diana S. Breaux, WSBA No. 46112
16  YARMUTH WILSDON PLLC
818 Stewart Street, Suite 1400
17  Seattle, WA 98101
Telephone:    206.516.3800
18  Facsimile:    206.516.3888
Email: jroller@yarmuth.com;
19  dbreaux@yarmuth.com

20  *Attorneys for Plaintiff and Counterdefendant*
*Telebuyer, LLC*

21

22

23

24

25

26

27



1

## CERTIFICATE OF SERVICE

2

3     I hereby certify that on this date, I electronically filed the foregoing document with the
Clerk of the Court using the CM/ECF system, which will send notification of such filing to the
following:

4

5     Brian D. Buckley
Ewa M. Davison

6     Fenwick & West LLP
bbuckley@fenwick.com

7     edavison@fenwick.com

8     Matthew J. Moore
Michael J. Gerardi

9     Latham & Watkins LLP
matthew.moore@lw.com

10    michael.gerardi@lw.com

11

12    Douglas E. Lumish
Richard G. Frenkel
Gabriel S. Gross

13    Patricia Young
Eugene Chiu

14    Latham & Watkins LLP

15    doug.lumish@lw.com
rick.frenkel@lw.com

16    gabe.gross@lw.com
patricia.young@lw.com

17    eugene.chiu@lw.com

18

19    Cassius K. Sims
Latham & Watkins LLP

20    cassius.sims@lw.com

21    I declare under penalty of perjury under the laws of the State of Washington that the
foregoing is true and correct.

22

23    Dated:  September 23, 2014 at Seattle, Washington.

24                                            s/Sue Stephens
                                      Sue Stephens, Legal Assistant

25

26

27



YARMUTH  WILSDON PLLC
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888