1

2

3

4

5

6

7

The Honorable Barbara J. Rothstein

8

9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

TELEBUYER, LLC,

Plaintiff,

v.

AMAZON.COM, INC., AMAZON WEB
SERVICES LLC, and VADATA, INC.,

Defendants.

AMAZON.COM, INC., AMAZON WEB
SERVICES LLC, and VADATA, INC.,

Counterclaimants,

v.

TELEBUYER, LLC,

Counterclaim-
Defendant.

Case No. 2:13-cv-01677-BJR


**AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF**

**DUE DATE:  OCTOBER 7, 2014**

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE  206.389.4511

# TABLE OF CONTENTS

*Page:*

INTRODUCTION ------------------------------------------------------------------- 1

    1.    The Rule Against Functional Claiming -------------------------------------- 1

    2.    The Rule Against Claiming More Than What Was Invented ----------------------- 1

I.    THE PATENT LAWS PROHIBIT FUNCTIONAL CLAIMING. ------------------------- 3

II.    THE "CONTROL" TERMS ARE PURELY FUNCTIONAL, DO NOT COMPLY WITH 35 U.S.C. § 112(6), AND ARE THUS INDEFINITE. ---------- 7

    A.    The Claims Themselves Do Not Supply the Required Structure, Materials or Acts to be Definite. ------------------------------------------ 7

    B.    Telebuyer's Claims Do Not Invoke the Life-Line or *Quid Pro Quo* of 35 U.S.C. § 112(6). ----------------------------------------------- 9

    C.    Even Under 35 U.S.C. § 112(6), Telebuyer's Claims  Are Indefinite. ------------------------------------------------------------ 10

III.    ALL OF THE RECORD EVIDENCE SHOWS THAT ALL OF THE ASSERTED CLAIMS REQUIRE A DIAL-UP TELEPHONE NETWORK. ---------------------------------------------------------------- 13

    A.    The Written Description------------------------------------------------- 14

        1.    The Abstract ------------------------------------------------- 15

        2.    The Figures ------------------------------------------------- 15

        3.    The Statement of Related Applications -------------------------------- 16

        4.    Field of the Invention----------------------------------------------- 16

        5.    Background of the Invention ----------------------------------------- 16

        6.    Summary of the Invention ------------------------------------------- 17

        7.    Detailed Description of the Preferred Embodiments ----------------------- 17

    B.    The Prosecution Histories----------------------------------------------- 18

        1.    The Original Claims ------------------------------------------- 18

        2.    The Amendments ------------------------------------------- 19

    C.    The Extrinsic Evidence------------------------------------------------- 22

IV.    THE COURT SHOULD ADOPT AMAZON'S OTHER CONSTRUCTIONS. ---------- 24

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

A.    "Site" ---------------------------------------------------------------------- 24

B.    "Dynamic Video," "Dynamic Images," And Dynamic Data"----------------------- 26

C.    The "Still Video" And "Still Image" Terms------------------------------------------ 27

D.    "Request Data" and "Proposed Data" -------------------------------------------- 28

E.    "Video Memory For Conveying/Providing" ----------------------------------- 29

F.    "Storage memory configured for receiving" ------------------------------------- 32

G.    "Processor Capability" ----------------------------------------------------------- 32

CONCLUSION --------------------------------------------------------------------------------- 35

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

1

# TABLE OF AUTHORITIES

2

*Cases:*                                                                         *Page(s):*

3    *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
       521 F.3d 1328 (Fed. Cir. 2008)-------------------------------------------------- 11, 12, 31, 32

4

5    *BioMedino, LLC v. Waters Techs. Corp.*,
       490 F.3d 946 (Fed. Cir. 2007) ------------------------------------------------------------- 5

6    *Blackboard, Inc. v. Desire2Learn, Inc.*,
       574 F.3d 1371 (Fed. Cir. 2009)------------------------------------------------------------35

7

8    *Boss Indus. v. Yamaha Motor Corp. USA*,
       No. 2:05-cv-422, 2007 U.S. Dist. LEXIS 98875 (D. Utah Sept. 7, 2007) ---------------------20

9    *C.R. Bard, Inc. v. U.S. Surgical Corp.*,
       388 F.3d 858 (Fed. Cir. 2004) ------------------------------------------------------------14

10

11   *Control Resources, Inc. v. Delta Elec., Inc.*,
       133 F. Supp.2d 121 (D. Mass. 2001)------------------------------------------------------28

12   *Dealertrack, Inc. v. Huber*,
       674 F.3d 1315 (Fed. Cir. 2012)---------------------------------------------------- 11, 34

13

14   *EnOcean GmbH v. Face Int'l Corp.*,
       742 F.3d 955 (Fed. Cir. 2014) ------------------------------------------------------------10

15   *Eon-Net LP v. Flagstar Bancorp*,
       653 F.3d 1314 (Fed. Cir. 2011) ----------------------------------------------------------14

16

17   *ePlus, Inc. v. Lawson Software, Inc.*,
       700 F. 3d 509 (Fed. Cir. 2012)---------------------------------------------------- 11, 34

18   *Ergo Licensing, LLC v. CareFusion 303, Inc.*,
       673 F.3d 1361 (Fed. Cir. 2012)----------------------------------------------------11, 31, 32

19

20   *Finisar Corp. v. DirecTV Grp., Inc.*,
       523 F.3d 1323 (Fed. Cir. 2008)----------------------------------------------------------11

21   *Fuller v. Yentzer*,
       94 U.S. 288 (1877) ----------------------------------------------------------------------- 4

22

23   *Function Media, L.L.C. v. Google, Inc.*,
       708 F.3d 1310 (Fed. Cir. 2013)---------------------------------------------------- 11, 12

24   *Halliburton Energy Servs. v. M-I LLC*,
       514 F.3d 1244 (Fed. Cir. 2008)----------------------------------------------------6, 7, 35

25

26   *Halliburton Oil Well Cementing Co. v. Walker*,
       329 U.S. 1 (1946)----------------------------------------------------------------4, 9, 33

27   *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*,
       732 F.3d 1376 (Fed. Cir. 2013)---------------------------------------------------- 11, 12

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF          - iii -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

*In re Katz Interactive Call Processing Patent Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011) --------------------------------------------------------------------35

*Intellectual Ventures I LLC v. Canon, Inc.*,
    No. 11-792-SLR, 2014 WL 1392690 (D. Del. Apr. 10, 2014) ----------------------------------33

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
    382 F.3d 1354 (Fed. Cir. 2004) --------------------------------------------------------------------30

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ------------------------------------------------------------------------14

*Mass. Inst. of Tech. v. Abacus Software*,
    462 F.3d 1344 (Fed. Cir. 2006) --------------------------------------------------------------- 30, 32

*Med. Instr. & Diag. Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003) --------------------------------------------------------------------- 5

*Microsoft Corp. v. Multi-Tech Systems, Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004) ----------------------------------------------------------- 14, 20, 24

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) ------------------------------------------------------------------------------27

*Netword, LLC v. Centraal Corp.*,
    242 F.3d 1347 (Fed. Cir. 2001) --------------------------------------------------------------- 13, 27

*Noah Sys., Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012) ----------------------------------------------------------- 10, 11, 12

*Nystrom v. Trex Co., Inc.*,
    424 F.3d 1136 (Fed. Cir. 2005) --------------------------------------------------------------------14

*O'Reilly v. Morse*,
    56 U.S. (15 How.) 62 (1854) ------------------------------------------------------------------- 3, 4

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) --------------------------------------------------------------- 13, 14

*Pi-Net Int'l Inc. v. JPMorgan Chase & Co.*,
    No. 12-282-SLR, 2014 WL 1997039 (D. Del. May 14, 2014) ----------------------------------33

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) --------------------------------------------------------------------14

*Saffran v. Johnson & Johnson*,
    712 F.3d 549 (Fed. Cir. 2013) ----------------------------------------------------------------------- 5

*SciMed Life Sys. v. Advanced Cardiovascular*,
    242 F.3d 1337 (Fed. Cir. 2001) --------------------------------------------------------------------14

*TecSec, Inc. v. IBM Corp.*,
    731 F.3d 1336 (Fed. Cir. 2013) --------------------------------------------------------------------30

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF
Case No. 2:13-cv-01677-BJR

- iv -

**FENWICK & WEST LLP**
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE  206.389.4511

*Triton Tech. of Tex., LLC v. Nintendo of Am., Inc.*,
   753 F.3d 1375 (Fed. Cir. 2014)-------------------------------------------------------11

*Verizon Servs. Corp. v. Vonage Holding Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007)-------------------------------------------------------14

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ------------------------------------------------- 13, 26

*Wang Labs., Inc. v. Am. Online, Inc.*,
   197 F.3d 1377 (Fed. Cir. 1999)-------------------------------------------------------14

*Statutes*

35 U.S.C. § 112(2) -------------------------------------------------------------------35

35 U.S.C. § 112(6) ----------------------------------------------------------- *passim*

35 U.S.C. § 112(f) ----------------------------------------------------------------- 5

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF
Case No. 2:13-cv-01677-BJR

- v -

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE 206.389.4511

**INTRODUCTION**

The patent laws advance science and the useful arts through two equally important engines of innovation—one private, one public.  The first engine is private invention, which the patent laws promote by protecting specific solutions to specific problems that specific inventors contribute to the public weal.  The second engine is public innovation, which the patent laws promote by protecting the public's right to create other, different, and often better solutions to the same problems.  Virtually every rule of substantive patent law is intended to balance these two engines of innovation.   Many of those rules are at issue in this case.  Two in particular lie at the heart of this claim construction dispute.

1.     **The Rule Against Functional Claiming**

The first rule is that no person may own all ways of achieving a result.  Instead, patents are awarded for *particular* ways of achieving a result, reserving to the public *other* ways that are different and often better.  In the vernacular of patent law, the rule prohibits "purely functional claiming"—that is, claiming something *solely* by what it *does* as opposed to what it *is*.  The rule requires that patents claim specific and identifiable "structures" (*e.g.*, specific and identifiable *things* or *act*s) that are used to perform a claimed "function."  The reason for the rule is plain.  When a patent claims only functionally, it purports to own *all possible structures*, both present and future, that perform or will perform a function, thereby depriving the public of the benefits of future innovation.  For this reason, functional claiming has been prohibited by our patent laws for more than 150 years.  The consequence for claim construction is that a functional claim is inherently indefinite because it logically cannot be construed.  It cannot be construed because a person of skill in the art cannot logically identify what structures fall inside and (importantly) outside of a claim's scope.  No person may own infinity.  If a patent fails to convey what "less than infinity" is claimed, it is inherently, logically and legally indefinite.

2.     **The Rule Against Claiming More Than What Was Invented**

The second rule is that a patent may never be construed to remove from the public ways of solving a problem (*i.e.,* specific structures or acts for performing a function) that the named

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

1  inventor never actually invented.  This rule has many forms.  Two are at issue here.  First, when

2  an inventor consistently describes his or her "invention"—as opposed to a specific embodiment

3  of that invention—to have a particular scope, the claims cannot be construed more broadly.  And

4  second, when a patent applicant repeatedly tries to claim more broadly in the Patent Office, and

5  the Patent Office repeatedly rejects those efforts, and the applicant abandons those efforts in re-

6  sponse to those objections, then the issued claims can never be construed to cover what the Pa-

7  tent Office rejected and the applicant abandoned.

8                                    *   *   *

9        Both rules—each a cornerstone of our patent system—are squarely implicated at this pro-

10  cedural juncture.  Central to each and every claim in each and every patent is something called a

11  "traffic control system" (and other variants of the term).  This traffic control system is the brain

12  of the purported invention and is claimed to perform a host of complex computing functions that

13  allow buyers and sellers to locate each other, communicate with each other, and make and accept

14  offers to buy and sell things.  But the patents never say what this traffic control system *is*.  In-

15  stead, the patents say only what it *does*.  As a result, the patents purport to own *all* structures,

16  both present and future, that can perform this host of functions.  In this way, Telebuyer's claims

17  violate the 150 year-old rule against functional claiming.  No citizen or person of skill in the

18  art—not even Telebuyer's own expert—can identify what structures fall inside and (importantly)

19  outside of the claim.  Stated differently, Telebuyer's claims do not convey—even to Telebuyer's

20  own expert—how much "less than infinity" Telebuyer purports to own.  Consequently, Telebuy-

21  er's claims are inherently, logically and legally indefinite.

22        At the same time, the Telebuyer patents consistently describe "*the* invention"—as op-

23  posed to a specific embodiment of that invention—to require a dial-up telephone system without

24  a single reference to the World Wide Web.  This is no coincidence.  Mr. Katz, the sole inventor

25  named on the Telebuyer patents, tried to claim more broadly in the Patent Office—on five sepa-

26  rate occasions before two separate patent examiners—but the Patent Office repeatedly rejected

27  Mr. Katz's efforts to claim World Wide Web e-commerce, efforts that Mr. Katz abandoned in

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                    - 2 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE   206.389.4511

1   response to those objections.  Mr. Katz's present patent claims cannot now be construed to cover

2   what his patents never once mention, what the Patent Office rejected five separate times, and

3   what Mr. Katz abandoned in response—namely, modern World Wide Web e-commerce.

4   **I.      THE PATENT LAWS PROHIBIT FUNCTIONAL CLAIMING.**

5          The prohibition against functional claiming enjoys a long and distinguished history.  In

6   1854, the Supreme Court reviewed Samuel Morse's pioneering patent on telegraphy.  Notably,

7   one of his claims recited telegraphy in purely functional terms—that is, the claim was agnostic

8   about what specific machines or other structures should be used to transmit letters electronically

9   and at a distance.  Stated differently, the claim sought the end result or naked function of telegra-

10  phy, however achieved, independent of specific machines, and thus claimed "the exclusive right

11  to every improvement where the motive power is the electric or galvanic current, and the *result*

12  is the marking or printing of intelligible characters, signs, or letters at a distance."  *O'Reilly v.*

13  *Morse*, 56 U.S. (15 How.) 62, 112 (1854) (emphasis added).  In striking the claim, the Court ex-

14  plained that the purpose of the prohibition against functional claiming—or the prohibition of

15  owning results however achieved—is to protect the public's right to innovate:

16              If this claim can be maintained, *it matters not by what process or ma-*
    *chinery the result is accomplished*.  For aught that we now know *some future*
17  *inventor*, in the onward march of science, may discover a mode of writing or
    printing at a distance by means of the electric or galvanic current, without using
18  any part of the process or combination set forth in the plaintiff's specification.
    His invention may be less complicated—less liable to get out of order—less ex-
19  pensive in construction, and in its operation. . . .

20              Nor is this all, while he *shuts the door against inventions of other per-*
    *sons*, the patentee would be able to avail himself of *new discoveries* in the prop-
21  erties and powers of electro-magnetism which scientific men might bring to
    light.  For he says he *does not confine his claim to the machinery or parts of*
22  *machinery, which he specifies*; but claims for himself a monopoly in its use,
    *however developed*, for the purpose of printing at a distance. . . .  The court is of
23  opinion that the claim is too broad, and not warranted by law.

24  *Id.* at 113 (emphasis added).  *See also id.* at 120 ("no patent can lawfully issue upon such a

25  claim" for a mere result or "effect" instead of the "the process or machinery necessary to produce

26  it").  Consequently, Professor Morse's patent was limited to the specific machinery or acts that

27  he disclosed for achieving his telegraphic results:

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                    - 3 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE  206.389.4511

> To produce that effect, it must be combined with, and passed through, and oper-ate upon, *certain complicated and delicate machinery*, adjusted and arranged upon philosophical principles, and prepared by the highest mechanical skill. . . . And for the method or process thus discovered, he is entitled to a patent. But he has not discovered that the electro-magnetic current, used as motive power, *in any other method, and with any other combination*, will do as well.

*Id.* at 117.  *See also Fuller v. Yentzer*, 94 U.S. 288, 288 (1877) (It has long been the "established rule" that a patent "will not be sustained if the claim is for a *result*") (emphasis added).

Nearly 100 years after the *Morse* case, the Supreme Court applied the rule against func-tional claiming to strike a patent involving sonar in the oil and gas industry.  In *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1 (1946), the patent claimed all "means" for measuring distances by detecting echoes to improve the process of drawing oil from wells.  *Id.* at 3.  There, unlike here, the patent's specification identified a specific structure—a resonator—for achieving the claimed result, but the claims were not so limited.  *Id.* at 8-9.  There, just as here, the claim sought to cover all means for achieving the result at precisely the most important part of the in-vention.  And there, just as in *Morse*, the Court struck the claims for violating the rule against functional claiming and to protect future innovation:

> The language of the claim thus describes this most crucial element in the "new" combination *in terms of what it will do rather than in terms of its own physical characteristics or its arrangement in the new combination apparatus*.  We have held that a claim with such a description of a product is invalid as a violation of [the Patent Act].

*Id.* at 9 (emphasis added).

> In this age of technological development there may be many *other devices* be-yond our present information or indeed our imagination which will *perform that function and yet fit these claims*.  And unless frightened from the course of ex-perimentation by broad *functional claims like these*, inventive genius may evolve many more devices to accomplish the same purpose.

*Id.* at 12 (emphasis added).

In 1952, Congress amended the Patent Act to address the very circumstances raised in *Halliburton*.  Again, in *Halliburton*, the patent's specification identified a precise structure—a resonator—for achieving the claimed sonar function.  The problem in *Halliburton*, however, was that the claim did not recite that structure expressly, but instead used the term "means for," a

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                    - 4 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE  206.389.4511

term which on its face includes *any and all* structures, both present and future, that achieve a claimed result.  In response, Congress created 35 U.S.C. § 112(6), now 35 U.S.C. § 112(f),[1] which today allows applicants to use the term "means" as a way of incorporating into a patent claim the specific structures or acts that are recited in their specifications without reciting those structures and acts expressly in the claims:

> An element in a *claim* for a combination may be expressed as a means or step for performing a *specified function* without the recital of structure, material, or acts in support thereof, and such claim *shall be construed to cover the corresponding structure, material, or acts described in the specification* and equivalents thereof.

35 U.S.C. § 112(6) (emphasis added).

The statute is both a drafting convenience and a rule of claim construction—a *quid pro quo* available to applicants at their election.[2]  Prior to 1952, a patent claim was deficient even if specific structures, materials or acts for performing a claimed function were identified and disclosed in a patent's specification.  After 1952, the Congress gave a life-line to patent applicants by allowing draftspersons to identify their specific structures, materials, and acts in their patent specifications—as opposed to their claims—and advised construing courts to treat these structures, materials, and acts *as if they had been recited in the claims expressly*.  The critical point here is that at no time—not before or after 1952—has the Congress or the Supreme Court allowed a patent applicant to claim a naked function, much less a host of naked functions, without identifying specific structures, materials, or acts for performing those functions *somewhere* in the

---

[1] Because Mr. Katz applied for the patents-in-suit before the enactment of the America Invents Act, § 112(6) applies here.

[2] *See also Saffran v. Johnson & Johnson*, 712 F.3d 549, 562 (Fed. Cir. 2013) (Section 112(6) was designed as a "convenience" to patent applicants; a tool they could use to make claim drafting easier); *BioMedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 n.1 (Fed. Cir. 2007) ("Permitting an applicant to use a broad means expression for claiming a functional limitation provided that the specification indicates what structure constitutes the means for performing the claimed function is often referred to as the 'quid pro quo' for the convenience of employing § 112, [¶] 6."); *Med. Instr. & Diag. Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003) ("If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid [the price for use of the convenience of broad claiming afforded by § 112(6)] but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification.  Such is impermissible under the statute.").

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF
Case No. 2:13-cv-01677-BJR

- 5 -

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE  206.389.4511

1    patent.  And the *only* two ways to do so are (1) in the claims expressly or (2) by invoking the

2    life-line or *quid pro quo* of 35 U.S.C. § 112(6).

3        A more recent decision, also involving the Halliburton company, is instructive.  In *Halli-*

4    *burton Energy Servs. v. M-I LLC*, 514 F.3d 1244 (Fed. Cir. 2008), Halliburton's patent claims

5    recited the term  "fragile gel."  *Id* at 1250.  But neither the claims nor the specification defined

6    this "fragile gel" by its structure or composition—and so the life-line or *quid pro quo* of 35

7    U.S.C. § 112(6) was no help.  *Id.* at 1250-51.  Halliburton, however, urged the court to adopt a

8    construction of the term "fragile gel" based on what it *does*, not what it *is*—namely, a functional

9    definition.  *Id.* at 1250.  According to the court, "the two parts of Halliburton's proposed defini-

10   tion discussed above (ability of the fluid to transition quickly from gel to liquid, and the ability of

11   the fluid to suspend drill cuttings at rest) are *functional*, *i.e.*, the fluid is defined 'by what it *does*

12   rather than what it *is*.'"  *Id.* at 1255 (emphasis added, citation omitted).  Not surprisingly, the

13   court rejected Halliburton's construction, but not before emphasizing the "vice of functional

14   claiming, [which] occurs 'when the inventor is painstaking when he recites what has already

15   been seen, and then uses conveniently functional language *at the exact point of novelty*.'"  *Id.*

16   (emphasis added, citation omitted).  Consequently, the court declared that all of the "claims con-

17   taining that term [fragile gel] are indefinite."  *Id.* at 1250.[3]

---

18   [3] Today, the problem of functional claiming is widely cited as a leading cause of the poor

19   quality patents that too often result in patent litigation abuse.  *See e.g.,* Federal Trade Comm'n,
     *The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition,* at 102

20   (Mar. 2011), available at http://www.ftc.gov/os/2011/03/110307patentreport.pdf ("[T]he Com-
     mission urges that courts extend their recent focus on indefiniteness to address functional claim-

21   ing in general, in order to ensure disclosure of what is within and what is outside of the patent.");
     White House, *FACT SHEET: White House Task Force on High-Tech Patent Issues*, at 2 (June 4,

22   2013), available at http://www.whitehouse.gov/the-press-office/2013/06/04/fact-sheet-white-
     house-task-force-high-techpatent-issues (the President announced that "tightening functional

23   claiming" was an area the PTO needed to improve on and requested that it "develop strategies to

24   improve claim clarity"); Gov't Accountability Office, *Intellectual Property: Assessing Factors*
     *That Affect Patent Infringement Litigation Could Help Improve Patent Quality*, at 29 (Aug.

25   2013), available at http://www.gao.gov/assets/660/657103.pdf (finding that "functional claims
     and other overly broad claims may allow patent owners who sue for infringement to argue in

26   court that their patent covers (1) an entire technology when it may only cover a small improve-

27   ment, or (2) future technologies that their patent did not originally intend to cover.").

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                          - 6 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE  206.389.4511

1   As discussed immediately below, it is undeniable (and even admitted by Telebuyer's ex-

2   pert) that the various "control" terms recited in Telebuyer's claims are not specific structures,

3   materials or acts.  They are, instead, words defined solely by their functions—or combinations of

4   functions.  It is undeniable, too, that these functions are not ancillary to Telebuyer's claims—

5   they appear, just as in *Halliburton*, "at the exact point of novelty" of the alleged invention.  And

6   it is undeniable that neither Telebuyer's claims nor Telebuyer's litigation counsel attempts to in-

7   voke the life-line or *quid pro quo* of 35 U.S.C. § 112(6).  And for good reason; it wouldn't make

8   a difference because the claims would still be indefinite.  They would still be indefinite because

9   where, as here, a patent relies on general purpose and generic computing equipment to perform

10  an allegedly novel computing function (to say nothing of a host of allegedly novel and advanced

11  computing functions), the "structure" required to render those claims definite are the specific

12  computer *algorithms*, system *logic*, or program *instructions* that make the general purpose com-

13  puting equipment perform the recited functions.  Telebuyer's patents contain no such algorithms,

14  no such system logic, and no such program instructions—not in the claims, and not in the speci-

15  fication—which renders all of the "control" terms indefinite as a matter of law.

16  **II.   THE "CONTROL" TERMS ARE PURELY FUNCTIONAL, DO
17          NOT COMPLY WITH 35 U.S.C. § 112(6), AND ARE THUS
        INDEFINITE.**

18      **A.   The Claims Themselves Do Not Supply the Required
              Structure, Materials or Acts to be Definite.**

19

20  Every asserted claim recites a "control" term that is articulated in slightly different ways,[4]

21  but which is defined solely by its functions—namely, interfacing buyers and sellers, and facilitat-

---

[4] The different ways include the following: "traffic control system," "central communication control system," "central data system," "central site," "commercial transaction control system," "commercial transaction communication control system," "one or more multiple coordinated central stations," "one or more multiple coordinated control systems," "one or more of multiple coordinated control systems," "control system," "communication control system," "one or more of multiple coordinated communication control systems," "commercial transaction communication system," "one or more multiple coordinated central control stations," "one or more central control stations," "one or more multiple coordinated control stations," "one or more multiple coordinated communication control systems," "one or more of multiple coordinated one or more central control stations," "one or more multiple commercial transaction control systems," "one or more multiple coordinated commercial transaction control systems," "one or

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF          - 7 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

1    ing communications and transactions between them.  Claim 1 of the '894 Patent is exemplary.  It

2    recites "control of a traffic control system," "interfacing the buyers with the traffic control sys-

3    tem," "wherein certain buyers electronically communicate with the traffic control system" to "in-

4    itiate a transaction at the traffic control system," "receiving identification data at the traffic con-

5    trol system," "storing . . . request data . . . at the traffic control system," and "storing at the traffic

6    control system, billing data."  *See, e.g.,* '894 Patent at cl. 1.  *See also* '508 Patent at cl. 85; '509

7    Patent at cl. 1; '984 Patent at cl. 157; '796 Patent at cl. 70; '272 Patent at cl. 31; '364 Patent at cl.

8    76.  Nowhere do the claims define what specific structures or acts fall within these "control"

9    terms such that at least *some* structures and acts that can perform these functions do not—the

10   hallmark of definiteness.  Instead, the claims purport to own each and every structure or act—

11   whether existing now or in the future—that can perform these functions. This is the very defini-

12   tion of a functional claim element.

13           If there were any doubt, Telebuyer's own expert, Dr. Michael Shamos, resolved it at his

14   deposition. Dr. Shamos admitted repeatedly that the claimed "control system" includes *anything*

15   that can perform the claimed control *functions,* and that it would be "difficult to imagine *any-*

16   *thing*" that can perform these functions that would *not* fall within the scope of the claim:

17           Q.     If something performs a *function* of controlling traffic, is it a traffic con-
                    trol system?  Or is there more to it?

18           A.     . . . You have to be able to *receive signals, interpret them, decide what
19                  to do with them, and then possibly send them out externally through
                    some other communication line*.  And a traffic control system has to
                    have the components to do that. Given that, then I suppose there's *great*
20                  *generality as to how one might architect a traffic control system.*

21   (Young Decl., Ex. 1, Shamos Dep., at 91:20-92:12 (emphasis added).)

22   ───────────────────────────────────────────────────────────
     more multiple coordinated control units," "one or more multiple coordinated central control
23   units," and "central control site."

24           Even Telebuyer's expert could not explain why Telebuyer's claims use so many different
     terms to express the same limitation.  (Declaration of Patricia Young ("Young Decl."), Ex. 1,
25   Deposition of Michael I. Shamos, Ph.D, at 174:17-25 ("Q. Why not—why wouldn't the patents
     just have one phrase if they all mean the same thing?  A. Well, I confess to you I've been puz-
26   zling over that for two years.  This is a florid style of claiming that this particular patent attorney
     used.  I can imagine reasons for doing it, and I can imagine detriments to doing it.  But I can't
27   answer the question because I don't know what was in the mind of the drafter.").)

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                    - 8 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

Q.       . . . If the buyers can be *interfaced* with it, the transaction can be *initiated* at it, identification data can be *received* at it, and billing data can be *stored* at it, and an interface can be *established* between it and the buyer, is there *anything* that would *not* be a traffic control system, in your mind, anything that would *fall without* that claim phrase, traffic control system?

A.       *It's difficult to imagine that anything wouldn't be a traffic control system that met all that because it would necessarily have all the components that I listed of a traffic control system.*

(*Id.* at 99:8-20 (emphasis added).)

Q.        There are probably tens of thousands, if not more, of types of control systems, aren't there?  Maybe millions?

A.       I'm willing to go as far as to admit that there are a large number of different control systems.  But they all share the commonality of being a control system.

(*Id.* at 184:8-14.)

Q.       Is it limited in any way to any form of communication network, sir?  In your opinion?

A.       Sure. I mean, I don't think smoke signals would qualify. There are many ways of communicating that would not involve personal computers with video capability. But other than that, I don't know. *I don't know how it would be limited.*

(*Id.* at 86:23-87:4; *see also id.* at 91:4-14 ("I think I can tell by looking at something whether it's a traffic control system or not. . . .  *By determining whether it controls traffic.*") (emphasis added).)

That testimony is important, if not dispositive, evidence that Telebuyer's claims do no more than describe the very core or brain of the entire alleged invention—the very point of novelty—in purely functional terms—*i.e.*, "in terms of what it will do rather than in terms of its own physical characteristics or its arrangement in the new combination apparatus."  *Halliburton*, 329 U.S. at 9.  That conclusion dooms Telebuyer's claims unless (1) they can benefit from the life-line or *quid pro quo* of 35 U.S.C. § 112(6), and, assuming that they could, (2) the specification sufficiently describes the "control" terms by what they *are* and not by what they *do*.

**B.       Telebuyer's Claims Do Not Invoke the Life-Line or
*Quid Pro Quo* of 35 U.S.C. § 112(6).**

Under the modern Patent Act, there is only one exception to the prohibition against

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF
Case No. 2:13-cv-01677-BJR

- 9 -

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE   206.389.4511

1 claiming a function, which, of course, is not an exception but rather a drafting rule and a rule of

2 construction.  Under 35 U.S.C. § 112(6), an applicant may claim a function while omitting the

3 actual structure that performs the function by invoking the words "means for" or "step for" per-

4 forming the function.  So doing will, as a matter of law, incorporate and limit the scope of the

5 claims to the specific structures, materials and acts disclosed in the specification for performing

6 the claimed function (and their equivalents).  Here, there is no dispute that Telebuyer's "control"

7 terms do not use the words "means for" or "step for" performing the numerous control functions,

8 which creates the presumption that Telebuyer does not seek the benefit of the statute.  *See*

9 *EnOcean GmbH v. Face Int'l Corp.*, 742 F.3d 955, 958 (Fed. Cir. 2014) ("where, as here, the

10 claim language does not recite the term 'means,' we *presume* that the limitation does not invoke

11 § 112, ¶ 6.") (emphasis added).  That presumption is consistent with the fact that, at least to date,

12 Telebuyer's counsel has denied that the "control" terms may be construed under 35 U.S.C. §

13 112(6).  (D.I. 132, Joint Claim Construction Statement ("JCCS"), at 26, 38, 41, 43); (Young

14 Decl., Ex. 2, Opening Expert Rpt. of Michael I. Shamos ("Shamos Rpt."), at ¶¶ 131, 148, 167,

15 187.)

16      At first glance, this would appear to be a curious position for Telebuyer to take.

17 Telebuyer's only hope for cabining these claims is to invoke the benefits of § 112, ¶ 6 and incor-

18 porate the structures disclosed in the specification, and yet Telebuyer steadfastly refuses to do so.

19 A closer look, however, explains why.  The specification is devoid of the special structures that

20 are required for computer-implemented claim elements under modern patent law—much of

21 which was developed long after the PTO issued the patents-in-suit.

22          **C.    Even Under 35 U.S.C. § 112(6), Telebuyer's Claims**
23                  **Are Indefinite.**

24      Where, as here, a claim recites complex computing functions, the Federal Circuit has

25 "consistently required that the structure disclosed in the specification be more than simply a gen-

26 eral purpose computer or microprocessor."  *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312

27 (Fed. Cir. 2012).  There is only one exception to this rule.  A general purpose computer or mi-

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                        - 10 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE  206.389.4511

croprocessor will be sufficient structure only if the claimed function is performed inherently by *any* general purpose computer or microprocessor, regardless of how it is programmed or configured.  *Id.* at 1312 n.8.  But "[w]hen dealing with a 'special purpose computer-implemented means-plus-function limitation,' we require the specification to disclose the algorithm for performing the function."  *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013) (citation omitted).[5]  The reason for the rule is plain.  "Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to 'the corresponding structure, material, or acts' that perform the function."  *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) (quoting 35 U.S.C. § 112(6)).  Thus, without limiting a computer-implemented claim to a specific algorithm, system logic, or series of computing steps, the claim necessarily would devolve into the very functional claim that 35 U.S.C. § 112(6) was intended to prevent.  *See Noah Sys.*, 675 F.3d at 1318 ("This court imposed the algorithm requirement to *prevent purely functional claiming* when a patentee em-

---

[5] *See also ePlus, Inc. v. Lawson Software, Inc.*, 700 F. 3d 509, 519 (Fed. Cir. 2012), *vacated in part on other grounds*, --- F.3d ---, 2014 WL 3685911 (Fed. Cir. 2014) ("Here, the specification does not disclose any structure that is responsible for generating purchase orders. There is no instruction for using a particular piece of hardware, employing a specific source code, or following a particular algorithm.  There is therefore nothing in the specification to help cabin the scope of the functional language in the means for processing element: The patentee has in effect claimed everything that generates purchase orders under the sun.  The system claims are therefore indefinite."); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1330 (Fed. Cir. 2012) (reversing district court's denial of motion for summary judgment of indefiniteness because "the '841 Patent's specification discloses no algorithm pursuant to which the 'central processing means' could perform the claimed function of 'tracking'"); *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012) ("control means" indefinite because it required "special programming" but the patent did not provide "any step-by-step" process); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340-41 (Fed. Cir. 2008) (recitation of "software" in the patent, without further details, did not provide sufficient structure for a "database editing means"); *see also Triton Tech. of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378-79 (Fed. Cir. 2014) (phrase "numerical integration" did not sufficiently disclose an algorithm for performing the claimed integrating function of an "integrator means"); *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379-81 (Fed. Cir. 2013) (purported "sleep propensity algorithm" disclosed in the specification that merely "lists inputs without specifying any single formula or function or algorithm whose terms are defined and understandable" was inadequate to save the claims from indefiniteness); *Noah Sys., Inc.*, 675 F.3d at 1318 (where "a claim recites multiple identifiable functions and the specification discloses an algorithm for only one, or less than all, of those functions, [the court] must analyze the disclosures as . . . when no algorithm is disclosed").

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF        - 11 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE  206.389.4511

ploys a special purpose computer-implemented means-plus-function limitation.") (emphasis added); *Aristocrat*, 521 F.3d at 1333 (striking claim as invalid for lack of algorithm and stating, "The *point* of the requirement that the patentee disclose particular structure in the specification and that the scope of the patent claims be limited to that structure and its equivalents *is to avoid pure functional claiming*") (emphasis added).

Here, the only structure that could possibly perform the many complex and exotic functions of the "control" terms is, at best, a specially programmed computer or combination of specially programmed computers.  (*See* Young Decl., Ex. 3, Declaration of Leonard J. Forys, Ph.D ("Forys Decl.") at ¶¶ 53-60.)  Again, Telebuyer's expert, Dr. Shamos, confirms this important point:

> Q.   . . . One thing I want to know if I've covered completely is, for all of these terms, would you agree that I couldn't just go out and go to Best Buy and buy a computer that served as the -- sorry, I have to find it -- that serve as the data communication control system terms in section D of your report, and serve as the multiple control system[/]station terms in your report on page 34, or as the control unit terms on page 38, without specially programming it?
>
> A.   *I think that's right*.  The special programming might not involve more than using the conventional functions of those computers.  *But as you take the thing home from the store, it will not perform the functions laid out for it in these claims.*

(Young Decl., Ex. 1, Shamos Dep., at 214:7-20.)

This testimony is important.  It shows that the Telebuyer patents depend on "special programming," which the patents never disclose.  True, special programming may be disclosed in different ways, including as "'a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure.'"  *Function Media*, 708 F.3d at 1318  (quoting *Noah Sys.*, 675 F.3d at 1312).  But a "description of an algorithm that places no limitations on how values are calculated, combined, or weighted is insufficient to make the bounds of the claim understandable."  *Ibormeith*, 732 F.3d at 1382.  The court will search in vain for such special programming in Telebuyer's patents, (*see* Young Decl., Ex. 3, Forys Decl., at ¶¶ 53-60), and not even Telebuyer has identified any to date.  At most, Dr. Shamos complains that Amazon "failed

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF
Case No. 2:13-cv-01677-BJR

- 12 -

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE  206.389.4511

1   to consider" certain passages in the specification when showing the absence of special program-

2   ming.  (Young Decl., Ex. 4, Rebuttal Expert Report of Michael I. Shamos ("Shamos Rebuttal"),

3   at ¶ 73.)  This is untrue—indeed Dr. Forys analyzed those passages and found no mention of al-

4   gorithms.  (Young Decl., Ex. 3, Forys Decl, at ¶¶ 53-56, 59.)  At any rate, neither Dr. Shamos

5   nor Telebuyer even attempts to explain why those passages matter.   Again, Dr. Shamos testified:

6       Q.    You don't opine that those passages [in the specification] actually lay
              out an algorithm for the four functions you've described for the traffic
7             control system, do you, sir?

8       A.    Well, no, because we just talked the four functions here today.  They
              weren't listed as part of my report.
9

10  (Young Decl., Ex. 1, Shamos Dep., at 107:15-20.)

11        For all of these reasons, the "control" terms in Telebuyer's patents violate the rule against

12  functional claiming, and are therefore indefinite.  Telebuyer, of course, disagrees, asserting that

13  the "control" terms somehow refer to a physical system of some sort.  But even were that true,

14  such a system would necessarily require a telephonic interface apparatus for interfacing remote

15  telephonic terminals of the dial-up telephone system, as all of the record evidence convincingly

16  shows.

17  **III.    ALL OF THE RECORD EVIDENCE SHOWS THAT ALL OF THE
            ASSERTED CLAIMS REQUIRE A DIAL-UP TELEPHONE**
18  **        NETWORK.**

19        Patent claims are "directed to the invention that is described in the specification; they do

20  not have meaning removed from the context from which they arose."  *Netword, LLC v. Centraal*

21  *Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001); *see also Phillips v. AWH Corp.*, 415 F.3d 1303,

22  1315 (Fed. Cir. 2005) (en banc) ("The specification 'is always highly relevant to the claim con-

23  struction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disput-

24  ed term.'") (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

25  Thus, as a guiding principle, "'the construction that stays true to the claim language and most

26  naturally aligns with the patent's description of the invention will be, in the end, the correct con-

27  struction.'"  *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*,

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                              - 13 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE  206.389.4511

1   158 F.3d 1243, 1250 (Fed. Cir. 1998)).  A court "'should also consider the patent's prosecution

2   history, if it is in evidence.'"  *Id.* at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52

3   F.3d 967, 980 (Fed. Cir. 1995)).  "The prosecution history, which we have designated as part of

4   the 'intrinsic evidence,' consists of the complete record of the proceedings before the PTO and

5   includes the prior art cited during the examination of the patent."  *Id.*  "Like the specification, the

6   prosecution history provides evidence of how the PTO and the inventor understood the patent,"

7   evidence on which the public is entitled, indeed encouraged, to rely.  *Id.*  Most important, when a

8   patent specification describes "*the* invention"—and not merely one embodiment thereof, the

9   claims may not be construed more broadly.  Applying these principles, in *Microsoft Corp. v.*

10  *Multi-Tech Systems, Inc.*, 357 F.3d 1340 (Fed. Cir. 2004), the Federal Circuit limited the claims

11  at issue to a dial-up telephone system, excluding the packet-switched Internet, reasoning: "In

12  light of those clear statements in the specification that the invention ('the present system') is di-

13  rected to communications 'over a standard telephone line,' we cannot read the claims of the '627

14  patent, the '649 patent, or the '532 patent to encompass data transmission over a packet-switched

15  network such as the Internet."  357 F.3d at 1348.[6]

16      ### A.      The Written Description

17          Telebuyer's patents describe nothing more than combining ordinary telephone technolo-

18  gy found in nearly every 1994 American home with conventional personal computers of that

19

20      [6] *See also Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1321-22 (Fed. Cir. 2011) ("[I]n
    describing the invention in detail, the written description explains that '*the invention* provides an
21  interface between information originating from a hard copy document and a computer
    application unit which uses the information.' . . . These statements about *the invention* are not
22  limited to specific embodiments or examples but describe and define *the invention overall*.");
    *Verizon Servs. Corp. v. Vonage Holding Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a
23  patent thus describes the features of *the 'present invention' as a whole*, this description limits the
    scope of the invention."); *SciMed Life Sys. v. Advanced Cardiovascular*, 242 F.3d 1337, 1341
24  (Fed. Cir. 2001) (internal citations omitted) ("'[W]hen the 'preferred embodiment' is described
    as *the invention itself*, the claims are not entitled to a broader scope than that embodiment'")
25  (quoting *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999)).  This is
    especially true of structure recited in the "Summary of the Invention" section or the "Abstract."
26  *See, e.g.*, *Eon-Net*, 653 F.3d at 1321; *Nystrom v. Trex Co., Inc.*, 424 F.3d 1136, 1139 (Fed. Cir.
    2005); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements
27  that describe the invention as a whole, rather than statements that describe only preferred embod-
    iments, are more likely to support a limiting definition of a claim term.").

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                      - 14 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE  206.389.4511

same era to facilitate videophone communications and transactions between buyers and sellers over a dial-up phone network. The patents consistently describe "the invention"—not merely one embodiment thereof—to require the use of a dial-up telephone network. The World Wide Web is not mentioned, anywhere.

## 1. The Abstract

Each patent shares the same two-sentence Abstract, which is the first substantive description of "the invention." Notably, the Abstract expressly defines the "traffic control system" to "comprise" a "*telephonic* interface apparatus for interfacing remote telephonic terminals of the *dial-up telephone system*":

> A traffic control system selectively interfaces members of plural groups, as buyer groups and vendor groups, for video communication through a *dial-up telephone* system, for analyzing and compiling data, scheduling appointments, implementing conferences, consummating sales and the like. The traffick-control [sic] system *comprises* a *telephonic* interface apparatus for interfacing remote *telephonic* terminals of the *dial-up telephone* system identified with the members of the plural groups, a video recording unit for recording and playing video transcriptions, a storage memory for storing data on the members, including *telephonic* terminal numbers and area-of-interest codes and a control computer to selectively interconnect the video recording unit with the remote *telephone* terminals through the *telephonic* interface apparatus to record and receive video communication.

(D.I. 132, Joint Claim Construction Statement ("JCCS"), at 245-85 ('894 Patent at Abstract) (emphasis added).)[7] The Abstract uses the terms "telephone," "telephonic," or "dial-up" no fewer than seven times in just two sentences. By contrast, the Abstract does not mention the World Wide Web.

## 2. The Figures

The figures, too, are replete with references to "dial-up telephone" technology. Figure 1 shows both a "DIAL-UP PUBLIC TELEPHONE SYSTEM" and a "TELEPHONE INTERFACE SWITCH." '894 Patent at Fig. 1. Figure 2 illustrates combinations of telephones and PCs located at buyer and seller premises communicating over the "DIAL-UP PUBLIC TELEPHONE

---

[7] Citations to common material in the Telebuyer patents are to U.S. Patent No. 6,323,894 ("the '894 Patent").

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF
Case No. 2:13-cv-01677-BJR

- 15 -

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE  206.389.4511

1   SYSTEM."  (*Id.* at Fig. 2; *see also id.* at Figs. 3, 5, 6, & 7 (illustrating other telephone system

2   elements such as a touch-tone telephone keypad, "telephone interface structure," "auto dialer,"

3   "operator," "calling no. ANI," "call," "telephone No.," and "call billing data").)

4       No figure shows the World Wide Web.

### 3.   The Statement of Related Applications

6       Telebuyer's Statement of Related Applications cross-references three earlier applications

7   from the long chain leading up to the patents-in-suit.  '894 Patent at 1:5-21.  One is entitled

8   "Scheduling and Processing System for *Telephone* Video Communication," and the other two

9   are entitled "*Videophone* System for Scrutiny Monitoring With Computer Control."  (*Id.*)  Those

10  applications, too, are replete with references to telephone technology.  (*See, e.g.*, Young Decl.,

11  Ex. 5, U.S. Patent No. 5,412,708, at 2:59-63; *id.*, Ex. 6, U.S. Patent No. 5,495,284, at 2:65-3:2;

12  *id.*, Ex. 7, U.S. Patent App. No. 08/067,783, Application, at 46.)

13      None mentions the World Wide Web.

### 4.   Field of the Invention

15      The "Field of the Invention" states that "*the* invention"—not just one embodiment there-

16  of—"relates to the field of computerized telephone and video communication, and more particu-

17  larly, to a communication traffic control system for providing video communication *through a*

18  *dial-up telephone system*":

19          The *present invention* generally relates to the field of computerized telephone
    and video communication, and more particularly, to a communication traffic
20          control system for providing video communication *through a dial-up telephone*
    *system*, for selectively interfacing members of plural groups, for example,
21          wholesale buyer groups and vendor groups.

22  '894 Patent at 1:25-31 (emphasis added).

23       "*The* invention" is not said to "relate" to the World Wide Web.

### 5.   Background of the Invention

25      The "Background of the Invention" is consistent:  "Over the years, integration of com-

26  puter and *telephone* technologies has brought many advances in the telecommunication indus-

27  try."  *Id.* at 1:43-45 (emphasis added).  Again, there is no mention of the World Wide Web.

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                    - 16 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE  206.389.4511

6.        **Summary of the Invention**

The "Summary of the Invention" explains how the "*the* present invention"—again, not just one embodiment thereof—could fulfill a "need" for videoconferencing by leveraging standard "dial-up" telephone equipment.  The very first two sentences provide in their entirety:

> Generally, the system of *the present invention* involves traffic regulation and control for video communication between a plurality of remote, widely distributed locations, from a central unit, utilizing *dial-up telephone facilities in today's computer environment*, and with *voice quality lines*.  Specifically, for example, the dynamic graphics of *telephonic* video (*on standard analog lines and digital lines* over Integrated Services Digital Network (ISDN)) facilitate *videophone*, while video still displays and digital lines facilitate high fidelity (hi-fi) video displays along with audio capabilities, all combined with the interactive capability of computers to attain an effective commercial product routing system with video vending capability.

*Id.* at 3:39-52 (emphasis added); *see also id.* at 3:66-4:13 (describing use of personal computers and speakerphones for videoconferencing).

The "Summary of the Invention"—again, a section of the written description given special weight according to traditional tools of claim construction—does not mention the World Wide Web.

7.        **Detailed Description of the Preferred Embodiments**

The last section of the written description—the "Detailed Description of the Preferred Embodiments"—again touts (also in its first two sentences) that the "significant aspect" of "the invention" is a combination of dial-up telephone lines, videophones, and PC equipment:

> As indicated above, a *significant aspect* of the scheduling and routing system of the present invention is based on recognizing that a *dial-up public telephone system* may be effectively utilized for visual communication and conferences between a plurality of remote locations regulated and controlled by a central traffic control station.  More specifically, it has been recognized that for an effective communication traffic control system, *dial-up voice quality lines, such as standard analog or digital lines*, may be employed variously in conjunction with *videophone equipment*, computer facilities (personal computers (PCs) with video capabilities) and various forms of *telephonic equipment* as voice generators, auto dialers and D-channel or in-band signalling [*sic*] apparatus.

'894 Patent at 6:49-65 (emphasis added); *see also, e.g., id.* at 16:3-9; 19:15-17.

Notably, the "Detailed Description of the Preferred Embodiments" concludes with the

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF          - 17 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE  206.389.4511

1    standard boilerplate disclaimer that the reader should not hold the applicant to the embodiments

2    described in the patents.  And yet—and this is unusual—even this boilerplate repeats that the in-

3    vention uses conventional telephone technology:

4            In view of the above description, it will be apparent that numerous operating
             formats, programs and layouts may be accomplished using a wide variety of
5            *videophone* equipment in cooperation with computing and *telephone* apparatus.

6    *Id.* at 24:56-59.

7            All told, the entire specification refers to dial-up telephone technology hundreds of times,

8    including 139 references to "videophone," "telephone" or "telephonic"; 23 references to "dial-

9    up"; and 162 references to "call," "calls," "calling," "caller," and "called."  (Young Decl., ¶ 10;

10   *see also id.*, Ex. 8, Annotated Copy of '894 Patent.)  And yet, nowhere do the patents mention

11   the World Wide Web, or the web servers, web browsers, and related technologies needed for

12   web-based e-commerce.

13                       **B.       The Prosecution Histories**

14           Telebuyer tried on at least five separate occasions to persuade at least two different PTO

15   patent examiners to read the specification of the patents-in-suit to include the Internet and the

16   World Wide Web.  And on each occasion the examiner rejected Telebuyer's current litigation

17   position that conclusory and isolated references to "electronic bulletin boards" and "on-line ser-

18   vices" are somehow sufficient to broaden the scope of the patents beyond dial-up telephone sys-

19   tems.

20                       **1.       The Original Claims**

21           Telebuyer's original claims recited dial-up telephone technology expressly.  Claim 1 in the

22   original application that led to the '894 Patent included no fewer than four express references to

23   "telephone" or "telephonic" elements.    (D.I.  132,  JCCS,  at  334  ('894  Application  at

24   TLB0000319).)  In seeking to distinguish these claims from the prior art, Telebuyer repeatedly

25   argued that the claims were limited to dial-up telephone-based technologies as opposed to com-

26   monly used Ethernet networks.  (*Id.* at 394 (4/18/1996 Reply to Office Action at TLB0000636).);

27   (*Id.* at 420 (2/17/1998 Reply to Office Action at TLB0000671).)

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                    - 18 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

1

2. **The Amendments**

2     The Court may judicially notice that the World Wide Web superseded telephone networks

3     as the preferred technology for e-commerce—a fact, ironically, due in large measure to the suc-

4     cess of technologies invented by Amazon.  Telebuyer, too, took notice, and four years into the

5     prosecution of its patents, began to reshape them in subtle and mischievous ways.  For example,

6     Telebuyer dropped its express telephone limitations in favor of amorphous and unspecified

7     "communication systems."  (*See, e.g.*, *id.* at 425 (2/20/1998 Amendment at TLB0000689 (re-

8     moving "telephonic terminal numbers" and adding "commercial transaction communication con-

9     trol system")); *id.* at 525-26 (8/2/1999 Amendment at TLB0001602-03 (replacing "dial-up tele-

10    phone" with "public communication system" and removing references to "telephone" and "dial-

11    up telephone system")).)

12     But the Patent Office saw these amendments for what they were, and would have none of

13    it.  For example, during the prosecution of the application for the '796 Patent, the Examiner re-

14    jected Telebuyer's efforts to add claim language referring to a "vendor data site."  (*Id.* at 1538

15    (8/7/2006 Office Action at TLB0019219).)  In doing so, the Examiner cited the lack of support in

16    the specification for the Internet or the World Wide Web:

> 17    [T]he term 'data site' is generally known in the art as a location on the World
> 18    Wide Web.  Applicant's *specification neither uses the term 'vendor data site'
> nor describes a web site accessible via the Internet*.  Therefore, the subject mat-
> 19    ter claimed was not described in such a way as to reasonably convey that the in-
> ventor, at the time the application was filed, had possession of the claimed in-
> 20    vention.

21    (*Id.*)  To ensure there would be no confusion in the public record, in her final office action the

22    Examiner noted that "applicant's specification clearly describes direct communication with a

23    vendor location (vendor site), *not access to a data site on the World Wide Web*."  (*Id.* at 1578

24    (1/10/2008 Office Action at TLB19270).)  Telebuyer then retreated to the term "site" instead of

25    "data site."  (*Id.* at 1541-42 (2/23/2007 Reply to Office Action at TLB0019222).)

26     In parallel with the prosecution of the patents-in-suit, and in connection with yet another

27

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF    - 19 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE  206.389.4511

1  patent sharing the same specification in related Patent Application No. 09/316,430,[8] Telebuyer

2  tried to convince a different examiner—on four separate occasions—that its specification could

3  support claims to Internet commerce.  And on each occasion, the Patent Office rejected Telebuy-

4  er's efforts.

5      First, Telebuyer attempted to amend Figure 2 by changing "DIAL-UP PUBLIC TELE-

6  PHONE SYSTEM" to "COMMUNICATION SYSTEM/DIAL-UP PUBLIC TELEPHONE

7  SYSTEM."  (*See, e.g.*, Young Decl., Ex. 9, '430 Application File History Excerpts, 3/20/2003

8  Preliminary Amendment, at AMZ_TB-001030958).)  The examiner rejected this subtle effort to

9  slip through support for the Internet years after the original application had been filed:

10     Request to insert "COMMUNICATION SYSTEM" in FIG. 2 broadens the
       scope to include additional communication systems, *other than the presently*
11     *specified "dial-up public telephone system*," such as cable television network,
       *Internet telephone*, wireless, etc. which are *not supported by the disclosure*.
12

13  (D.I. 132, JCCS, at 2371 (5/22/2003 Office Action at AMZ_TB-001031065).)

14     Six months later, Telebuyer tried again by arguing that "such forms of communication

15  are explicitly set forth in applicant's disclosure."  Telebuyer's support for this argument was ex-

16  actly the one sentence on which Telebuyer so heavily relies for support in this litigation:

17     More specifically, at page 8, beginning on line 15, several communication sys-
       tems alternatives are referred to, again, including 'desktop PCs' (personal com-
18     puters).  Additionally, 'electronic bulletin boards", on-line computer services
       and other communication systems are mentioned.
19

20  (*Id.* at 2414 (11/20/2003 Amendment at AMZ_TB-001031109).)  Once again, the  Patent Office

21  rejected Telebuyer's efforts to capture the Internet.  (*Id.* at 2426 (02/23/2004 Office Action at

22  AMZ_TB-001031123 ("[O]bjections to the proposed amendments in the disclosure, as new mat-

23

24  ――――――――――
       [8] The '430 Application is a continuation of the '894 Patent, one of the patents-in-suit.  The
25     file history of a related patent application with a common specification is relevant to the under-
       standing of the scope of a common term, and may be considered by the Court.  *See Microsoft*,
26     357 F.3d at 1349-50; *see also Boss Indus. v. Yamaha Motor Corp. USA*, No. 2:05-cv-422, 2007
       U.S. Dist. LEXIS 98875, at *17 (D. Utah Sept. 7, 2007) ("When interpreting claims within a
27     family of related applications, the Court's analysis is guided not only by the intrinsic evidence
       associated with the patent at issue, but also by the intrinsic evidence associated with the other
       family members as well.").

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                    - 20 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

ter is maintained [sic] based on the analysis presented on pages 2-5 in the earlier office action.")).)

And so Telebuyer tried again.  In its September 3, 2004 amendment and response, it sought again to amend Figure 2, and referred the Examiner back to its prior argument that the single sentence in the written description with references to on-line and bulletin board services was enough to broaden the patents to cover the Internet.  (Young Decl., Ex. 9, '430 Application File History Excerpts, 09/03/2004 Amendment, at AMZ_TB-001031159 ("Applicant respectfully requests the Examiner to consider the arguments (with respect to Section 112, 102 and 103 of the Patent Statute) urged before in view of the amendments to the claims presented here.").)  The Patent Office again considered the issue and reached the same conclusion.  (*Id.*, 9/24/2004 Office Action, at AMZ_TB-001031162 ("The examiner has once again considered these argument but they are not persuasive[.]").

And so Telebuyer tried again.  On April 4, 2005, Telebuyer submitted another amendment and response.  Telebuyer noted the disclosure of personal computers and then rehashed the same single sentence as its sole evidence for the broadening amendment:   "Specifically, Applicant's specification indicates the use of 'personal computers' that accomplish on-line communication thereby indicating computers that may access the internet (see page 6, line 28).  More specifically, at page 8, beginning on line 15, several communication system alternatives are referred to again including 'desktop PCs' (personal computers).   Additionally, 'electronic bulletin boards', on-line computer services and other communication systems are mentioned."  (D.I. 132, JCCS, at 2447-48 (04/04/2005 Amendment at AMZ_TB-001031183-84).)   And once again, the Patent Office rejected Telebuyer's counterintuitive efforts to expand its claims to reach Internet commerce:

> (i) Request to insert COMMUNICATION SYSTEM in Fig. 2 *broadens the scope to include additional communication systems, other than the presently specified 'dial-up public telephone system'*, such as cable television network, Internet telephone, wireless, etc. which are not supported by the disclosure.

(*Id.* at 2458 (07/20/2005 Office Action at AMZ_TB-001031198).)

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                    - 21 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE   206.389.4511

Finally, on September 14, 2006, Telebuyer made its fifth attempt to convince the Patent Office that Telebuyer invented Internet e-commerce, and restated, word-for-word, the same argument it made in April.  (*Id.* at 2477 (09/14/2006 Amendment at AMZ_TB-001031232-33).).  Again, the examiner was not persuaded, and again refused to permit the amendment to Figure 2 because the written description does not support the disclosure of any communication system other than a dial-up telephone network.  (*Id.* at 2493-94 (11/28/2006 Office Action at AMZ_TB-001031276-77 ("Applicant's arguments . . . are therefore not found persuasive for same reasons as already analyzed.[.]").

Despite five attempts before two examiners, Telebuyer never succeeded in persuading the Patent Office to read its specification to support claims covering the Internet or any other communication system beyond the dial-up public telephone system that the patents consistently describe as "*the* invention."[9]

### C.    The Extrinsic Evidence

Telebuyer's expert, Dr. Shamos, concedes that the explosion of the web in 1994 was the subject of extensive contemporaneous press coverage:

> Q.    Would you agree that the emergence of the web was the hottest topic in the technical press in 1994?
>
> A.    I'm not ready to say that it was number one. But it certainly was incredibly hot.

(Young Decl., Ex. 1, Shamos Dep., at 34:5-9; *see also id.* at 32:2-6 (admitting "[t]he internet and the web were being written about largely by both the technical press and the mainstream press throughout '93 and '94").)  And beyond this widespread coverage, the prior art cited on the cover of the patents include references to the Internet and the World Wide Web, establishing conclusively that Telebuyer was aware of both:

> Q.    . . . .  Will you agree with me then that regardless of who found it [the

---

[9] Telebuyer did manage to inject new matter mentioning the Internet into the specification of U.S. Patent No. 8,315,364, the seventh patent-in-suit in this case.  (D.I. 132, JCCS at 1846-79 ('364 Patent at 2:31-33; 3:62-4:4, 20:12-16, 23:18-20).)  But those isolated references do nothing to change the basic fact that Mr. Katz did not invent Internet commerce, and even Telebuyer does not rely on these new references as support for its claim constructions here.

1    prior art], at least during the prosecution of the '894 patent Mr. Katz or
2    his patent lawyers were aware of the internet?

     A.    Yes.

4    (*Id.* at 37:19-24.)

5         Given this testimony, the only reasonable conclusion is that Telebuyer was well aware of

6    both the World Wide Web and the Internet, but never referred to either because Telebuyer never

7    intended to claim any communication system other than a dial-up videophone network.  Only

8    now, Telebuyer seeks to ensnare the World Wide Web through a single sentence in its 24-

9    column specification:

10        Communication between the routing system and the different buyers and ven-
          dors may be accomplished in a variety of ways, as for example, by electronic
11        mail (transmission of messages across a network between two desktop PCs),
          electronic bulletin boards, on-line computer services (such as Prodigy® or
12        CompuServe®), facsimile, voice-mail or the like.

13   (Young Decl., Ex. 4, Shamos Rebuttal, at ¶ 67 (discussing '894 Patent at 4:67-5:6); *id.*, Ex. 1,

14   Shamos Dep., at 218:16-219:17.)  But Telebuyer's reading of this lone sentence cannot bear the

15   weight imposed on it.  On its face, the sentence cannot support ownership of the World Wide

16   Web or Internet commerce—as the Patent Office found on five separate occasions.  This is im-

17   portant because, by the time the patents-in-suit were filed, if one of ordinary skill in the art were

18   describing the World Wide Web he or she would use that word explicitly:

19        Q.    So after 1991 you were referring to the web as the web?

20        A.    Well, I don't -- I'm uncertain today about the period between 1991 and
                1993.  *But certainly by 1993 everybody in the field was referring to it as*
21              *the web.*

22        Q.    When you say "everybody in the field," what field do you have in mind?

23        A.    Computer scientists.  Anybody who had any access to the internet was
                referring to it as the web.

24

25   (Young Decl., Ex. 1, Shamos Dep., at 35:9-18; *see also id.* at 34:22-35:4 ("[A]fter Berners-Lee

26   [the inventor of the web], and it was christened the World Wide Web and everybody was calling

27   it that, I called it that.  But prior to that I would have called it the internet.").  And the vague ref-

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                - 23 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE  206.389.4511

erence to Prodigy and CompuServe as "on-line" services does not come close to converting the Telebuyer patents into Web patents:  Neither CompuServe nor Prodigy was web-hosted in 1994 when the patents-in-suit were filed.  (*Id.* at 242:13-243:7 (conceding services "[p]robably were not" web-hosted in 1994 "[b]ecause of the commercial restrictions on the internet").

\*   \*   \*

Under the circumstances and on this record—both intrinsic and extrinsic—it would defy common sense, be grotesquely unfair, and turn the patent system on its head to allow Telebuyer to claim ownership of modern Internet commerce on the World Wide Web.  It would also be in-compatible with controlling precedent.  In *Microsoft Corp. v. Multi-Tech Systems, Inc.*, just like in this case, the patentee's original application claimed a dial-up telephone network.  Just as in this case, the applicant, over the course of many applications, attempted to broaden its claims by reciting a "personal communications system" just like the "public communications network" re-cited in Telebuyer's claims.  *See* 357 F.3d at 1348.  And just as in this case, the common specifi-cation repeatedly and consistently referred to "*the* invention"—not just a preferred embodiment thereof—as using a dial-up telephone system.  *Id*. at 1347-48; *see also id.* at 1348 (finding the specification referred to a telephone line "roughly two dozen times," but "[n]where does it even suggest the use of a packet-switched [Internet] network.")  The court in *Multi-Tech* flatly reject-ed the applicant's efforts to expand its claims.  This Court should reach the same result here.

## IV.    THE COURT SHOULD ADOPT AMAZON'S OTHER CON-STRUCTIONS.

### A.    "Site"

| Amazon's Position | Telebuyer's Position |
| --- | --- |
| Physical location (not a website). | A location or place. |

Both parties agree that a "site" means a physical location or place.  But Telebuyer has re-fused to confirm that the term cannot also encompass a website or virtual place in cyberspace, insisting on its ambiguous construction which may, or may not, include a website.

The claims reference only a "site" and never a "website."  The specifications, too, never

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF          - 24 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

1    mention a "website" or include any reference to the web.  This absence of disclosure of the web

2    is more than sufficient to reject Telebuyer's efforts to add the web through ambiguity alone.

3    Additionally, at the time of the applications, the plain meaning of "site" referred only to a physi-

4    cal location.  "Site" was not defined in any of the computer dictionaries cited by the parties and

5    all general dictionary definitions of "site" relied upon by the parties recite a physical location.

6    (Young Decl., Ex. 10, Webster's Third New International Dictionary 2128-29 (1993) at

7    AMZ_TB-001030363-64 ("2 a: the local position of building, town, monument, or connection

8    with its surroundings b: a space of ground occupied or to be occupied by a building, c: land made

9    suitable for building purposes.").)  Further, "site" is used interchangeably with location through-

10   out the specification to refer to physical locations of buyers, vendors, and the system.  *See, e.g.*

11   '894 Patent 5:16-19 ("That is, as disclosed, the central traffic control system or alternatively, plu-

12   ral coordinated such systems (located at one site or plural sites), as well as, the buyer locations

13   . . . .").

14          The prosecution history eliminates all doubt that the word "site" cannot be construed to

15   cover websites.  Again, during the prosecution of the '796 patent, the Patent Office rejected

16   Telebuyer's attempts to inject broad claim language that could, potentially, be read to cover web-

17   based components.   (D.I. 132, JCCS, at 1538 (8/7/06 Office Action at TLB0019219 (rejecting

18   proposed amendment adding "data site" because Telebuyer's application "neither uses the term

19   'vendor data site' *nor describes a web site accessible via the Internet*.")).)  Telebuyer dropped

20   the word "data" from the claim and settled on just "site," explaining that the specification sup-

21   ported the amendment by disclosing the *physical location* of vendor computers.  (*Id.* at 1569

22   (Oct. 10, 2007 Amendment and Response at TLB0019258-59 ("Furthermore, at page 19, para-

23   graph 0062, the specification indicates that 'central traffic control system TIS directs and ex-

24   changes on-line and off-line traffic between the vendor and buyer sites . . . .'")).)  The Patent Of-

25   fice accepted this amendment, but pointed out again that the specifications do not describe "ac-

26   cess to a data site on the World Wide Web."   (*Id.* at 1578 (1/10/08 Office Action at

27   TLB0019270).)

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                                    - 25 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE   206.389.4511

1

B.      "Dynamic Video," "Dynamic Images," And Dynamic Data"[10]

2       There are two disputes regarding the "dynamic" terms.  The first is simple:  Telebuyer's

3   inclusion of the example "e.g. movies" is wrong.  The parties have agreed to a construction of

4   "video," meaning "information visually displayed including images and/or graphics, which may

5   include text but not the display of only text." (D.I. 132, JCCS, at 2.)  Telebuyer's construction of

6   "dynamic" takes that agreed-to definition of video and modifies it to mean "moving images

7   and/or graphics, *e.g. movies*, which may include text but not the display of only text."  (*Id.* at 81.)

8   There is no intrinsic support for movies in the patent, and modifying "dynamic" to mean "mov-

9   ing video (e.g. movies)" invites confusion by a lay jury likely to associate the term movies with

10  feature length films such as those produced in Hollywood, not to mention that "dynamic" is used

11  to modify nouns other than "video."

12      Ignoring this misplaced example, Telebuyer really appears to be arguing that "dynamic"

13  means "moving."  This is yet another effort by Telebuyer to distance the claims from its own de-

14  scription of the invention in the specification.  In particular, the specifications refer repeatedly to

15  the purported "invention" as one for interactive, "face-to-face" videophone calls between buyers

16  and sellers.  '894 Patent at 15:47-51; *see also id.* at 3:40-52, 8:46-65, 12:43-45, 15:22-25, 16:48-

17  55.  And the specification makes clear that it is exactly these live, real-time video calls that are

18  the "dynamic" communications of the claims.  (*Id.*; Young Decl., Ex. 3, Forys Decl., at ¶ 161.)

19  Telebuyer's construction appears to read this preferred embodiment out of the claims—which is

20  "rarely, if ever, correct."  *Vitronics Corp.*, 90 F.3d at 1583.

21      As Telebuyer will undoubtedly point out, several of its claims—which were largely writ-

22  ten many years after the specification—include the nonsensical step of retrieving "stored" "dy-

23  namic" video" from memory, which is inconsistent with its meaning as set out in the specifica-

24  tion.  *See* '894 Patent, cl. 7 ("stored video data includes dynamic motion video").  And the ex-

25

26      [10] The "dynamic" terms are: "dynamic video" / "dynamic … video" / "dynamic video

27  images" / "dynamic … video images" / "dynamic images" / "dynamic motion video" / "dynamic data" / "dynamic video data" / "video data being … dynamic."

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                    - 26 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE  206.389.4511

1    trinsic evidence submitted by Telebuyer does not resolve the ambiguity; on the contrary,

2    Telebuyer cites to six dictionaries that provide different and inconsistent definitions for "dynam-

3    ic."  (Young Decl., Ex. 3, Forys Decl., at ¶ 164-65; D.I. 132, JCCS, at 84-86.)

4         Because, in the end, no consistent meaning is evident, the "dynamic" terms are indefinite

5    under the Supreme Court's recent decision in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.

6    Ct. 2120, 2124 (2014) ("[W]e hold that a patent is invalid for indefiniteness if its claims, read in

7    light of the specification delineating the patent, and the prosecution history, fail to inform, with

8    reasonable certainty, those skilled in the art about the scope of the invention.").  Should the

9    Court disagree, Amazon submits that the definition in the specification should apply and "dy-

10   namic video" should be construed as limited to live, real-time, and unrecorded video such as that

11   seen in a videoconference.  *Netword*, 242 F.3d at 1352 ("The claims are directed to the invention

12   that is described in the specification; they do not have meaning removed from the context from

13   which they arose.").

14        **C.       The "Still Video" And "Still Image" Terms**[11]

| Amazon's Position | Telebuyer's Position |
|---|---|
| "Still" should be given its plain and ordinary meaning.  The parties have agreed on a construction for "video." | "Still image and/or graphic, e.g. a photo-graph, which may include text but not the display of only text." |

19        The parties have agreed on the construction of the term "video."  (D.I. 132, JCCS, at 2.)

20   For "*still* video," though, Telebuyer restates "still" with no explanation for what it means, and

21   then inexplicably re-defines "video" in a way that is different from and inconsistent with the par-

22   ties' agreement.

23        The Court need not construe this term.  Neither party asks the Court to construe "still"

24   and so its plain meaning should apply.  And Telebuyer offers no reason for departing from the

25   parties' agreement concerning the term "video."  Otherwise, the multiple constructions for the

26   ───────────────

27   [11] The "still" terms are: "still video" / "still images" / "still image data" / "still video images" / "still video data."

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF
Case No. 2:13-cv-01677-BJR                    - 27 -

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

1   same term—"video"—risk needlessly confusing the jury.  *See, e.g., Control Resources, Inc. v.*

2   *Delta Elec., Inc.*, 133 F. Supp.2d 121, 127 (D. Mass. 2001) ("In the end, claim construction must

3   result in a phraseology that can be taught to a jury of lay people.").

4           **D.      "Request Data" and "Proposed Data"**

| Amazon's Position | Telebuyer's Position |
|---|---|
| **"Request Data"[12]** | |
| Request for proposal. | No construction necessary, plain and ordinary meaning. |
| **"Proposed Data"** | |
| Proposal. | Data suggested, put forth, or recommended for consideration. |

13          The terms "request data" and "proposed data" are not used in the specifications and ap-

14   pear for the first time in the claims.  The phrases also have no common and ordinary meaning.

15   The specifications, however, do shed light on what the terms could mean.  Specifically, buyer

16   requests are described six times in the specification, and in each description the buyer submits a

17   "request for proposal."  '894 Patent at Fig. 9, 7:19-22, 8:46-52, 10:36-47, 10:50-55, 18:29-31,

18   21:1-4, 21:15-29, 24:28-55.  Likewise, the response from the vendor to these requests is, in every

19   instance, a proposal.  *Id.* at 3:19-24, 4:24-33, 7:19-22, 10:50-55, 11:16-20, 18:29-42, 18:60-63,

20   21:15-34, 24:49-55.  Given this consistent usage of the terms, the Court should construe "request

21   data" to mean a request for a proposal, and "proposed data" to mean the responsive proposal.

22          Telebuyer's construction of "proposed data," on the other hand, should be rejected for

23   several reasons.  First, it improperly replaces the affirmative term "proposed" with the more

24   equivocal "suggested" and the much vaguer "put forth."  Second, as with Telebuyer's other pro-

25   posed constructions, it would expand the scope of the claims beyond anything disclosed in the

---

26          [12] "Request Data" includes: "request data" / "data from the requesting party to indicate an

27   area of interest" / "buyer request."

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                    - 28 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

specification; there is no disclosure in the patents of a proposal that is merely the "recommenda-tion for consideration" of some undefined "data."  And, third, Telebuyer's construction is incon-sistent with its own expert's concession that proposed data is "responsive to a buyer's request" in that the proposed construction would permit any data "suggested, put forth or recommended" regardless of whether it responds to a request or not.  (Young Decl., Ex. 1, Shamos Dep., at 148:20-24.)

### E.       "Video Memory For Conveying/Providing"

Claim 17 of the '509 patent requires a "video memory device for conveying one or more video images including at least high resolution still images as part of the proposed data relating to the area of interest indicated by the buyers." '509 Patent at 26:36-43; *see also id.* at claims 35, 50, 53, 57.  Claim 74 substitutes "providing" for "conveying" and references stored and dynamic video, but is otherwise identical in reciting "video memory":  "video memory for providing stored video including one or more dynamic or high resolution still video images as part of the proposed data relating to the area of interest indicated by the buyers."  *Id.* at 36:17-25; *see also id.* at claims 64, 68, 80.  Unlike the control terms discussed earlier, which engage in impermissi-ble functional claiming, the video memory terms use the generic term "video memory" "for" per-forming the "conveying" function in the same format employed for means-plus-function claim-ing under 35 U.S.C. § 112(6).  Because they claim generic, structure-less means "for" perform-ing the recited functions, these terms invoke 35 U.S.C. § 112(6) and are thus limited to the struc-tures set forth in the specifications.  And because the specifications lack any algorithms for pro-gramming a special purpose computer to perform the functions, the claims with these "video memory" terms should be held invalid for indefiniteness.

Despite avoiding the word "means," the claims are designed to capture any device that is "for conveying" or "for providing" video, along with other "proposed data" to the buyer.  As such, the terms are limited only by their function, and not by any specific structure, and so should be construed as means-plus-function terms.  *See, e.g.*, *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 n. 4 (Fed. Cir. 2006) [hereinafter *MIT*] ("Of course, a claim term

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                    - 29 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE  206.389.4511

defined solely in functional terms, without more, would fall within Section 112(6)."). As such, "video memory" is nothing more than "a nonce word or a verbal construct" that serves as a substitute for means. *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004).

Telebuyer argues that "memory" is the name for a known class of structures, and so not a nonce word akin to "means." (Young Decl., Ex. 2, Shamos Rpt., at ¶ 33.) If the claims used "memory" according to standard parlance to mean a device for *storing* data, or even for writing data to or reading data from a computer storage device, Telebuyer might have a point. *See, e.g., TecSec, Inc. v. IBM Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013). But they do not. As noted above, Telebuyer assigns a far more complex and specialized function to the "video memory" that is different from the mere storage of data and which requires, again, the combination of video with the "proposed data," and the "conveyance" or "providing" of that data to the buyer—functions that are not simply inherent in a generic memory device. '509 Patent at claims 17, 35, 50, 53, 57, 64, 68, 74, 80. Dr. Shamos admits as much:

> Q. What's being described here [in the "video memory" terms] is conveying that data to the buyer, isn't it?
>
> A. Well, it's ultimately going to the buyer, yes.

(Young Decl., Ex. 1, Shamos Dep., at 134:24-135:2; *see also id.* at 134:5-8 (admitting the claims do not recite merely reading or extracting data from memory).)

> Q. Is it still your opinion then that merely reading from memory is sufficient to convey the data as required by claim 17 of the '509 patent?
>
> A. *No.* What I think I said was, you have to read from memory and then you have to send the data out of the memory somewhere else. That's the conveying part. *If I just read it and it never leaves the memory, then it's not conveyed anywhere.*

(*Id.* at 141:19-142:1.)

> Q. Of course. I understand. But let me just ask this question, which is, you list these types of memories, *you say they're these commonly known broad classes of structures for storing data, storing computer data specifically. And you list RAM and EPROM and floppy discs and optical discs as examples. None of those are known common structures that*

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF
Case No. 2:13-cv-01677-BJR

- 30 -

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE 206.389.4510
FACSIMILE  206.389.4511

> *would be used for conveying video data*, the images described in the claims, all the way to the buyer, or providing it?
>
> A.  *That's right*.  And that's why you're not right when you say it means that.  Because what was used here are terms that would have meaning to those of skill in the art.  *Those of skill in the art know what a video memory does, and it doesn't do what you suggest it should be doing.*

(*Id.* at 145:14-146:4.); *see also id.* at 147:16-148:19 (hard drives and magnetic tape drives "would not, as a known common structure to those of skill in the art, convey or provide the video images all the way to the buyer").)  In short, "memory" is not the name for a known structure for the actual conveying function being claimed, and so the "video memory" terms must be construed under § 112(6) or else they would violate the rule against functional claiming.  *MIT*, 462 F.3d at 1354 n. 4; *see also Ergo Licensing*, 673 F.3d at 1364 (concluding that description of "memory" in the specification failed to provide "structure capable of performing the function of 'controlling the adjusting means.'").

The specification of the patents-in-suit fall short of disclosing sufficient structure that corresponds to the conveying or providing functions.  For example, Figure 5 illustrates a "control computer T16" designed "to provide data that is processed along with other data to control and facilitate on-line and off-line communications between buyer and vendor terminals." '894 Patent at 20:7-11.  The control computer addresses a "buyer-vendor/merchandise code storage unit T2[6]." *Id.* at 20:6-7.  A "video file server T34 is coupled directly to the telephone interface structure T12 and to the control computer T16," and is also connected to an "audio response unit T18" and an "auto dialer T14." *Id. at* 19:24, 20:26-28, 23:31.  As shown in these passages, in every instance obtaining the memory and "providing" it is done by a "control computer" which, again, is a special purpose computer.  (*Id.*; *see also* Young Decl., Ex. 3, Forys Decl., at ¶ 79.)  But wholly absent from the specification is any *algorithm* for programming a computer to perform this specialized function.  (Young Decl., Ex. 3, Forys Decl., at ¶¶ 80-86.)  As such, the "video memory" terms are indefinite.  *Aristocrat*, 521 F.3d at 1333.

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF          - 31 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

1

### F.    "Storage memory configured for receiving"

2

The "storage memory" term suffers from the same defect:  It attempts to use the name of

3

a broad class of devices known only for *storing* data to perform a different and unorthodox func-

4

tion—here, "receiving" (in addition to storing) very specific data:

5

> a storage memory configured for receiving and storing data on said members of
> said buyer and vendor groups, including identification data and commercial trans-
> action data including video data relating to at least certain group members that al-
> so relates to the area of interest[.]

6

7

8

'508 Patent at 30:20-24.  As above, because the function is different from the traditional function

9

performed by "storage memory," that term cannot be given its ordinary meaning, and the "stor-

10

age memory" term ultimately is bounded only by its function and so must be construed under §

11

112(6), if at all.  *MIT*, 462 F.3d at 1354 n.4; *Ergo Licensing*, 673 F.3d at 1364.

12

The specification again fails to identify sufficient structure for performing the claimed

13

function.  Rather, its disclosure here, too, depends on the use of a special purpose "control com-

14

puter" for which no algorithm is ever disclosed.  (*See* Young Decl., Ex. 3, Forys Decl., at ¶¶ 102-

15

10; '894 Patent at Figs. 2 & 5 (video file server (37 and T34) coupled directly to a telephone in-

16

terface structure (T12) and a control computer (28 and T16)).)  Accordingly, the "storage

17

memory" terms are indefinite.  *Aristocrat*, 521 F.3d at 1333.

18

### G.    "Processor Capability"

19

The "processor capability" terms are also claimed purely by their function and with no

20

identified structure:

21

> *processor capability within the one or more multiple coordinated control units for
> selective control of communications* between certain multiple buyers and the site,
> the *processor capability configured for selective processing of communications*
> based on an area of interest indicated by certain multiple buyers either (a) via re-
> mote terminals with a video display, (b) via remote telephonic terminals respond-
> ing to automated voice prompts from the audio response unit, or (c) via the opera-
> tor interface, *the processor capability configured to utilize the area of interest to
> provide responsive data* relating to the area of interest from the site including se-
> lect video data and providing the responsive data to the certain multiple buyers at
> the remote terminals with a video display . . . .

22

23

24

25

26

27

'984 Patent at 24:38-52 (emphasis added); *see also id.* at 29:58-30:4.

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                                    - 32 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

This claim language does not even purport to claim a "processor," but claims instead only the *capability* of a processor after it has been specially programmed to perform the functions of the claim.  (Young Decl., Ex. 1, Shamos Dep., at 173:17-174:6 ("I think if you walked out in the street to a computer scientist and said, what's a processor capability, he would probably say it's *something a processor can do*.") (emphasis added).)  Here again, like the "memory" terms, the processor capability terms use the generic term "processor capability" "for" performing the functions in the claims in the same format employed for means-plus-function claiming under 35 U.S.C. § 112(6).  Thus, such terms must be construed under § 112(6) or held invalid under *Halliburton*.  *See, e.g.*, *Pi-Net Int'l Inc. v. JPMorgan Chase & Co.*, No. 12-282-SLR, 2014 WL 1997039, at *12-13 (D. Del. May 14, 2014) (applying § 112(6) to a "computer system executing the back-end transactional application for processing the transaction request in real-time"); *Intellectual Ventures I LLC v. Canon, Inc.*, No. 11-792-SLR, 2014 WL 1392690, at *2-3 (D. Del. Apr. 10, 2014) (applying § 112(6) to "a computing device for providing a main image").

As the "capability" of a processor, there can be no doubt that the structure at issue here includes a computer.  (*See* Young Decl., Ex. 3, Forys Decl., at ¶¶ 127-28.)  And there can be no legitimate dispute that, given the highly specific functionality required of the processor— selective processing and control of communications between buyers and sellers using the "area of interest"—a *special purpose*, *specially programmed* computer is required.  (*Id.*)  Here again, Telebuyer's expert, Dr. Shamos, agrees:

Q.   Well, I'll go back to Best Buy.  I can go buy a laptop or a computer, it'll have a processor, right?

A.   Yes.

Q.   It'll have a processor that can generally do computer processing?

A.   Yes.

Q.   But *unless I specially program it it won't be able to selectively process communications based on an area of interest* indicated by certain multiple buyers, right?  I'm looking at number 1, C1 in your report, page 16.

A.   *Yes, uh-huh*.  Well, it's not configured for that.  *So when you bought it it wasn't configured as required by the claim*.

Q.     You have to program it?

A.     Effectively, yes.

Q.     Same is true for a processor, I couldn't just buy it at Best Buy, *I'd have to program it before it could selectively control communications between certain multiple buyers and the at least one vendor*, as recited in claim 78 of the '984 patent?

A.     *Yes*.

(Young Decl., Ex. 1, Shamos Dep., at 170:14-171:11 (emphasis added).)

The specification fails again to disclose any algorithm for the requisite programming needed to achieve the claimed "processor capability."  Rather, the patent refers once again only to the seemingly unlimited power of the "control computer" for performing this function, but again with no explanation of *how* it would do so.  (*See* Young Decl., Ex. 3, Forys Decl., at ¶ 129-130.)  For example, the control computer blocks in Figs. 1, 2, and 5 are blank.  And, critically, the specification repeatedly references the control computer's *ability* to control traffic communications, but provides no *algorithms* to accomplish any of this.  (*Id.* (citing '894 Patent at 19:23-36, 19:37-63, 19:64-20:11, 22:28-36, 24:11-14, cols. 21-24).)  The same is true for the use of an "area of interest" indicated by buyers—the specification includes a blank box for "selectivity logic" in Fig. 2, box 47, and provides no algorithm for that "logic."  (*See* Young Decl., Ex. 3, Forys Decl., at ¶ 132; '894 Patent at 13:32-35, 18:22-24.)  And where there is an attempt to claim a specialized function with no disclosure of the algorithm for performing that function, Courts have found such claims indefinite.  *See, e.g.*, *ePlus*, 700 F.3d at 518-20 (reversing district court's finding that "means for processing" claims related to generating purchase orders were indefinite because patent contained "no instruction for using a particular piece of hardware, employing a specific source code, or following a particular algorithm," meaning the patentee had "in effect claimed everything that generates purchase orders under the sun"); *Dealertrack*, 674 F.3d at 1330 (reversing district court's denial of motion for summary judgment of indefiniteness because "the '841 Patent's specification discloses no algorithm pursuant to which the 'central processing means' could perform the claimed function of 'tracking'"); *Blackboard, Inc. v. Desire2Learn,*

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF
Case No. 2:13-cv-01677-BJR

- 34 -

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

1   *Inc.*, 574 F.3d 1371, 1383 (Fed. Cir. 2009) (finding a claim indefinite where the alleged structure

2   was "essentially a black box that performs a recited function").

3        Mr. Katz, Telebuyer's sole employee and the named inventor of its patents-in-suit, has

4   tried before to claim a specialized function performed by a generic processor with no disclosure

5   of the algorithm for performing that function, only to have his claims invalidated by the Federal

6   Circuit:

7        And by claiming a processor programmed to perform a specialized function
     without disclosing the internal structure of that processor in the form of an algo-

8        rithm, Katz's claims exhibit the "overbreadth inherent in open-ended functional
     claims," *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1256 n. 7 (Fed.

9        Cir. 2008), in violation of the limits Congress placed on means-plus-function
     claims in section 112, paragraph 6. Because of the absence of the requisite

10       structure, we affirm the district court's indefiniteness ruling as to claims 21 and
     33 of the '551 patent and claim 13 of the '065 patent.

11

12  *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1315 (Fed. Cir. 2011).  The

13  result should be the same here.  *Id.* ("Without any disclosure as to the way Katz's invention con-

14  ditionally couples calls, the public is left to guess whether the claims cover only coupling based

15  on particular system conditions, such as the availability of an operator, or are broad enough to

16  cover any coupling in conjunction with an if-then statement in source code. Katz's claims there-

17  fore fail to fulfill the 'public notice function' of 35 U.S.C. § 112 ¶ 2 by 'particularly pointing out

18  and distinctly claiming' the invention.").

19  **CONCLUSION**

20       This is a classic case of indefiniteness.  Telebuyer's patents are "painstaking" when they

21  recite "what has already been seen," and then use "conveniently functional language at the exact

22  point of novelty" of the alleged invention.  *Halliburton*, 514 F.3d at 1250.  The hard work of true

23  invention demands much more.  But there is no more here.  The Court should adopt Amazon's

24  proposed constructions and prevent Telebuyer's aspirational, technologically anemic, and argotic

25  telephone patents from taxing the real technology used every day to power America's Internet

26  economy.

27

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF                - 35 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON 98101
TELEPHONE 206.389.4510
FACSIMILE  206.389.4511

1    September 23, 2014                      Respectfully submitted,

2                                           By:  *s/ Richard G. Frenkel*
                                                 Matthew J. Moore (*pro hac vice*)
3                                                matthew.moore@lw.com
                                                 LATHAM & WATKINS LLP
4                                                555 Eleventh Street, NW, Suite 1000
                                                 Washington, D.C.  20004-1304
5                                                Telephone:  (202) 637-2200
                                                 Facsimile:  (202) 637-2201

6

7

8                                                Douglas E. Lumish (*pro hac vice*)
                                                 doug.lumish@lw.com
9                                                Richard G. Frenkel (*pro hac vice*)
                                                 rick.frenkel@lw.com
10                                               Gabriel S. Gross (*pro hac vice*)
                                                 gabe.gross@lw.com
11                                               Patricia Young (*pro hac vice*)
                                                 patricia.young@lw.com
12                                               Eugene Chiu (*pro hac vice*)
                                                 eugene.chiu@lw.com
13                                               LATHAM & WATKINS LLP
                                                 140 Scott Drive
14                                               Menlo Park, California  94025-1008
15                                               Telephone: (650) 328-4600
                                                 Facsimile:  (650) 463-2600

16

17                                          By:  *s/ Brian D. Buckley*
18                                               Brian D. Buckley, WSBA No. 26423
                                                 Ewa M. Davison, WSBA No. 39524
19                                               1191 Second Avenue, 10th Floor
                                                 Seattle, Washington 98101
20                                               Phone:     (206) 389-4510
21                                               Fax:       (206) 389-4511
                                                 Email:     bbuckley@fenwick.com
22                                                          edavison@fenwick.com

23                                          Counsel for Defendants
24                                          AMAZON.COM, INC., AMAZON WEB
                                            SERVICES LLC, and VADATA, INC.

25

26

27

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF               - 36 -
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511

1

### CERTIFICATE OF SERVICE

2

I, Richard G. Frenkel, hereby certify that on September 23, 2014, I caused the foregoing
**AMAZON'S OPENING CLAIM CONSTRUCTION BRIEF** to be served on the following

3

parties as indicated below:

4

| | |
|---|---|
| 5 **Jeremy E. Roller** <br> **Diana S. Breaux** <br> YARMUTH WILSDON PLLC <br> 818 Stewart Street, Suite 1400 <br> Seattle, WA  98101 <br><br> *Attorneys for Plaintiff Telebuyer LLC* | [ ]  By United States Mail <br> [ ]  By Legal Messenger <br> **[X] By Electronic CM/ECF** <br> [ ]  By Overnight Express Mail <br> [ ]  By Facsimile <br> [ ]  By Email [by agreement of counsel] <br> jroller@yarmuth.com <br> dbreaux@yarmuth.com |
| **Brian M. Berliner** <br> **Mark Alan Samuels** <br> **Xin-Yi Zhou** <br> O'MELVENY & MYERS LLP <br> 400 S. Hope Street, Suite 1050 <br> Los Angeles, CA  90071-2899 <br><br> *Attorneys for Plaintiff Telebuyer LLC* | [ ]  By United States Mail <br> [ ]  By Legal Messenger <br> **[X] By Electronic CM/ECF** <br> [ ]  By Overnight Express Mail <br> [ ]  By Facsimile <br> [ ]  By Email [by agreement of counsel] <br> bberliner@omm.com <br> msamuels@omm.com <br> vzhou@omm.com |
| **Marc Pensabene** <br> O'MELVENY & MYERS LLP <br> Times Square Tower <br> 7 Times Square <br> New York, NY  10036 <br><br> *Attorneys for Plaintiff Telebuyer LLC* | [ ]  By United States Mail <br> [ ]  By Legal Messenger <br> **[X] By Electronic CM/ECF** <br> [ ]  By Overnight Express Mail <br> [ ]  By Facsimile <br> [ ]  By Email [by agreement of counsel] <br> mpensabene@omm.com |
| **Jonathan Crawford** <br> O'MELVENY & MYERS LLP <br> 2765 Sand Hill Road <br> Menlo Park, CA  94025 <br><br> *Attorneys for Plaintiff Telebuyer LLC* | [ ]  By United States Mail <br> [ ]  By Legal Messenger <br> **[X] By Electronic CM/ECF** <br> [ ]  By Overnight Express Mail <br> [ ]  By Facsimile <br> [ ]  By Email [by agreement of counsel] <br> jcrawford@omm.com |

25

26    September 23, 2014          By:  s/ Richard G. Frenkel

27                                              For Richard G. Frenkel
                                                 LATHAM & WATKINS LLP

AMAZON'S OPENING
CLAIM CONSTRUCTION BRIEF
Case No. 2:13-cv-01677-BJR

FENWICK & WEST LLP
1191 SECOND AVENUE, 10TH FLOOR
SEATTLE, WASHINGTON  98101
TELEPHONE  206.389.4510
FACSIMILE   206.389.4511