**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

**TELEBUYER, LLC,**

     **Plaintiff,**

  **v.**

**AMAZON.COM, INC., AMAZON WEB**
**SERVICES LLC, and VADATA, INC.,**

     **Defendants.**
_____

**AMAZON.COM, INC., AMAZON WEB**
**SERVICES LLC, and VADATA,**

     **Counterclaimants,**

  **v.**

**TELEBUYER, LLC,**

     **Counterclaim-**
     **Defendant.**

**Civil Action No. 2:13-cv-1677-BJR**

**ORDER GRANTING SUMMARY**
**JUDGMENT OF INVALIDITY**
**PURSUANT TO 35 U.S.C. § 101**

## I.  INTRODUCTION

Plaintiff and Counterclaim Defendant Telebuyer, LLC ("Telebuyer") alleges that

Defendants and Counterclaimants Amazon.com, Inc., Amazon Web Services LLC, and

VADATA, Inc. (collectively "Amazon") are infringing seven patents that generally relate to

electronic commerce. The seven patents are: U.S. Patent Nos. 6,323,894, 7,835,508,

7,839,984, 8,059,796, 8,098,272, and 8,315,364 (collectively, the "Asserted Patents").

Amazon moves this Court for summary judgment of invalidity on the ground that the Asserted

Patents are directed to ineligible subject matter under 35 U.S.C. § 101. The Court heard oral

1

argument on June 9, 2015. Upon consideration of the motion, the opposition thereto, and the entire record in this case, together with the relevant legal authority, the Court GRANTS summary judgment.

## II.      BACKGROUND

### A.      Procedural History

Telebuyer initiated this lawsuit against Amazon in the United States District Court for the Eastern District of Virginia. On September 12, 2013, the Eastern District of Virginia granted Amazon's motion to transfer venue to the Western District of Washington pursuant to 28 U.S.C. § 1404(a). The case was assigned to United States District Judge Richard A. Jones. Thereafter, Amazon filed its Answer and countersued, seeking a declaratory judgment of non-infringement and invalidity with respect to each of the Asserted Patents. The matter was reassigned to this United States District Judge on April 16, 2014. The parties filed a Joint Claim Construction and Prehearing Statement on July 28, 2014. On October 16, 2014, the Court instructed Telebuyer to limit the number of asserted claims from nearly 200 to 32.

The parties completed claim construction briefing in October, 2014. In the briefing, Amazon charged that the Asserted Patents are invalid as indefinite under 35 U.S.C. § 112. Thereafter, on December 17, 2014, the Court conducted a technology tutorial hearing directed to the disclosures in the Asserted Patents and the Amazon technologies that Telebuyer accuses of infringement. During this hearing, the parties agreed that the question of whether the Asserted Patents are indefinite under 35 U.S.C. § 112 is a threshold issue that is determinative of this case. Therefore, the Court stayed the claim construction proceedings pending a decision regarding indefiniteness. The Court also raised, *sua sponte*, the question of whether the Asserted Patents are invalid under 35 U.S.C. § 101 in light of the United States Supreme

Court's recent ruling in *Alice Corp. Pty. Ltd v. CLS Bank International* 134 S. Ct. 2347 (2014), and instructed the parties to file briefing on this issue. Amazon filed the instant motion for summary judgment on February 17, 2015, alleging that the Asserted Patents are invalid under both 35 U.S.C. § 101 (abstract idea) and § 112 (indefiniteness). The Court heard oral arguments on June 9, 2015. At the conclusion of the hearing, the parties agreed that it is not necessary for the Court to analyze each of the 32 claims; rather, Telebuyer would identify representative claims for the purpose of adjudicating the summary judgment motion. On June 11, 2015, Telebuyer identified four representative claims for the Court to review.

**B.      The Representative Claims**

Telebuyer identified the following four representative claims: U.S. Patent No. 6,323,894, claim 185; U.S. Patent No. 7,835,509, claim 74; U.S. Patent No. 8,059,796, claim 24; and U.S. Patent No. 8,315,364, claim 55. These claims recite the following:

Patent '894, claim 185:

A method enabling on-line and off-line communications including video communication, between at least two parties from different buyer-vendor groups, located at remote terminals with communication capability, for example personal computers, through a public communication system, the communications directed and exchanged under control of a central data system that facilitates interactive data sharing by the parties, comprising the steps of:

interfacing at least a requesting one of the parties from a first group, at a remote terminal, with the central data system, for on-line communication through said public communication system wherein said party uses said remote terminal to request data from the central data system;

receiving data from the requesting party to indicate an area of interest and other data to facilitate further electronic communication;

storing at least a part of the data received from the requesting party indicative of an area of interest at the central data system;

selectively providing select data relating to the area of interest from the central data system, the select data including stored video data obtained from a video storage device associated with the central data system, the video storage device having a plurality of different video images relating to different areas of interest obtained from parties of a second group, the select data obtained from the video storage device and comprising either high resolution freeze frame data or dynamic

data or both and a graphic including text display of pertinent information relating to the area of interest;

transmitting from the central data system to the requesting party a notification soliciting further viewing of video and text data embodied in sales presentations relating to the select area of interest; and

subsequently interfacing the requesting party to the central data system for further viewing of select video sales presentations.

Patent '509, claim 74:

A method for directing and exchanging on-line communications under control of one or more multiple coordinated central control stations to accomplish transactions that relate to merchandise or a service available for purchase, the method involving selective interfacing of buyers at a plurality of remote locations using personal computers with video capability, the one or more multiple coordinated central control stations in communication with one or more vendors with a capability to electronically communicate, under control of the one or more central control stations, through a public communication system, the one or more of multiple coordinated one or more central control stations located at one or more plural sites, the method comprising the steps of:

interfacing at least certain buyers with the one or more multiple coordinated central control stations to communicate with one or more widely distributed vendors;

receiving request data from the buyers at the at least one or more multiple coordinated central control stations, the request data entered by the buyers to indicate an area of interest on a particular merchandise or service;

receiving identification data provided by buyers from the remote locations via the one or more central control stations;

storing at least a part of the request data from at least one buyer at the one or more multiple coordinated central control stations and using at least a part of the request data to selectively obtain proposed data from the vendors responsive to the buyers' request data, the one or more multiple coordinated central control stations providing the proposed data from the vendors to the buyers in accordance with stored priority designations previously accorded to at least certain of the vendors under control of the one or more multiple coordinated central control stations;

providing access by the buyers under control of the one or more multiple coordinated central control stations to a video memory for providing stored video including one or more dynamic or high resolution still video images as part of the proposed data relating to the area of interest indicated by the buyers, the video images previously obtained from a source relating to one or more vendors and stored for subsequent viewing by interested buyers; and

facilitating manipulation by the buyers of the stored video whereby the buyers can use a mouse associated with the personal computers to change the video images or highlight select areas with a cursor controlled by the mouse.

4

Patent '796, claim 24:

A process of control involving a plurality of terminals for prospective buyers, the terminals having video display capability, and a plurality of vendors associated with one or more different merchandise or services, wherein the buyer terminals communicate with a central site offering the one or more different merchandise or services or both associated with the plurality of vendors, and further involving a communication network accessible to members of the public, the process of control for the possible consummation of transactions, and comprising the steps of:

storing at least video data and other information relating to the different merchandise or services or both for vendors wherein the merchandise or services or both relate to areas of interest;

receiving buyer data including data relating to an area of interest along with identification data from a prospective buyer terminal, wherein said buyer identification data comprises a preregistered buyer identification number or identification data;

utilizing at least certain of the buyer data to determine an appropriate vendor with related video data and selectively providing and communicating via the communication system the video data and other information relating to merchandise or services or both from stored video data and other information for display at the prospective buyer terminal responsive to merchandise or service data or both received from the prospective buyer terminal;

enabling control of said video data at the prospective buyer terminal; and

receiving and storing data relating to communication of a transaction between the appropriate vendor via the central site and the prospective buyer terminal.

Patent '364, claim 55:[1]

A process for directing and exchanging data communications in real-time under control of one or more multiple coordinated central control units to accomplish transactions relating to merchandise or services available for purchase, the process involving interfacing under control of the one or more multiple coordinated central control units, one or more buyers at a plurality of remote locations using remote video terminals including personal computers with video capability, the one or more multiple coordinated central control units in communication with one or more vendors and having a capability to electronically communicate through a public communication system, the process comprising the steps of:

interfacing one or more buyers with the one or more multiple coordinated central control units for electronic communication;

receiving identification data from at least one buyer, the identification data qualifying the at least one buyer for select communications with the one or more multiple coordinated central control units;

---

[1] Claim 55 is a dependent claim of claim 51 (which is not asserted), which in turn depends on claim 47.  As set forth here, claim 55 is a form that incorporates the claims in its dependency chain.

receiving request data from one or more buyers, the request data indicating an
area of interest relating to merchandise or services available for purchase;

storing at least part of the request data; interfacing one or more buyers to a video
memory under control of the one or more multiple coordinated central control
units, the video memory storing one or more high resolution video images and
text data relating to merchandise or services available for purchase from the one
or more vendors;

facilitating access to proposed data from the video memory, the proposed data
including video images and text data responsive to the request data for viewing by
a buyer;

storing ratings data relating to the one or more vendors;

storing data relating to one or more transactions initiated by one or more buyers;
and

transmitting to at least one buyer a message including data relating to a
transaction initiated by the at least one buyer after an interface between the at
least one buyer and the one or more multiple coordinated central control units is
terminated, the data including a number identifying the transaction.

… further comprising the step of: notifying one or more buyers regarding a new
merchandise or service offering from a vendor.

… further comprising obtaining buyer reaction data regarding the new
merchandise or service offering.

## C.   The Parties' Arguments

Telebuyer applied for Asserted Patent '894 in 1994; the remaining Patents were filed
with the Patent Office between 2000 and 2003. Each Patent generally relates to electronic
commerce, that is, commercial transactions conducted electronically on the Internet. The
Patents center around a traffic control system[2] that, according to Telebuyer, provides "e-
commerce buyers with the most relevant product information and enable[s] e-commerce
vendors to target those buyers most likely to be interested in their products." Dkt. No. 204 at
5; Dkt. No. 1 at ¶ 19.  Telebuyer asserts that in the early 1990s, merchants had begun
experimenting with different forms of electronic communication to facilitate commerce and,
by the early 2000s, when Telebuyer applied for the Asserted Patents, several technological

---

[2] The representative claims refer to the traffic control system as "the central data system," "central control stations,"
"central control units," and/or "central site."

6

problems had emerged in the e-commerce industry. Telebuyer claims that the conventional approach for presenting information, adopted by the e-commerce systems at the time, was to provide a set of catalog menus and allow buyers to find their own way through a maze of available vendors and products. According to Telebuyer, this approach resulted in "information overload," was cumbersome and inefficient, and provided limited, if any, ability to filter through available data or to compare products from multiple vendors.

Telebuyer asserts that its traffic control system solved these specific technological problems by accessing not only data about the products offered for sale, but also other information, such as buyers' interactions and areas of interest. Further, rather than requiring the buyer to sort through massive volumes of product data, Telebuyer's traffic control system uses various types of stored data to provide e-commerce buyers with the most relevant product information and enable e-commerce vendors to target those buyers most likely to be interested in their products.

Telebuyer also alleges that its patents employ advanced video capabilities that, in combination with the other claim elements, addressed the shortcomings of then-existing e-commerce systems and allowed buyers to conduct a more meaningful examination and comparison of products than would otherwise have been possible. Telebuyer claims that Amazon, by offering goods and services to customers through Amazon's websites, uses systems and/or methods that directly infringe the Asserted Patents.

Amazon counters that the Asserted Patents are invalid under 35 U.S.C. § 101 because they are drawn to patent-ineligible subject matter—namely, the abstract idea of connecting buyers and sellers through the use of generic computers—and they contain no inventive concept. Amazon asserts that the Asserted Patents simply describe an alleged problem—information overload in e-commerce—announce purely generic steps that purport to solve that

7

problem, and recite already in existence and well-known computer operations to perform the steps. According to Amazon, all of the generic computer components (*e.g.*, personal computers, storage memory, video memory, remote terminals, processors, and public communication systems) and all of computer functions (*e.g.*, receiving, storing, transmitting, and processing data and video images) described by the Asserted Patents already existed and were well-known at the time the patents were issued. Thus, the Patents do not provide any inventive concept, much less something "significantly more" that is required to satisfy Section 101.

The Court agrees with Amazon and, for the reasons discussed below, the Court concludes that the Asserted Patents are invalid.[3]

### III.    LEGAL STANDARDS

#### A.    Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Patent eligibility under 35 U.S.C. § 101 is an issue of law. *Intellectual Ventures I LLC v. Capital One Bank*, 2015 WL 4068798, *2 (Fed. Cir. July 6,

---

[3] Whether a claim is directed to patent-ineligible subject matter under 35 U.S.C. § 101 is a threshold issue. *CLS Bank Int'l v. Alice Corp. Pty. Ltd*., 717 F.3d 1269, 1277 (Fed. Cir. 2013), *aff'd, Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, ___ U.S. ___ , 134 S. Ct. 2347 (2014).  Because this Court finds that these patents are not valid under Section 101, it will not address Amazon's Section 112 arguments.

2015); see also, *Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012).

   **B.     35 U.S.C. § 101**

   Section 101 of the Patent Act defines patent-eligible subject matter. It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has recognized an implicit exception for three categories of subject matter not eligible for patentability—laws of nature, natural phenomena, and abstract ideas. *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). The purpose of these carve outs is to protect the "basic tools of scientific and technological work." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012). Indeed, the Supreme Court has "repeatedly emphasized … that patent law [should] not inhibit further discovery by improperly tying up the future use of laws of nature." *Id.* at 1301. The concepts covered by these carve outs are "part of the storehouse of knowledge of all men … free to all men and reserved exclusively to none." *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948).

   In *Alice*, the Supreme Court reaffirmed the framework laid out in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012) "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." 134 S. Ct. at 2355. First, the court must determine whether the claims are drawn to patent-ineligible subject matter. *Id*. If the answer is yes, the court must look to "the elements of the claim both individually and as an 'ordered combination'" to see if there is an "'inventive concept'—*i.e.*, an element or combination of

9

elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Tuxis Technologies, LLC v. Amazon.com, Inc.*, 2015 WL 1387815, *2 (D. Del. March 25, 2015) (quoting *Alice*, 134 S. Ct. at 2355) (alteration in original). "A claim that recites an abstract idea must include 'additional features' to ensure that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]." *Alice*, 134 S. Ct. at 2357 (internal quotation marks omitted). Further, "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment." *Id*. at 2358 (quoting *Bilski v. Kappos*, 561 U.S. 593, 610 (2010) (internal quotation marks omitted)). For instance, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id*.

## IV.    DISCUSSION

### A.    Recent Decisions Construing *Alice*

To determine the application of *Alice* and its jurisprudence to the representative claims in this case, it is useful to examine the decisions that have construed similar patent claims under Section 101 since *Alice*. The Federal Circuit has applied the guidance from *Alice* in a number of recent cases. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) involved a patent on a method for distributing copyrighted media over the Internet. The claimed method provided that a consumer would receive copyrighted content for free, in exchange for viewing an advertisement, and the advertiser would pay for the copyrighted content. The Federal Circuit had previously held that the claims in *Ultramercial* were patent-eligible; however, in its most recent opinion, issued after the Supreme Court remanded the case for reconsideration in light of *Alice*, the Federal Circuit held that the claims were invalid

under Section 101. The Court first held that the recited method was directed to an abstract idea that was: "receiving copyrighted media, selecting an ad, offering the media in exchange for watching the selected ad, displaying the ad, allowing the consumer access to the media, and receiving payment from the sponsor[.]" 772 F.3d at 715. Turning to the second step in the *Alice* framework, the Court found that the limitations in the patent did not transform the abstract idea into patent-eligible subject matter. *Id*. Important to the instant case, the Court specifically found that the limitations relating to the addition of a "general purpose computer" and the Internet to otherwise conventional steps were not sufficient to make an invention patent-eligible. *Id*. at 716.

In another instructive decision, the Federal Circuit addressed the application of Section 101 in a case involving a patent on a computerized business method. That case, *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343 (Fed. Cir. 2014), involved patents on a method to extract data from documents using a scanner, to recognize specific information from the extracted information, and to store that information. The Court held that the claims were directed to the abstract idea of data collection, recognition, and storage, all of which, the Court noted, are well-known. For the second step, the Court found that the claims merely recited the use of existing, well-known technology to recognize and store data. Significantly, the Court determined that there was nothing inventive about the claim's "use of a generic scanner and computer to perform well-understood, routine and conventional activities." 776 F.3d at 1348.

In *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014), another post-*Alice* case, the Federal Circuit once again held that a computer-implemented invention was invalid under Section 101. The claims in *buySAFE* recited a method by which the provider of a safe

transaction service would receive a request for a performance guarantee of an online commercial transaction, and a computer would process the request by underwriting the requesting party and offering a transaction guaranty that would be binding upon the closing of the transaction. The Federal Circuit noted that the claims before it were "squarely about creating a contractual relationship—a 'transaction performance guaranty'—that is beyond question of ancient lineage." *Id*. at 1355. As such, the Court held, the claims were plainly directed to an abstract idea.

Turning to step two, the Court stated that it was not enough that the claim limited the abstract idea "to a particular technological environment." *Id*. at 1354–55. Nor was the Court persuaded by the invocation of computers because the recited computer functionality was "quite generic." *Id*. The Court further stated that it "cannot be enough that the transactions being guaranteed are themselves online transactions." *Id*. at 1355. At best, the Court explained, that limitation is "an 'attempt to limit the use of the abstract guarantee idea to a particular technological environment,' which has long been held insufficient to save a claim" under Section 101. *Id*.

District courts in the Eastern District of Texas and Delaware have issued similar holdings under the *Alice* framework. In *Loyalty Conversion Systems Corporation v. American Airlines, Inc*., 66 F. Supp. 3d 829 (E.D. Texas Sept. 3, 2014), the district court deemed invalid patents that were directed to a system by which non-negotiable credits earned in an awards program (*i.e.* frequent flyer miles) could be converted into credits that could be used to purchase goods from a vendor other than the issuing entity. The district court determined that the patents boiled down to a "very simple invention: a computer-driven method and computer program for converting one vendor's loyalty award credits into loyalty award credits of

another vendor." *Id*. at 835. As such, the court concluded that the patents were "not

fundamentally different from the kinds of commonplace financial transactions that were the

subjects of [*Bilski* and *Alice*]." *Id*.

Trying to save its patents under step two of the *Alice* framework, Loyalty argued that

the patents contained an "inventive concept" that amounted to "significantly more" than the

abstract idea of converting loyalty award credits. To wit, Loyalty pointed out that the patents

contained "a computerized method and system for doing the task efficiently." *Id*. at 837. The

district court was not persuaded, noting instead that the role of the computer in the claims was

limited to the basic functions of a generic computer: including storing and displaying

information, performing simple arithmetic calculations, and enabling a customer to make e-

commerce purchases from a vendor. *Id*. at 841. The court noted that nothing in the claims

purported to improve the functioning of the computer itself, and the computer components of

the claims added nothing that was not already present in the steps of the claimed methods,

other than the speed and convenience of basic computer functions. *Id*. The district court

concluded:

> In short, [these] patents although [] dressed up in the argot of invention, simply
> describe a problem, announce purely functional steps that purport to solve the
> problem, and recite standard computer operations to perform some of those steps.
> The principal flaw in these patents is that they do not contain an 'inventive
> concept' that solves practical problems and ensures that the patent is directed to
> something 'significantly more than' the ineligible abstract idea itself. As such,
> they represent little more than functional descriptions of objectives, rather than
> inventive solutions.

*Id*. at 845.

Finally, in *Tuxis Technologies, LLC v. Amazon.com, Inc*., 2015 WL 1387815 (D.

Delaware March 25, 2015), the district court ruled that the patents were directed to the abstract

idea of a seller inducing a buyer to purchase more expensive items or other add-ons in order to

13

make a more profitable sale, in other words, upselling. The patentee had argued that the patents were not directed to just the abstract idea of upselling, but instead, to "particular ways to implement upselling in connection with…remote electronic commerce." *Id*. at *2. The district court disagreed, finding that the fact that the upselling occurs "remotely and/or over the Internet does not make the claimed subject matter non-abstract." *Id*.

As to whether the claims contained an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application, Tuxis argued that the claims included a method for ensuring that the seller is "not offering for upsell an item determined to already be possessed by the user." *Id*. at *3. Tuxis argued that "upselling techniques are generally concerned with suggesting an additional good or service the customer might be interested in— they are not typically concerned with excluding potential goods or services from the customer." *Id*. According to Tuxis, this "negative rules" application was the inventive concept that sufficiently grounded the abstract idea of upselling. The district court was not persuaded, stating that "the fundamental premise behind upselling is determining what a customer wants or needs based on information learned about that customer…Salespersons [] have always been able to keep written or mental notes about a customer's purchase history, including the customer's likes and dislikes. This practice allows the salesperson to avoid offering items that the customer has already purchased or has declined to purchase in the past." *Id*. at *3.

Next, Tuxis argued that the patent claims required establishing communication via the Internet between the user's computer and Tuxis' system, which "meaningfully limits the claim because it excludes in-person sales techniques." *Id*. at *4. Again, the district court was not persuaded by Tuxis' argument, stating that "[c]ommunication is a 'routine [and] conventional

14

use of the Internet,' which does not transform the abstract idea of upselling into patent-eligible subject matter." *Id*.

Lastly, Tuxis argued that "there is no evidence that Internet upselling techniques involving pictures…were known in the prior art," and therefore, the use of pictures via the Internet is an inventive concept. *Id*. at *4. Once again, Tuxis' argument was rejected. The district court stated "[t]here is no meaningful difference [] between showing a customer a picture of an item and showing the customer the actual item itself. Further, displaying an image over the Internet is a basic computer function that 'add[s] nothing of practical significance' to the abstract idea of upselling." *Id*. (quoting *Ultramercial*, 772 F.3d at 716).

**B.      Whether the Representative Claims Are Directed to an Abstract Idea**

As discussed above, under the two-step *Alice* framework, this Court must first determine whether Telebuyer's representative claims are directed to patent-ineligible subject matter. *Alice*, 134 S.Ct. at 2355. Amazon contends that the claims are directed to the abstract idea of facilitating commerce by connecting buyers and sellers through the use of generic computers. Telebuyer argues that the asserted claims are not simply directed to the abstract idea of connecting buyers and sellers, but rather, the claims are directed to a "groundbreaking" traffic control system that solved the "technological problems" that had emerged with the development of e-commerce, specifically information-overload, the cumbersome and inefficient way in which information was provided to the consumer, and the consumer's inability to compare products from multiple vendors. Telebuyer argues that the traffic control system solved these problems by, among other functions, using stored data, including videos from a video storage device, to provide information that may be of interest to the buyer. In short, Telebuyer

15

argues that the asserted claims are "an e-commerce innovation—a new way of facilitating transactions with the use of centralized computers, video storage devices, and databases." *Id*. at 12.

Telebuyer's arguments are not persuasive. Applying *Alice* and its jurisprudence to the representative claims, it is clear that each of the claims is directed to the abstract idea of connecting buyers and sellers. For instance, claim 185 of Patent '894 and claim 74 of Patent '509 describe "[a] method for directing and exchanging on-line communications…to accomplish transactions that relate to merchandise or a service available for purchase" by: (1) interfacing buyers with a central data system(s)[4]; (2) receiving data from buyers who are connected with the central data system(s) to indicate area(s) of interest; (3) receiving identifying data from buyers; (4) storing the data indicating area(s) of interest in a central data system; (5) providing select data (in the form of graphics and video images) relating to the indicated area of interest; (6) facilitating  manipulation of the video image by the buyer through the use of a mouse; (7) transmitting to the requesting party a solicitation to view more product information; and (8) interfacing the requesting party with the central data system to view more product information.[5]

These claims describe nothing more than what buyers and sellers have done since the dawn of commerce—the only difference is that Telebuyer suggests the application of generalized computer function and technology in the transaction. Stated without the limitation of  generalized technology, claims 74 and 185 simply list the well-known, everyday tasks of completing a sales transaction: (1) a buyer is drawn to a market by a sign advertising the market; (2) a vendor asks the buyer what kind of product he is interested in purchasing; (3) the vendor asks the buyer his name; (4) the vendor makes notes of the buyer's name and

---

[4] Claim 74 of Patent '509 refers to the central data system as "coordinated central control stations."
[5] Claim 185 of Patent '894 also enables off-line communications.

16

preferences; (5) based on what the buyer has told him, the vendor points to the portion of his booth that contains the product the buyer is interested in; (6) the buyer picks up the product and examines it more closely; (7) the buyer asks to see more of the vendor's products; and (6) the vendor brings out more products to show the buyer.[6]

Telebuyer attempts to recast its asserted claims more narrowly as having solved an information overload problem by making product recommendations to buyers based on areas of interest. This does not make the patents any less abstract. Providing better information about supply (sellers and products) to demand (buyers), and vice versa, has always been a way to reduce information overload. The fact that purchaser choice has become more difficult because more information is available does not change the nature of the problem. It may be more complex, but it is still an abstract idea. It is a matter of degree not kind. Simply put, the idea of connecting informed buyers and sellers is not different from the fundamental economic concepts found to be abstract ideas by the Supreme Court in *Alice* and by the Federal Circuit in applying *Alice*.

## C.   Innovative Concept

As discussed above, claims that are directed to an abstract idea may still be patentable if the claims contain an "innovative concept" sufficient to "transform the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357. Therefore, the Court must next consider the elements of the claims—both individually and as an ordered combination—to

---

[6] Telebuyer's two remaining representative claims are process claims that describe the same type of consumer transactions described in claim 74 of Patent '509 and claim 185 of Patent '894. Claim 55 of Patent '364 does add the element of allowing a buyer to rate a seller and/or a transaction. But, again, such an element is commonplace within sales transactions. In the example listed above, the buyer could tell his neighbor about his experience, positive or negative, at the market.

assess whether the elements transform the nature of the claims into a patent-eligible inventive concept. *Content Extraction,* 776 F.3d at 1347.

Telebuyer argues that its "groundbreaking" traffic control system is the "innovative concept" that "transform[s] the claimed abstract idea into a patent-eligible application."  As discussed above, Telebuyer claims that the traffic control system solved the then existing problem of "information overload" in e-commerce by: (1) employing a data-driven approach for identifying buyer interest, and (2) capitalizing on advanced video capabilities that allow buyers to view and compare products. Dkt. No. 204 at 18; s*ee*, *e.g.*, '894 Patent, claims 34, 185.

The problem with Telebuyer's proffer is that although Telebuyer describes its traffic control system as "revolutionary," all aspects of the system (*i.e.*, the utilization of data-driven and video technologies) were conventional and well-known characteristics of generic computers at the time that the Asserted Patents were issued. Whether or not applied in exactly the same method or medium as the Asserted Patents describe, the technology already existed. Like the patents in *Ultermercial*, *buySAFE*, and *Loyalty*, far from being revolutionary, the Asserted Patents actually contribute nothing new: no new hardware, programming, system logic, or algorithms. Instead, the claims describe nothing more than employing the basic features of generic computers and applying them to the abstract idea of facilitating commerce. For instance, Patent '894, claim 185 states:

> A method enabling on-line and off-line communications including video communication, between at least two parties from different buyer-vendor groups, located at *remote terminals* with communication capability, for example *personal computers*, through a *public communication system*, the communications directed and exchanged under control of a *central data system* that *facilitates interactive data sharing* by the parties, comprising the steps of: *interfacing [a party] …to request data* from the central data system; *receiving data* from [the party]…; *storing at least part of the data*…; selectively *providing select data*…including

18

> *stored video data* obtained from *a video storage device*…; *transmitting* from the central data system to the requesting party a notification soliciting further *viewing of video and text data*; and …*interfacing* the requested party to the central data system.

Patent '894, claim 185 (emphasis added). Each of the recited steps does no more than require a generic (*i.e.* personal) computer to perform basic computer functions (*i.e.* requesting, receiving and storing data, and transmitting, storing, and displaying video). Using such generic, well-understood, and routine computing devices for their generic, well-understood, and routine computing functions does not add inventive weight to Telebuyer's claims. As the Supreme Court explained in *Alice*, "the mere recitation of a generic computer" performing basic functions "cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id*. at 2358. Put another way, "[s]tating an abstract idea while adding the words 'apply it with a computer'" is not enough to transform the abstract idea into patentable subject matter. *Id*.; *see also Bancorp*, 687 F.3d at 1278 (citation omitted) ( the "use of a computer in an otherwise patent-ineligible process for no more than its most basic function—making calculations or computations—fails to circumvent the prohibition against patenting abstract ideas and mental processes"); *DDR*, 773 F.3d at 1257, 1259 (noting that there is nothing inventive about "merely recit[ing] the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet."); *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010) ("In order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious

mechanism for permitting a solution to be achieved more quickly, *i.e.*, through the utilization of a computer for performing calculations.")[7]

Here, Telebuyer claims to have come up with the "groundbreaking" idea of using a traffic control system to make transactions in e-commerce more efficient. Yet, the representative claims fail to disclose anything new. The claims simply take existing, well-known technologies and suggest that the technologies can be linked and utilized for their basic functions in order to facilitate commerce. This does not constitute invention within the meaning of Section 101. *See Alice*, at 2359 (rejecting method claims because they did not effect an improvement in any technology or technical field). Indeed, the representative claims are devoid of *any* specialized hardware, programming, system logic, or algorithms that would allow Telebuyer's traffic control system to actually function. While Telebuyer describes the use of a data-driven traffic control system in e-commerce, it left to others the task of creating—*i.e.*, inventing—the necessary algorithms and other specialized programming to achieve that system.

The fact that claims need "something more" than the simple implementation of an abstract idea on a generic computer is demonstrated in *DDR Holdings, LLC v. Altec Indus., Inc.*, 773 F.3d 1245 (Fed. Cir. 2014). *DDR Holding* is the only case that has construed the *Alice* jurisprudence in favor of the patentee and its holding is illustrative. The claims in *DDR Holdings* recited systems used to enable host websites to avoid losing visitors when those visitors click on an advertisement on the host site. The Federal Circuit held that the patents

---

[7] The Court notes that the patents in these cases were either filed prior to the application date for Telebuyer's Asserted Patents or were filed around the same time as the Asserted Patents. For instance, the application for US Patent No. 5,970,479, one of the patents in dispute in *Alice*, was filed on May 28, 1993, and US Patent No. 5,926,792, one of the patents in dispute in *Bancorp*, was filed on September 18, 1998. The patents at stake in *SiRF Tech* were filed between 2000 and 2003.

were not invalid under Section 101. In doing so, the Court distinguished the claims before it from the claims in *Ultramercial*, *buySafe*, and *Bancorp* on several grounds. First, it noted that the claims did not embody a fundamental economic principle. Rather, the Court found, the challenge of retaining website visitors is one "particular to the Internet." *Id*. at 1257. Second, the Court observed that the claimed solution does not simply use computers to serve a conventional business purpose; instead, it "is necessarily rooted in computer technology in order to overcome a problem specially arising in the realm of computer networks." *Id*. The Court noted that the claims did not "broadly and generically claim 'use of the Internet' to perform an abstract business practice," but specified "how interactions with the Internet are manipulated to yield a desired result." *Id*. at 1258. Lastly, the Court observed that the claims included a special way to automate the creation of a composite web page. "In other words, the patent required doing something *to* a web page, not simply doing something *on* a web page, a difference that the [Federal Circuit] regarded as highly important to the issue of patent eligibility." *Kroy Holdings, LLC v. Safeway, Inc.*, 2015 WL 3452469, *10 (E.D. Texas May 29, 2015) (emphasis in original).

Telebuyer argues that *DDR Holdings* actually supports its position because just as the claims in *DDR Holdings* solved a problem that is unique to the Internet, its traffic control system solves the problem of "information overload"—a problem, Telebuyer argues, that is unique to e-commerce. The two are not similar. The problem of information overload is no different than gathering and comparing product information, which is as old as human commerce itself. Making this process faster and more efficient through the use of the storage and processing capacities of computers does not add any new and creative element to the process.

21

## IV.    CONCLUSION

In applying the two-step framework outlined in *Alice*, the Court finds that each of the representative claims is directed to patent-ineligible subject matter. The claims are directed to the abstract idea of facilitating commerce by connecting informed buyers and sellers—a fundamental economic principle that can be traced to society's transition from feudalism to the earliest forms of capitalism. While limitations narrow the scope of the representative claims, these limitations do not amount to an "inventive concept" but, rather recite generic computer components for their conventional functions. Therefore, each of the asserted claims is invalid under Section 101. Amazon's Motion for Summary Judgment is HEREBY GRANTED with respect to all of the asserted claims of the Asserted Patents.

Dated 23rd day of July, 2015.

Barbara Jacobs Rothstein
U.S. District Court Judge